UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,    ) Docket No. 06-cr-10029
                             )
        Plaintiff,           )
vs.                          )   Peoria, Illinois
                             )   May 24, 2007
LARRY J. CAFFIE,             )
                             )
        Defendant.           )
_____)

RECORD OF PROCEEDINGS
BENCH TRIAL
VOLUME I
BEFORE THE HONORABLE JOE BILLY MCDADE
UNITED STATES DISTRICT JUDGE

THE APPEARANCES

JOHN CAMPBELL, ESQ.
BRADLEY MURPHY, ESQ.
Assistant U.S. Attorney
One Technology Plaza, Suite 400
211 Fulton Street
Peoria, IL  61602
On behalf of the Plaintiff

JERRY A. SERRITELLA, ESQ.
411 Hamilton Blvd., 1600
Peoria, IL  61602
On behalf of the Defendant

Nancy Mersot, CSR, RPR
United States District Court Reporter
100 N.E. Monroe Street
Peoria, IL  61602

Proceedings recorded by mechanical stenography,
transcript produced by computer-aided transcription.

INDEX

| GOVERNMENT'S WITNESSES: | Page |
|---|---|
| TODD WALCOTT | |
| Direct Examination | 3 |
| Cross-Examination | 30 |
| DARREN WOLTERS | |
| Direct Examination | 38 |
| BRETT FOWLER | |
| Direct Examination | 49 |
| Cross-Examination | 107 |
| Redirect Examination | 124 |
| Recross-Examination | 135 |
| Further Redirect Examination | 137 |
| Further Recross-Examination | 137 |
| MICHAEL GRAY | |
| Direct Examination | 140 |
| Cross-Examination | 205 |
| Redirect Examination | 217 |
| Recross-Examination | 223 |
| Further Redirect Examination | 232 |
| KENNETH BAYS | |
| Direct Examination | 234 |

```
 1              (Proceedings were held in open court.)
 2              MR. MURPHY:  Detective Todd Walcott, Your
 3    Honor.
 4                        TODD WALCOTT,
 5    after having been duly sworn, testified as follows:
 6                     DIRECT EXAMINATION
 7    BY MR. MURPHY:
 8    Q.   Sir, will you please state your name and spell
 9    your last name for us.
10    A.   Todd Walcott, W-a-l-c-o-t-t.
11    Q.   What is your business or position, sir?
12    A.   I am a detective with the City of Bloomington
13    Police Department.
14    Q.   How long have you been with the City of
15    Bloomington?
16    A.   Vice narcotics unit.
17    Q.   How long with the City of Bloomington Police
18    Department?
19    A.   Seven and a half years.
20    Q.   What is your current assignment, please?
21    A.   Vice narcotic unit.
22    Q.   Tell us on a day-to-day basis the nature of your
23    duties.
24    A.   Investigate general narcotics cases or long term
25    cases.
```

1  Q.   Okay.  If I could please, I would like to direct
2  your attention now to March 21st of 2006 and ask you
3  if you in the afternoon hours of that day if you
4  were on duty?
5  A.   Yes, I was.
6  Q.   And were you part of a group of individuals from
7  vice and narcotics that were investigating a
8  individual that you now know is Larry Caffie?
9  A.   Yes.
10  Q.   And ultimately about a week later on June 28th
11  of 2006, did you, sir, personally arrest Larry
12  Caffie?
13  A.   Yes, I did.
14  Q.   And is the Larry Caffie that you arrested on
15  that date present in court here today?
16  A.   Yes, he is.
17  Q.   Will you point directly at him?
18  A.   It is the gentleman in the green jump suit with
19  a white long-john top underneath.
20         MR. MURPHY:  Will the record reflect that he
21  has pointed to the defendant?
22         THE COURT:  The record will reflect.
23  BY MR. MURPHY:
24  Q.   Detective Walcott, what I would like to do is go
25  back to March 31st with that day, did you attend a

1  surveillance briefing that was held at about 4:30 in

2  the afternoon that day?

3  A.   Yes, I did.

4  Q.   What was your assignment that day, sir?

5  A.   Static surveillance in the Franzetti's lot.

6  Q.   And in addition to just being a surveillance

7  officer, did you have some other special duty that

8  was assigned?

9  A.   Yes.

10  Q.   What was that?

11  A.   I was to videotape any activity at that

12  location.

13  Q.   In fact that afternoon did you -- some time

14  shortly before 5:00, did you set up and did you in

15  fact videotape at that location?

16  A.   Yes, I did.

17  Q.   I have -- or you have produced and I have asked

18  you to review Government's Exhibit Number 2 which is

19  a DVD, correct?

20  A.   Yes.

21  Q.   And you have reviewed that DVD?

22  A.   Yes.

23  Q.   And you -- does it contain scenes that you

24  videotaped on March 21st, 2006?

25  A.   Yes, it does.

1  Q.   Did it truly and accurately show certain of the

2  scenes that you were able to see that afternoon?

3  A.   Yes.

4  Q.   And does it show the area of the Franzetti's

5  business?

6  A.   Yes, it does.

7  Q.   Before we show the video, I want to walk through

8  your surveillance activities that day, if I could

9  please.  And I would like to direct your attention

10  also to Government's Exhibit -- I believe it's --

11  15-A, let me double check that.  That is the diagram

12  here, 15-A, and will you tell us, first of all, what

13  is 15-A?

14  A.   It's an overhead view of the area of Washington

15  and Clinton and several other streets.

16  Q.   Could you use the pointer that I just gave to

17  you and show to the Court and counsel here which is

18  Washington Street that you're talking about?

19  A.   This is Washington Street here, this east/west

20  street.

21  Q.   Which one is Clinton Street?

22  A.   The north/south one right there.

23  Q.   They are both clearly marked on the diagram?

24  A.   Yes.

25  Q.   And we have been talking about a business named

1   Franzetti's.  Where is that located on the diagram?

2   A.   It is this building right here.

3   Q.   Okay.  And --

4        THE COURT:  What's the name of that

5   business?

6        THE WITNESS:  Franzetti's Pantry.

7        THE COURT:  How do you spell it?

8        THE WITNESS:  F-r-a-n-z-e-t-t-i, I'm not

9   sure.

10  BY MR. MURPHY:

11  Q.   It's a convenience type store, correct?

12  A.   Correct.

13  Q.   And there is a large parking lot right next to

14  it?

15  A.   Yes.

16  Q.   And it would be -- the parking lot area would be

17  at the corner of Washington and Clinton?

18  A.   Yes.

19  Q.   As you traveled north up Clinton from

20  Franzetti's, what is located next up the street?

21  A.   There is an old building that used to be

22  Mr. Quick's.  It is no longer there.  It was

23  demolished several years ago, and then there is a

24  car wash over here.

25  Q.   What you're telling us is this picture must have

1  been taken before the Mr. Quick's was demolished?

2  A.   Yes.

3  Q.   Point to that building again.

4  A.   Yes.

5  Q.   It was, on March 21st, that building right there

6  actually wasn't there at all, it was just a parking

7  lot?

8  A.   Yes.

9  Q.   And then where is the car wash area that you

10  told us about?

11  A.   Right here.

12  Q.   It would be straight north up on Clinton,

13  correct?

14  A.   Yes.

15  Q.   Okay.  Tell us please now, where you set up in

16  your surveillance location?

17  A.   I set up in the Franzetti's parking lot right in

18  one of these slots right here.

19  Q.   Then you would have been out on Washington

20  Street, one of the parking slots right there?

21  A.   Yes.

22  Q.   And were you shooting with this videotape that

23  you had that afternoon, were you shooting back

24  southbound back to the Franzetti's business?

25  A.   Yes.

 1          THE COURT:  Excuse me, now is north -- which

 2  way is north on?

 3          THE WITNESS:  This way, sir.

 4          THE COURT:  Going that way.  Okay.  And you

 5  were in the Franzetti's parking lot?

 6          THE WITNESS:  Yes, right in the spots right

 7  there.

 8          THE COURT:  Facing north?

 9          THE WITNESS:  I was facing north.

10          THE COURT:  Okay.

11  BY MR. MURPHY:

12  Q.  At approximately 5:30 that afternoon, did you

13  have occasion to see a maroon Buick pulling into the

14  Franzetti's parking lot area?

15  A.  Yes, I did.

16  Q.  Did you video it?

17  A.  Yes, I did.

18  Q.  Tell us what you observed happen at the time the

19  maroon Buick pulled into the lot?

20  A.  I observed the informant walk towards the car

21  and get in the right rear passenger door.  And then

22  it exited the parking lot heading eastbound on

23  Washington.

24  Q.  Okay.  Did you stay in your location?

25  A.  Yes.

Q.   And at some point in time after it left the
vehicle headed eastbound on Washington, did you have
occasion to see the vehicle again?

A.   Yes, I did.

Q.   Tell us where you saw it again.

A.   Approximately a minute later the vehicle came
down the alley and stopped right here.

Q.   When you say came down the alley, it would be
coming back westbound down that alley, correct?

A.   Correct.

Q.   What happened when it got up in the vicinity of
Franzetti's?

A.   The informant exited the right rear passenger
door and the vehicle, Buick, left, backed out onto
Clinton Street, I believe.

Q.   Okay.  And did you at that point discontinue
your video?

A.   Yes.

Q.   And your surveillance?

A.   Yes.

Q.   Before we show the video, I want to direct your
attention please to a couple of the stills lying up
there just to your right.  I believe we have marked
those Exhibits 2-A and 2-B?

A.   Yes.

Q.   And what are they?  Can you identify what 2-A
and 2-B is?

A.   Exhibit 2-A is two still photos of the driver of
the vehicle wearing a white cap with a checkered
type pattern.  And 2-B is another side profile of
the driver and front seat passenger both wearing
ball caps.

Q.   To be clear, there were two individuals in the
vehicle when it showed up on that day, correct?

A.   Yes.

Q.   There was a driver and a front seat passenger?

A.   Yes, sir.

Q.   The individual that you now know as Larry
Caffie, do you know which of those two individuals
he was that day?

A.   He was the driver.

Q.   Thank you.

        MR. MURPHY:  We move for the admission of
2-A and 2-B please, Judge.

        THE COURT:  It will be admitted.

        MR. SERRITELLA:  Can I see them?

        MR. MURPHY:  You sure can.

        MR. SERRITELLA:  No objection, Your Honor.

        THE COURT:  All right.  Be admitted.

        MR. MURPHY:  We will now offer Exhibit 2,

```
 1  the video.  And we would like to play the video at
 2  this point, Judge.
 3          MR. SERRITELLA:  I would like to reserve my
 4  objection.
 5          MR. MURPHY:  You can see it much better on
 6  the small screens, Judge.  I don't know if it will
 7  work on the big screen.
 8          (Playing video.)
 9  BY MR. MURPHY:
10  Q.  What is happening here at this point?  What are
11  you videoing at this point?
12  A.  The informant at the pay phone making a phone
13  call.
14  Q.  Okay.  If -- although you video that vehicle,
15  that's not the vehicle that Mr. Caffie pulled up in?
16  A.  No, it was not.
17  Q.  And that's not Mr. Caffie?
18  A.  No.
19  Q.  And a point, in fact, you didn't know what kind
20  of vehicle Mr. Caffie would be showing up in?
21  A.  We were told that he drove several vehicles
22  every once in a while.
23  Q.  Is that the informant again back on that side of
24  the building?
25  A.  Yes, it is.
```

1  Q.   Is this the maroon Buick?

2  A.   Yes, it is.

3  Q.   Has the informant gotten in now at this point?

4  A.   Yes, he had.

5  Q.   And they have driven off?

6  A.   Yes.

7  Q.   And you say there is about a one minute interval

8  or thereabouts?

9  A.   Yes.

10 Q.   What is this showing?

11 A.   The informant exiting the vehicle.

12 Q.   They are coming back down the alley in the other

13 direction?

14 A.   Yes, they are coming westbound down the back of

15 the alley.

16 Q.    I think that's the end of the tape there.

17         I am going to ask to see if our technicians

18 can go back to 4:20.  You hit the fast forward.

19         Is this the side view that you got of

20 Mr. Caffie that day?

21 A.   Yes, it was.

22 Q.   Was that you zooming the camera up at that

23 point?

24 A.   Yes, it was.

25 Q.   I would like to move on, if I could, please, to

1  to -- let me ask, first of all, there was another

2  purchase that was arranged for March 24th, were you

3  present at all for that one?

4  A.   No, I was not.

5  Q.   So let's move then to the third purchase of

6  March 28th, if I could then please.  Were you

7  present for a surveillance briefing that was held at

8  about 12:30 p.m. on that day?

9  A.   Yes, I was.

10  Q.   What was your assignment that day?

11  A.   I was assigned to arrest Mr. Caffie on the take

12  down.

13  Q.   And did you have any other duties in terms of

14  surveillance at all that afternoon?

15  A.   I was only assigned to collect new evidence from

16  Mr. Caffie's person.

17  Q.   Okay.  And later that afternoon, about 1:30 or

18  so, p.m., did you become aware that a transaction

19  had occurred and did someone give you directions to

20  arrest the defendant?

21  A.   Yes, they had.

22  Q.   What happened in terms of what orders you

23  received?

24  A.   I received, I believe, from Detective Gray he

25  had the exhibit and he also had the informant.

1  Q.   Okay.

2  A.   That he had purchased.

3  Q.   Will you tell us where you were in the vicinity

4  that day?

5  A.   We were in the alley just to the north of

6  Jefferson.

7  Q.   Can you point it out for us?  Does it show on

8  15-A?

9  A.   Right there, we were in that general vicinity,

10 in that alley.

11 Q.   Okay.  You would have been north of the car wash

12 then?

13 A.   Yes.

14 Q.   And were you able to -- from your position

15 there, were you able to make any observations of the

16 maroon Buick as the transaction was happening that

17 day?

18 A.   All we observed, we observed the red Buick

19 travel eastbound on Jefferson between the house,

20 that's my best vantage point.

21 Q.   When a Officer Gray told you to effect the

22 arrest of Mr. Caffie, where did you sight the

23 vehicle at that point in time?

24 A.   The vehicle had already turned northbound on

25 Clinton.  We pulled out from the alley and observed

1  it up at Clinton and Locust Streets.

2         MR. MURPHY:  Okay.  At this point, Judge, I

3  would like to put up a second diagram, if I could.

4  This is 15-C for the record, Your Honor.

5  BY MR. MURPHY:

6  Q.   Detective, can you tell us what 15-C is?

7  A.   It's a larger overhead view of Franzetti's

8  Pantry involved in a broader area.

9  Q.   Will you tell us when you, after the purchase on

10 March 28th, and in order to effect the arrest of

11 Mr. Caffie, can you show us on the diagram where you

12 went, where you followed him please?

13 A.   Followed him, let's see.  Can I stand up

14 because --

15         THE COURT:  Yeah.

16 BY THE WITNESS:

17 A.   I followed him northbound on Clinton up to

18 Locust Street which is right here.  Mr. Caffie then

19 turned eastbound on Locust Street and then went

20 northbound on Linden Street.  And we arrested him in

21 the area of Linden and Walden.

22 Q.   Am I correct that that would be shortly after

23 1:30 p.m. that you made that arrest?

24 A.   Yes, it was.

25 Q.   How many individuals were in the vehicle at the

1  time you effected the arrest?

2  A.    Just Mr. Caffie.

3  Q.    Did this appear to be the same vehicle?

4  A.    Yes, it was.

5  Q.    That you had seen earlier on the 21st?

6  A.    Yes.

7  Q.    In fact, you had recorded the license number

8  from the 21st, had you not?

9  A.    Yes, I did.

10 Q.    That was the same license number?

11 A.    Yes.

12 Q.    Did you remember that license number?

13 A.    Yes, it was a temporary Illinois tag, 936F025.

14 Q.    Okay.  Please tell us how you effected the

15 arrest of Mr. Caffie and what happened at that time?

16 A.    We activated our emergency lights.  The vehicle

17 stopped.  I approached the driver side door.  Had

18 Mr. Caffie exit the door.  Then we placed him in

19 handcuffs and began searching him.

20 Q.    When you say "we," who was with you?

21 A.    Myself and Detective Stanfield.

22 Q.    Did you search Mr. Caffie's person at that time

23 after arresting him?

24 A.    Yes, I did.

25 Q.    What did you discover?

1  A.   I removed a large sum of cash from his left

2  front pants pocket and then a cell phone from his

3  right belt.  It was clipped on his belt.

4  Q.   Did you later examine that cash?

5  A.   Yes, I did.

6  Q.   And determine it be about $3,291?

7  A.   Originally, it was $3,491.

8  Q.   Okay.  And was there other items of evidence

9  removed from the car?

10  A.   Yes, there was.

11  Q.   What has that?

12  A.   Located also $100 of money sitting on the

13  armrest.

14  Q.   Describe where specifically in the vehicle.

15  A.   I'm sorry, it was on the driver's side armrest

16  where Mr. Caffie was sitting.

17  Q.   Would that be where his left arm would be on the

18  door?

19  A.   Yes.

20  Q.   It was on the top of his armrest there?

21  A.   Yes.

22  Q.   You indicate that's a hundred dollars cash?

23  A.   Yes.

24  Q.   Now after arresting Mr. Caffie, did you take he

25  and his vehicle down to the police station?

```
 1  A.   Yes, I did.  I drove it down.
 2  Q.   Okay.  Did you make a further examination of
 3  these monies both from his person and from the car
 4  after you got back down at the station?
 5  A.   Yes, I did later that day.
 6         MR. MURPHY:  Excuse me, Judge.
 7  BY MR. MURPHY:
 8  Q.   While examining those funds back down at the
 9  police station, were you provided a photocopy of the
10  buy money that was used on each of the three
11  occasions of March 21st, March 24th, and March 28th?
12  A.   Yes, I was.
13  Q.   And who provided that to you?
14  A.   Detective Gray.
15  Q.   And have I laid up there in front of you, each
16  of those three, I believe they have been marked for
17  identification as 1-A, 3-A, and 4-A?
18  A.   Yes.
19  Q.   Okay.  When comparing any of the monies that you
20  recovered from the defendant on the 28th, did you
21  find any of the buy money that had been used for the
22  March 21st buy?
23  A.   Yes, I did.
24  Q.   How much?
25  A.   $40.
```

Q.   And where was that located?

A.   It was contained in the cash that was removed
from his left front pants pocket.

Q.   And when you compared the monies that you
recovered to the photocopy of the buy money from
March 24th, did you find any of the buy money?

A.   Yes, I did.

Q.   And how much?

A.   $160.

Q.   Okay.  And when comparing the monies that you
recovered -- by the way, where was that $160
located?

A.   It was also contained in the large amount of
cash that I removed from his person.

Q.   And then when comparing the monies that you had
recovered to the buy -- photocopy of the buy money
from March 28th, did you discover any of the buy
money?

A.   Yes, I did.

Q.   How much?

A.   $100.

Q.   Where was that located?

A.   That was the money that we located on the
armrest of the vehicle.

Q.   Okay.  Did you then make photo copies of the buy

1  money that you recovered from each of the three

2  transactions?

3  A.   Yes, I did.

4  Q.   And is your photocopy of the buy money that you

5  recovered for each of the three present before you?

6  A.   Yes, it is.

7  Q.   Okay.  Let's talk about 1-B first of all.  What

8  is that photocopy of, 1-B?

9  A.   There is two $20 bills.

10  Q.   Is that a photocopy you made of the $40 that you

11  discovered in his pocket?

12  A.   Yes.

13  Q.   Move on to 3-B please.  What is that?

14  A.   That's copies of $20 bills.

15  Q.   And are they copies of the $160 that you found

16  in his pocket?

17  A.   Yes.

18  Q.   And move on to 4-B, if you would.  What is 4-B?

19  A.   There is a copy of four $20 bills and two $10

20  bills.

21  Q.   Is that the hundred dollars that you found in

22  the armrest?

23  A.   Yes, it is.

24  Q.   After making these photocopies, did you process

25  the money, or did you return it to your buy money

1  that you used?

2  A.   We removed our buy money and then processed the

3  rest of the money.

4  Q.   But you reserved these photocopies; am I

5  correct?

6  A.   Yes.

7  Q.   If I'm correct, 1-A, 3A, and 4-A were the copies

8  that were provided to you by Greg; is that right?

9  A.   Yes.

10  Q.   And 1-B, 3-B, and 4-B are the photocopies that

11  you made that day?

12  A.   Yes.

13  Q.   Of March 28th?

14  A.   Yes.

15  Q.   Now I want to direct your attention to

16  Exhibit 8.  Tell us please what Exhibit 8 is.

17  A.   It's a list of monies spent in the left column

18  and then monies recovered in the right column from

19  the buys of the 21st and 24th and the 28th and all

20  of the money that was recovered on the 28th.

21  Q.   Is Exhibit Number 8 a summary of your

22  comparisons of Exhibits 1-A, 3-A, 4-A to 1-B, 3-B,

23  and 4-B?

24  A.   Yes.

25  Q.   And in addition, does Exhibit 8 use a color

1  scheme to designate which were the bills, in fact,

2  you found either in Mr. Caffie's car or on his

3  person?

4  A.  Yes.

5  Q.  How does it do that?

6  A.  They are marked in blue letters.  They are blue.

7        MR. MURPHY:  At this point, Judge, we would

8  offer Exhibits 1-A, 1-B, 3-A, 3-B, 4-A and 4-B and

9  number 8.

10        MR. SERRITELLA:  No objection, Your Honor.

11        THE COURT:  Admitted.

12        MR. MURPHY:  May I approach again, Judge,

13  please?

14        THE COURT:  Yes, you may.

15  BY MR. MURPHY:

16  Q.  Officer, I've handed to you Government's

17  Exhibit 6.

18  A.  Yes.

19  Q.  What is this?

20  A.  It's a Motorola cell phone.

21  Q.  When did you first see that cell phone?

22  A.  I removed it off of Mr. Caffie's person upon his

23  arrest.

24  Q.  And did you keep that with you, take it back to

25  the station as well?

1  A.    Yes.

2  Q.    Did you and Detective Gray in fact cause that

3  cell phone to function that afternoon?

4  A.    Yes, I believe we did.

5  Q.    Describe for us what you did.

6  A.    We basically called the number that we were

7  using during the investigation to call Mr. Caffie.

8  Q.    And what happened when you called that number?

9  A.    The phone rang and our number, I believe, showed

10  up in the display.

11  Q.    So you're saying that the cell phone, Exhibit

12  Number 6, rang that afternoon when you called the

13  number that had been used by the informant to call

14  Mr. Caffie?

15  A.    Yes.

16  Q.    Lying in front of you is an Exhibit Number 19.

17  Do you see that in the envelope?

18  A.    Yes.

19  Q.    And would you open that up and pull the contents

20  out.  Is that a St. Louis Cardinal ball hat?

21  A.    Yes.

22  Q.    And did you see in this investigation a hat

23  similar to that?

24  A.    Yes, I did.

25  Q.    When and where?

```
 1  A.   March 21st, 2006.
 2  Q.   What were the circumstances?
 3  A.   When I was videotaping the deal at Franzetti's
 4  Pantry.
 5  Q.   And who was wearing it?
 6  A.   Mr. Caffie, it appeared to be the same cap.
 7          MR. MURPHY:  May I approach one last time,
 8  Judge?
 9          THE COURT:  Uh-huh.
10  BY MR. MURPHY:
11  Q.   Detective Walcott, I have handed to you Exhibits
12  1, 3, 4 and 20; is that correct?
13  A.   Yes.
14  Q.   And are each of those four exhibits the original
15  of a receipt that you commonly use during the course
16  of transportation of drug evidence to the crime lab?
17  A.   Yes.
18  Q.   Let me direct your attention, if I can please,
19  to the date of April 19th of 2006.  Did you have
20  certain duties that brought you over to the Morton
21  Crime Lab on that day?
22  A.   Yes, I did.
23  Q.   In fact, had you received there, at the
24  Bloomington Police Department, the drug evidence
25  that was part of this case?
```

1  A.   Yes.

2  Q.   And how many exhibits did you receive on that

3  occasion?

4  A.   Four.

5  Q.   And did you transport all four of those to the

6  crime lab?

7  A.   Yes.

8  Q.   When you received these exhibits, were these

9  sealed up in evidence bags?

10  A.   Yes, in a manila envelope.

11  Q.   And actually were you able to see the contents?

12  A.   No.

13  Q.   These weren't the clear glassy envelopes, they

14  were the manila, as you've described them?

15  A.   Yes.

16  Q.   So you didn't at any time that day view the

17  contents of that exhibit?

18  A.   No, I did not.

19  Q.   And did you understand that Exhibit 1 was the

20  drugs that had purportedly been purchased on

21  March 21st?

22  A.   Yes.

23  Q.   And that Exhibit 3 was the drugs that had been

24  purportedly purchased on March 24?

25  A.   Yes.

1  Q.   And that Exhibit 4 was the drugs that had been

2  purportedly purchased on March 28th?

3  A.   Yes.

4  Q.   And lastly, that there was a larger quantity of

5  drugs that had been seized from the house of

6  Mr. Caffie?

7  A.   Yes.

8  Q.   And that was marked as Exhibit 20?

9  A.   Yes.

10  Q.   So you took these three or these four exhibits

11  over to the Morton Crime Lab.  Those were also the

12  numbers that you assigned or had been assigned to

13  these exhibits as part of the investigation?

14  A.   Yes.

15  Q.   So when you took exhibits one, three, four and

16  20 to the crime lab, tell us what you did with them

17  please?

18  A.   I turned them over to Denise Hanley, the

19  forensic scientist at the State Police Crime Lab.

20  Q.   And was each of the receipts that you have

21  before you, 1, 3, 4 and 20, were those generated

22  that day?

23  A.   Yes.

24  Q.   Did you sign the receipt?

25  A.   Yes.

Q.   Will you hold up the top one?  Just indicate
which one that is.  Is that number one?

A.   Yes, it is number one.

Q.   Where did you sign the receipt?

A.   Signed on the received signature, received from.

Q.   Did you sign anywhere else?  Did you fill out
any of the form?

A.   No, I did not.

Q.   Did Denise Hanley as well sign it on that date?

A.   Yes, she did.

Q.   Did you follow that procedure for each of the
four exhibits?

A.   Yes.

Q.   Not only did you sign as the individual dropping
it off, she signed as an individual receiving it?

A.   Yes.

Q.   And do your signatures appearing prominently
thereon?

A.   Yes.

Q.   Was that the last contact that you had with the
drug evidence?

A.   Yes.

        MR. MURPHY:  Give me a moment, Judge.

        THE COURT:  Uh-huh.

BY MR. MURPHY:

Q.   I want to clear one thing up if I could.

        With regard to the amount of money that was

taken off the person of Mr. Caffie --

A.   Yes.

Q.   -- that total was how much did you pull out of

his pocket?

A.   $3,491.

Q.   And you in fact took a couple hundred out of

that quantity; is that correct?

A.   Yes, two hundred as was our buy money.

Q.   From the buys on the 21st and on the 24th?

A.   Yes.

Q.   So what was left was the 3291 then?

A.   Yes.

Q.   Okay.  But all totaled you would have recovered

the 3491 from his pocket plus the other hundred

dollars and from his car?

A.   Yes.

        MR. MURPHY:  Thank you, Judge.  Those are my

questions for Detective Walcott.

        MR. SERRITELLA:  If I may approach the

witness, Your Honor?

        THE COURT:  You may.

        MR. MURPHY:  I want to offer Exhibit 2, if I

haven't already.  That was the video that we showed,

1 Judge.

2          THE COURT:  Be received.

3          MR. SERRITELLA:  I have no objection.  Can I

4 see the receipts?

5                    CROSS-EXAMINATION

6 BY MR. SERRITELLA:

7 Q.   Detective, can you tell me where on April the

8 19th of 2006 you got Exhibits 1, 3, 4 and 20 from?

9 A.   Yes, our crime lab.  We have a marijuana leaf

10 identification room.  It is contained within the

11 crime lab.  So there is another access door that you

12 have to go into.

13 Q.   Slow down a second.

14 A.   I'm sorry.

15 Q.   You're saying that you received them from an

16 office or from some room at your police department?

17 A.   We locked them up in a cabinet.

18 Q.   What police department is that?

19 A.   Bloomington Police Department.

20 Q.   And there is a room there where these drugs --

21 this is where you got the drugs from?

22 A.   Yes.

23 Q.   And how did you go -- how did you get them from

24 this room?

25 A.   There is only restricted access to certain

1 detectives or officers on the crime lab.  You have

2 to enter the crime lab first and then there is a

3 door off to the left, that is the room for the

4 marijuana leaf identification room, and there is a

5 cabinet there, a locked cabinet, and that's where we

6 get the drugs from.

7 Q.   So you're there on this particular day, you walk

8 into this room?

9 A.   Yes.

10 Q.   Do you have to go through a clerk, an evidence

11 clerk before you get in there?

12 A.   No.

13 Q.   So you had the key to the room?

14 A.   Yes.

15 Q.   Is the room open to the public, or do you have

16 to have a key to get in the room?

17 A.   No.  You have to have a slide card to get into

18 the room plus to get in the lab, like I said, there

19 is a restricted access for certain people.

20 Q.   You swipe the card and go in the room?

21 A.   Yes, yes.

22 Q.   Is there anybody in the room?

23 A.   No.

24 Q.   And off of this room, there is another room?

25 A.   There is a larger crime lab, yes.

1  Q.    How do you get into that?

2  A.    You swipe in from the main corridor hallway

3  police department.

4  Q.    Who was there on the 19th?

5  A.    I don't recall.  There is an office and I

6  usually don't go in the office.  It is up there and

7  you can't see who is in the office because of the

8  brick wall.

9  Q.    Who has access to that room?

10  A.    Detective Scott Matthewson and then Detective

11  Doener (phonetically).

12  Q.    What about a crime technician?

13  A.    I'm not aware of that.  I don't know.

14  Q.    They call it the crime lab?

15  A.    Yes.  Those two are crime scene technicians.

16  Q.    So that implies that there are some lab people

17  that work in there?

18  A.    Yes.

19  Q.    What is that?

20  A.    Detective Scott Matthewson and Detective Dan

21  Doener.

22  Q.    You don't know if they were there that day?

23  A.    I don't know.

24  Q.    Then inside that second room there is a cabinet?

25  A.    Yes.

```
 1   Q.   Is this cabinet locked or unlocked?
 2   A.   It is locked.  At that time it was.
 3   Q.   Do you have a key for that?
 4   A.   Yes.
 5   Q.   Where -- do you keep the key on your person?
 6   A.   Yes, I do.
 7   Q.   How many people have a key, key to that cabinet?
 8   A.   Just the vice officers.
 9   Q.   So yourself and approximately how many officers,
10   if you know?
11   A.   Probably four.
12   Q.   Okay.  Do any clerks have keys to that cabinet?
13   A.   No.
14   Q.   What about the lab technicians?
15   A.   I don't know about that.  I don't believe so.
16   Q.   So you go into the cabinet, and you pick up
17   these envelopes.
18   A.   Yes.
19   Q.   And do you know how long they have been there?
20   A.   Approximately almost one month.
21   Q.   As far ar as you know, as you sit here today,
22   those had been sitting there since they --
23   originally the evidence had been originally been
24   seized; is that correct?
25   A.   Yes.
```

1  Q.   But that's as far as you know sitting here
2  today?
3  A.   Yes.
4  Q.   Who directed you to go get the drugs?
5  A.   Detective -- I'm sorry -- Sergeant Hoeniges
6  directs us once a month to take a lab run, to take
7  all of the evidence, the drug evidence over to the
8  crime lab.
9  Q.   How were these particular items, how did you
10 know that these related to the Larry Caffie case?
11 A.    We create and print a manifest off created by
12 the state police after we log it in the day it's
13 seized.  And I go through the manifest and check off
14 each piece of evidence that is on the manifest and
15 make sure that it is accounted for in the cabinet.
16 Q.   How do you match up the manifest to the item in
17 the cabinet?
18 A.   With the tag that's on -- like Detective Gray or
19 Detective Stanfield in this case would have applied
20 a property tag to it with exhibit numbers and that's
21 how I cross-examined both those.
22 Q.   So had you ever done this before?
23 A.   Yes.
24 Q.   So you matched up the numbers on the manifest
25 with the numbers on the items in the cabinet?

```
 1  A.   Yes.
 2  Q.   And then you took those items and you drove over
 3  to the Morton -- is that the Morton Crime Lab?
 4  A.   Yes, sir.
 5  Q.   How far of a drive is that for you?
 6  A.   Approximately a 45 minute drive, I believe.
 7  Q.   Did you stop anywhere on the way?
 8  A.   No.
 9  Q.   Went directly there?
10  A.   Yes.
11  Q.   Did you make out a police report or did you just
12  have this?
13  A.   No, I made a police report.
14  Q.   And then you signed the receipt and Miss Hanley
15  signed the receipt?
16  A.   Yes.
17  Q.   Now, I want to draw your attention to the
18  original date that you did the videotaping on March
19  the 21st of '06.  And I'm not sure, I might have
20  missed this but maybe I didn't.
21        As you sit here today, are you able to
22  identify the person in the video that was shown to
23  us that was driving the vehicle on March the 21st of
24  2006?
25  A.   Yes.
```

1  Q.   You're positive you're able to identify that

2  person?

3  A.   Yes.

4  Q.   And how do you identify that person?

5  A.   You mean in the court or in the video?

6  Q.   Is that person in the courtroom today?

7  A.   Yes, he is.

8  Q.   Will you point him out?

9  A.   He is the gentleman in the green jumpsuit with

10  the white long-john top on.

11  Q.   You're able to identify that person from looking

12  at the video and actually being present at the

13  scene, the actual transaction take place?

14  A.   Yes.

15  Q.   Now lastly, I want to draw your attention to

16  March the 28th of '06.  It's my understanding that

17  on that date you did not see any illegal activity on

18  the part of the defendant, you merely arrested him

19  after allegedly him doing something illegal; is that

20  correct?

21  A.   Yes.

22  Q.   Then you said that the hat, Exhibit Number 19,

23  the hat was similar.  It appeared to be similar to

24  you, to the hat that the defendant was wearing.

25  A.   Yes.

1  Q.   Okay.  I'm curious.  There has been a chain of

2  custody on this hat since you seized it, hasn't

3  there?

4  A.   Yes.

5  Q.   And you seized it from the defendant?

6  A.   No.

7  Q.   You didn't?

8  A.   No.

9  Q.   Who seized it from the defendant?

10 A.   That was seized from the house during the

11 execution of the search warrant.

12 Q.   And you saw the video?

13 A.   Yes.

14 Q.   And why do you say it's simply similar?  Why

15 don't you say that it is identical to the hat that

16 you saw the defendant wear in the video?

17 A.   Because I cannot see the logos from the video or

18 where I was positioned on the sides of the hat.  It

19 just had the similar patterns that's why I'm saying

20 it was similar.

21 Q.   He wasn't wearing this when he was arrested?

22 A.   No.

23       MR. SERRITELLA:  Thank you.  I have no

24 further questions, Judge.

25       THE COURT:  Any redirect?

1     MR. MURPHY:  No, Judge.

2     THE COURT:  All right.  Thank you.

3     MR. MURPHY:  We call Darren Wolters.

4                    DARREN WOLTERS,

5  after having been duly sworn, testified as follows:

6                  DIRECT EXAMINATION

7  BY MR. MURPHY:

8  Q.   Sir, will you please state your name.  Spell

9  both your first and last name.

10  A.   Darren Wolters, D-a-r-r-e-n, W-o-l-t-e-r-s.

11  Q.   And what is your occupation, sir?

12  A.   I'm a detective for the Normal Police

13  Department.

14  Q.   How long have you been with the Normal PD?

15  A.   Eight and a half years.

16  Q.   And the current nature of your duties with

17  Normal Police Department is what?

18  A.   I'm on our vice unit.

19  Q.   I am going to direct your attention back to

20  March 28th of 2006, and particularly the afternoon

21  hours of that date, were you down in Bloomington,

22  your sister city, assisting the police department in

23  an investigation?

24  A.   Yes, I was.

25  Q.   Did you attend a briefing that was held at

 1  12:30?

 2  A.   Yes, I did.

 3  Q.   What was your assignment at the briefing?

 4  A.   I was to provide surveillance and be a follow

 5  vehicle.

 6  Q.   Okay.  Do you recall where after the briefing

 7  was done and you went to different locations, do you

 8  recall where you went to, first of all?

 9  A.   I went to the area west of State Street.

10  Q.   Okay.  And is there a particular reason that you

11  went up to the area of State Street?

12  A.   Yes.  I was informed during the briefing that

13  the individual that was going to be selling the

14  cocaine to the informant lived at that address.

15  Q.   Okay.  And most specifically was that 1132 North

16  State Street?

17  A.   Yes, it was.

18  Q.   If I could please, Detective Wolters, direct

19  your attention to Government's Exhibit 15-C, that's

20  the diagram of a portion of Bloomington, Illinois.

21  Do you see the area of the home on 1132 North State

22  Street depicted there?

23  A.   Yes, I do.

24  Q.   And at this point -- is that an accurate diagram

25  or overhead view of not only the home that you were

1  surveilling at State Street but also the area down

2  around Franzetti's Pantry at Clinton and Washington?

3  A.   It does appear so, yes.

4  Q.   I want also to show you another diagram, if I

5  could please.  This one is marked 15-B.  You have

6  had occasion to look at these diagrams before you're

7  testifying here today, right?

8  A.   Yes, I have.

9  Q.   Is 15-B a bit closer up view of the area there

10  on State Street where you started your surveillance

11  that afternoon?

12  A.   Yes.

13  Q.   Is the little red laser pointer there?  Can you

14  indicate whereabouts on the diagram you set up your

15  surveillance that afternoon?

16  A.   I was in the area west.  We had another

17  detective that was watching the actual address.  I

18  was in the area of Marion off one of these side

19  streets, Marion, Ros, I believe.

20  Q.   Okay.  And direct your attention to about a

21  little bit before 1:30 p.m., did you have occasion

22  to observe a maroon Buick in the vicinity of that

23  address on State Street?

24  A.   Yes, I did.  Before taking my position, I did

25  drive by the residence and I did see that vehicle in

1  the driveway.

2  Q.   That was in the driveway at 11:32?

3  A.   Yes.

4  Q.   And at some point after you set up there further

5  down Marion Street, did you see the vehicle actually

6  driving?

7  A.   Yes, yes, I did.

8  Q.   Where was it and can you describe for us and

9  show us where the vehicle went that you saw?

10 A.   I saw a detective advise that the vehicle was

11 exiting 1132 North State Street and I picked up the

12 vehicle as it was traveling westbound on Marion.

13 Q.   In essence, it drove pretty much in front of

14 you?

15 A.   Yes, it did.

16 Q.   Did you continue to follow it at that point?

17 A.   After it got past my location I got directly

18 behind it.

19 Q.   Let me take this one down.  And I'm not having

20 much luck with these today, Judge.

21      Let me go back to 15-C now.  And would you

22 show us the pathway as you followed this vehicle

23 that afternoon shortly before 1:30.  Tell us where

24 it went and where you went.

25 A.   Okay.  As I said it went westbound on Marion

1    here, went up to Clinton.  Drove south on Clinton

2    past Empire, and I believe it cuts over to Woodruff

3    and back on Linden and it makes a curve.  I can't

4    see the exact area here but it makes a curve and

5    then turns south on Davis and went to Washington

6    Street.  Once it hit Washington, the vehicle

7    proceeded westbound on Washington to the area --

8    I'm sorry, to the area of Franzetti's.

9    Q.   Do you see Washington Street marked down here?

10   A.   Yes.

11   Q.   What you're saying that it kind of went through

12   the neighborhoods here and came westbound on

13   Washington?

14   A.   Yes, he took us through the neighborhood streets

15   there.

16   Q.   Okay.  And were you pretty much following him

17   all during that period?

18   A.   Yes I was.

19   Q.   Did you see him turn westbound on Washington?

20   A.   Yes.

21   Q.   Tell us what did you further observe when you're

22   both going westbound on Washington Street?

23   A.   After he went on Washington Street, another

24   unit, another detective picked up surveillance and

25   at that time I turned off to reposition myself.

Q.   Where did you reposition yourself, can you tell

us more specifically?

A.   I went around the block and I was in the area,

kind of circling on Jefferson, Jefferson Street and

this street directly north of Jefferson.

Q.   Did you -- after other officers picked the

vehicle up, where did you next see the vehicle?

A.   I saw it traveling it would have been eastbound

on Jefferson.  And right as I saw it, it took a turn

and turned south on Robinson and then went through

an alley.

Q.   Let me put up the other diagram here which we

have marked as 15-A.  Is that a closer up view of

the area of Franzetti's Pantry showing Washington

and Clinton Streets there?

A.   Yes.

Q.   Now you indicated that you last saw the vehicle

I believe heading westbound on Washington and then

you picked it up again somewhere on Jefferson

Street; is that right?

A.   Yes.  I saw it traveling westbound on Jefferson

and then I turned it -- I saw the vehicle turn south

on Robinson here then go in through the alley.

Q.   Where did it go?  All the way down the alley?

A.   I lost sight of it after it went down the alley,

1  advised other units, other detectives that the

2  vehicle was traveling there.

3  Q.   Did you reposition again?

4  A.   Yes, I did.

5  Q.   Where did you go?

6  A.   I repositioned.  I went around the block and I

7  was north of Franzetti's here, I'm sorry, north of

8  Clinton and Jefferson and staged at this location up

9  here.

10  Q.   Did you see the vehicle again?

11  A.   I did.

12  Q.   What did you see?

13  A.   I saw the vehicle pull onto Clinton Street and

14  travel northbound.

15  Q.   And did you notify the other surveillance

16  officers at that point in time that it was headed

17  northbound on Clinton?

18  A.   Yes.

19  Q.   And eventually the other officers then come and

20  arrest Mr. Caffie?

21  A.   Yes, they did.

22  Q.   Now, I want to ask you a couple questions about

23  your observations of the vehicle.  When you were

24  following the vehicle down to Washington Street and

25  heading west on Washington, how many individuals

1  could you observe in the vehicle?

2  A.   One.

3  Q.   And after you repositioned and saw the vehicle

4  moving, would be eastbound up on Jefferson Street

5  before it turned on Robinson, could you see how many

6  individuals were in the vehicle?

7  A.   I could see that there were at least two.

8  Q.   And where -- the two that you could see, where

9  were they located, in the front seat?

10  A.   Yes.

11  Q.   Okay.  And the last time that you saw the

12  vehicle when it's going northbound on Clinton at

13  that point, how many individuals were in the

14  vehicle?

15  A.   There was just one at that time.

16  Q.   Now the observations that you've just told us

17  about, that circling the block down here and going

18  through the alley, those observations were taking

19  place in a space of less than five minutes; is that

20  correct?

21  A.   Correct.

22  Q.   So sometime after 1:30 p.m. that afternoon is

23  when the arrest occurred?

24  A.   Correct.

25  Q.   Did you have any occasion at all to observe any

1  of the drugs that were either purchased or seized on

2  that day of March the 28th?

3  A.   No, I didn't.

4          MR. MURPHY:  Okay.  Thank you.

5          Judge, those are my questions.

6          THE COURT:  You may cross, Mr. Serritella.

7          MR. SERRITELLA:  No questions, Your Honor.

8          THE COURT:  I have a question for you.

9          How close did you come to the car at any

10  point during the matters that you've testified to?

11          THE WITNESS:  I tried to maintain a

12  distance.  After it left the house the first time

13  and I got behind it on Marion, I was probably the

14  closest to it, actually got directly behind it as it

15  turned south on Clinton Street.  And then after that

16  I kind of maintained a larger distance.  After the

17  deal took place, however, when he was northbound on

18  Clinton, I was able to get directly behind it.  As

19  it turned onto Clinton going northbound I was a

20  couple cars behind it.  When we got up to the

21  intersection of Locust I got behind it and

22  maintained that position until the officer stopped

23  the vehicle.

24          THE COURT:  Now did you -- I think you said

25  you saw the car going west on Marion?

1           THE WITNESS:  Correct.

2           THE COURT:  Toward Clinton?

3           THE WITNESS:  Correct.

4           THE COURT:  And you were west of Clinton at

5    that time?

6           THE WITNESS:  No, I was -- at that time I

7    was -- you're talking about when we first started?

8           THE COURT:  When you first started.

9           THE WITNESS:  I was in the area -- I was

10   west of State Street.  I was in the area of Marion

11   and Rosney I believe.

12          THE COURT:  Did the car turn on Clinton,

13   south of Clinton before it --

14          THE WITNESS:  My position was --

15          THE COURT:  The car never passed you on

16   Clinton, on Marion did it?

17          THE WITNESS:  I was still -- in my position,

18   I was still east of Clinton, so when he went past

19   me --

20          THE COURT:  When he passed you?

21          THE WITNESS:  Correct.

22          THE COURT:  Did you -- so I take it, at that

23   point he passed you on the street, did he not?

24          THE WITNESS:  I was facing southbound and he

25   was going -- he was going westbound.  So after he

1  went past my location, I went back and followed him

2  westbound.

3          THE COURT:  After -- at the time the car

4  passed your location there on Marion Street, were

5  you able to recognize the driver?  Were you able to

6  see his features?

7          THE WITNESS:  All I could see was a black

8  male driver.

9          THE COURT:  And at any time during the

10 events involving you, were you able to see the

11 features of the driver to the extent that you can

12 recognize him later?

13         THE WITNESS:  No, I wasn't.

14         THE COURT:  Okay.  Thank you.

15         MR. MURPHY:  That's all, Judge.

16         THE COURT:  Thank you.

17         THE WITNESS:  Thank you.

18         MR. MURPHY:  Judge, I do have one quick

19 question to clear up something.

20         THE COURT:  All right.

21                 DIRECT EXAMINATION

22 BY MR. MURPHY:

23 Q.  When he left, went westbound on Marion, he

24 actually didn't come all the way up here to Clinton,

25 did he?

1  A.   I'm sorry Linden Street.

2  Q.   It's Linden Street that he went south on?

3  A.   Yes.

4  Q.   This one over here and that's why he would have

5  come westbound.

6  A.   Yes, I was confused whenever he left afterwards

7  it was Clinton.  Whenever we proceeded to the actual

8  buy location, it was Linden Street, I misspoke.

9        MR. MURPHY:  Okay.  I just wanted to correct

10 that.  Thank you.

11        THE COURT:  Okay.

12        MR. CAMPBELL:  Government calls Brett

13 Fowler, Your Honor.

14                    BRETT FOWLER,

15 after having been duly sworn, testified as follows:

16                 DIRECT EXAMINATION

17 BY MR. CAMPBELL:

18 Q.   Could you please state your name and spell your

19 last name for the court reporter.

20 A.   Brett C. Fowler, Fowler.

21 Q.   Mr. Fowler, where do you live?  What town do you

22 live in?

23 A.   McLean County, Bloomington.

24 Q.   Are you currently employed?

25 A.   Yes.

1  Q.   Where are you working at?

2  A.   Restaurant.

3  Q.   In the Bloomington area?

4  A.   Yes.

5  Q.   Mr. Fowler, you have in fact in March of 2006,

6  beginning around March 21st became involved with the

7  investigation of a person who was providing drugs in

8  McLean County, Bloomington, Illinois; is that

9  correct?

10  A.   Yes.

11  Q.   Did you work with a particular Bloomington

12  Police Department detective at that point?

13  A.   Yes, Detective Gray.

14  Q.   Did you have some occasion in working with

15  Detective Gray to make phone calls to a particular

16  individual that you believe could provide drugs?

17  A.   Yes, J.

18  Q.   You knew him as J?

19  A.   Yes.

20  Q.   That is a street name?

21  A.   Yeah, that's what he said to call him.

22  Q.   And what kind of drugs were they that you were

23  attempting to purchase from J?

24  A.   Crack.

25  Q.   By that you mean crack cocaine?

1 A.   Yes, sir.

2 Q.   I would like to direct your attention back to

3 March 21st of 2006.  And ask you if on that

4 occasion, you, in fact, did meet with Detective Gray

5 and make a phone call?

6 A.   Yes, I did.

7 Q.   And this would have been somewhere in the

8 afternoon hours of the 21st of March 2006?

9 A.   Late afternoon, early evening.

10 Q.   All right.  How is it that you made a phone call

11 to a particular individual you knew as J on that

12 particular date?  How did that occur?  How did you

13 do it?  Where were you?

14 A.   I was at the Bloomington Police Station when we

15 called J.

16 Q.   Who was with you?

17 A.   Detective Gray.

18 Q.   You had made arrangements with Detective Gray to

19 do this type of investigation on this occasion?

20 A.   Yes.

21 Q.   And in this particular instance, you had made

22 some representation to Detective Gray about J?

23 A.   Yes.

24 Q.   What did you tell Detective Gray?

25 A.   He sold crack and we bought crack from him.

1  Q.   Okay.  On this particular occasion when you made

2  a phone call, did you place a phone call to the

3  person you knew as J?

4  A.   Yes, we did.

5  Q.   And when you made the phone call, do you recall

6  approximately what time it was?

7  A.   It was probably five, 5:30 in the evening.

8  Q.   And what did you say on the phone?  Was it a

9  lengthy conversation?

10  A.   No, it was short.  Told him that I had somebody

11  that had a hundred dollars and if we could meet up;

12  that was less than a two or three minute

13  conversation.

14  Q.   When you said that you had someone that had a

15  hundred dollars to spend, what did that mean to you

16  when you were calling J on the phone?

17  A.   He sold hundred dollar bags worth of crack.

18  Q.   You knew J from prior occasions; is that

19  correct?

20  A.   Yes.

21  Q.   Had you purchased what you believe to be crack

22  cocaine from J on prior occasions?

23  A.   Yes, I have.

24  Q.   Because on the 21st you really didn't mention a

25  particular type of drug; is that correct?

1  A.    Pardon?

2  Q.    You just mentioned the dollar amount on the

3  phone call?

4  A.    Yes.

5  Q.    And it was your understanding that that hundred

6  dollars was going to buy what type of drug?

7  A.    Crack.

8  Q.    When you were on the phone you got in touch with

9  J; is that correct?

10  A.    Yes.

11  Q.    And did you have a phone number that you used to

12  call him?

13  A.    Yeah, his cell phone number.

14  Q.    And do you, off the top of your head, recall

15  what number that is?

16  A.    242-0003.

17  Q.    Did you before March 21st call that telephone

18  number to talk to J?

19  A.    Yes.

20  Q.    Had you done that on numerous occasions?

21  A.    Several, yes.

22  Q.    When you made this call on the late afternoon

23  hours of 21st and Detective Gray was there after the

24  phone call was placed and you indicated that there

25  was a hundred dollars you had to spend, what

1  happened next?

2  A.   He said to go to Franzetti's and call when you

3  got to Franzetti's from the pay phone.

4  Q.   Who said that?

5  A.   J.

6  Q.   When you were on the phone talking to J you

7  recognized his voice?

8  A.   Yes.

9  Q.   You had talked to him on the phone before?

10  A.   Yes.

11  Q.   Numerous times?

12  A.   Yes, several.

13  Q.   You had talked to him in person before?

14  A.   Yes.

15  Q.   Numerous times?

16  A.   Yes.

17  Q.   When you hear that voice or when you heard that

18  voice on the phone, did you recognize it as J's

19  voice?

20  A.   Yes, I did.

21  Q.   Before leaving the police department, is there a

22  particular routine that you went through on this

23  occasion with Detective Gray before you went to

24  Franzetti's?

25  A.   Yes.  After the phone call he gave me the buy

1  money.  Before he gave me -- before Detective Gray

2  gave me the buy money he searched me, patted me

3  down, socks, shoes, pants, pockets, etcetera.

4  Q.   Was there any money that you had of your own on

5  you at that time?

6  A.   No.

7  Q.   And so Detective Gray found none?

8  A.   Pardon me?

9  Q.   He found no money?

10  A.   No.

11  Q.   Was there anything else of any nature of a

12  contraband such as a drug with you?

13  A.   No.

14  Q.   What did he do in the pockets, did he search

15  them or did you empty them?

16  A.   Turned them inside out.

17  Q.   Actually searched your shoes and socks?

18  A.   Yes.

19  Q.   You said he provided, he, being Detective Gray,

20  provided you with some buy money?

21  A.   Yes.

22  Q.   How much money?

23  A.   First time a hundred dollars.

24  Q.   And when you say "buy money," what does that

25  mean to you?

A.   Before -- they photocopy the money to have the
serial numbers before they actually give it to me so
they know, you know, if they were to arrest that
person, they can go back and match up that money.

Q.   Have a record of it?

A.   Yes.

Q.   Okay.  Did you receive that hundred dollars from
Detective Gray?

A.   Yes, I did.

Q.   What did you do after you had been searched and
received this buy money as you said it?

A.   We left the Bloomington Police Station.  Went to
Franzetti's -- went to East Front Street where he
dropped me off, East Front and Clinton, walked over
to Franzetti's and used the pay phone to call J.

Q.   Is that what you and Detective Gray had arranged
ahead of time that you would do that particular
action?

A.   Yes.

Q.   And call from that pay phone?

A.   Yes.

Q.   Had you ever done that before, before this
particular investigation on March 21st?

A.   No.

Q.   Brett, you will see up here on the easel there

1  is a large photograph.  You also have what looks

2  like a ball point pen in front of you.  It is

3  actually a laser pointer.  You will see a red dot

4  appear.  If you feel more comfortable you can

5  actually -- I think the Court will permit you to

6  stand and point however you want to do it.  But this

7  particular exhibit has been marked as exhibit 15-A

8  by this little yellow sticker and you recognize this

9  as an overhead photograph of the city street area?

10 A.   Yes, I do.

11 Q.   And you've seen this before?

12 A.   Yes.

13 Q.   So you're familiar with it.  I'd like to, first

14 of all, ask you since you just indicated that

15 Detective Gray took you to a location by Front and

16 Clinton Street, I don't know if you can see the

17 names of the street there or not, but if you can

18 point with a laser pointer approximately where that

19 was?

20 A.   That was right there.

21 Q.   So you're pointing down around this area, is

22 that Front Street?

23 A.   Yes.

24 Q.   And this street is what?

25 A.   Clinton Street.

1  Q.   And from the area where Detective Gray left you

2  out of the car, that was an undercover police car?

3  A.   Yes, it was.

4  Q.   Where did you go?

5  A.   I went to right there, Franzetti's.

6  Q.   This is what you know as Franzetti's?

7  A.   Yes.

8  Q.   So you just walked up half a block or so.

9  A.   Yes, sir.

10 Q.   When you went to Franzetti's in this area here,

11 where did you go, what part of the building?

12 A.   To the side of the building right there is a pay

13 phone.

14 Q.   Okay.

15 A.   Kind of shaky.

16 Q.   What did you do at the pay phone?

17 A.   I called J and said that I was at Franzetti's,

18 and he said that he would be there in five or ten

19 minutes.

20 Q.   When you called from that pay phone, what number

21 did you call?

22 A.   242-0003.

23 Q.   The same one that you called or used from the

24 police department?

25 A.   Yes, sir.

Q.   Did you understand that to be a land line or a
cell phone?

A.   That was a cell phone.

Q.   Cell phone.  Okay.  What arrangements or what
did you state in that conversation with J?

A.   I said that I was at Franzetti's.  He said that
he would be there in five or ten minutes.

Q.   Did you know what kind of vehicle J was driving
at that time?

A.   A red Buick.

Q.   The person that you referred to as J, at least
that time you knew him by that name, have you since
learned what that person's full name is?

A.   Yes.

Q.   Did you know it before this investigation, the
full name?

A.   No, I didn't.

Q.   What is the full name that you know that person
as now?

A.   Larry Caffie.

Q.   And that person that you met on the 21st or have
called and met on prior occasions that this
investigation revolves around, do you see that
person in court today?

A.   Yes.

Q.   Where is that person seated and can you describe
for the record what that person is wearing.
A.   He is wearing a green top with a white shirt
underneath and glasses.
Q.   Where is he seated please?  Just point.
A.   Yes, sir.
        MR. CAMPBELL:  For purposes of the record,
Your Honor, the witness has pointed to the defendant
and described his clothing.
        THE COURT:  The record will reflect the
witness has identified the defendant.
BY MR. CAMPBELL:
Q.   Were you aware on March 21st while you were
there at Franzetti's making the phone call that
there were other police officers around the area
doing surveillance?
A.   Yes.
Q.   You were familiar with that part of the
investigation?
A.   Yes.
Q.   Did you know or were you able to see where they
were from Franzetti's?
A.   No, I wasn't.
Q.   But you just knew that they were around?
A.   Yes.

Q.   And you were told that that would be something
that would happen?

A.   Yes.

Q.   Did you realize at that time or were you made
aware that a videotape was being made of the
transaction at least part of it?

A.   No, I wasn't.

Q.   Since this has happened before we get to the
actual transaction, have you learned that there was
a videotape made?

A.   Yes.

Q.   And that videotape in fact shows at least a
portion of the activities on that day?

A.   Yes.

Q.   And that videotape was then reduced or made into
a DVD, a digital format of the same thing?

A.   Yes.

Q.   And you've had a chance to review that or look
at it?

A.   No, I haven't.  The video?

Q.   You seen some still photos from there; is that
correct.

A.   Yes, still photos.

Q.   Let's get back to the parking lot at Franzetti's
by the pay phone.  After you made the phone call and

J, the defendant, says that he will be there in

about five minutes; is that correct as you recall?

A.   Yes.

Q.   What you did do?

A.   I stood by the pay phone and waited for him to

show up.

Q.   Did you see a vehicle that you recognized some

time after that within a matter of minutes?

A.   Yes.  A red Buick pulled in.

Q.   Who was driving that vehicle?

A.   J was.

Q.   Was someone else in the car as well?

A.   Willy was on the passenger side.

Q.   Do you know Willy's full name?

A.   No.

Q.   Had you see him before?

A.   Yes.

Q.   Where had you seen him before?

A.   He was on the Monroe Street house that J rented,

he was -- I met him there.

Q.   So you had had prior contact with him?

A.   Yes.

Q.   And was, for lack of a better term, an associate

of J's, a friend of his of some sort?

A.   Sure.

1 Q.   Did it surprise you to see him with J this

2 occasion?

3 A.   No, it didn't.

4 Q.   Okay.  Once the vehicle stopped there, what did

5 you do?

6 A.   I got in the passenger side in the back.

7 Q.   And would that be the right rear passenger door?

8 A.   Yes.

9 Q.   And what happened once you got in and closed the

10 door?

11 A.   We pulled out of the parking lot and got on East

12 Washington Street, took a right out of Franzetti's.

13 Q.   Again I want to ask you if you want to use the

14 pointer, you can kind of show the direction.  You're

15 starting at Franzetti's approximately at this end of

16 the building?

17 A.   Yes.

18 Q.   Do you want to use the pointer or do you want to

19 come and point?

20 A.   I will just point.

21       MR. CAMPBELL:  With Court's permission?

22       THE COURT:  You may.

23       MR. CAMPBELL:  Thank you.  If you would just

24 make sure that you stand to the side so the Court

25 and everyone can see.

1          THE COURT:  That's okay, I can see.  Go

2   ahead.

3   BY MR. CAMPBELL:

4   Q.   Where did you then leave -- you started at

5   Franzetti's.  Point to that.

6   A.   Yes.

7   Q.   That's where you got in the car?

8   A.   Yes.

9   Q.   What direction did you go then?

10  A.   East on Washington.

11  Q.   To what location after going there?

12  A.   We took a turn on this street right here.

13  Q.   And is there some large business that you can

14  see the top of the building, there is a great big

15  square structure here, do you know what that is in

16  Bloomington on that side street.

17  A.   That is Beer Nuts.

18  Q.   It is kind of a prominent business in

19  Bloomington.  It's been there a long time.  Once you

20  get on that street, where did you go?

21  A.   Turned down the alley, and headed back toward

22  Franzetti's.

23  Q.   So just really around the block or even a

24  portion of the block.

25          Once you get back to Franzetti's, what

1   happened there?

2   A.   I get out of the car right by the dumpster which

3   is right here by the side of the building with the

4   pop machine.

5   Q.   Okay.  You get out and the other two

6   individuals, the defendant driver and his friend

7   Willy are still there in the car?

8   A.   Yes.

9   Q.   Where do they go?

10  A.   I think they took a right on Clinton and went

11  back north.

12  Q.   Drive away?

13  A.   Yes.

14  Q.   You can take the witness stand.

15          Brett, after you got in the vehicle there,

16  initially there at Franzetti's when you jumped in

17  the back seat and you went east on Washington

18  Street, what happened in the car as you were going

19  down on Washington Street and turned on the side

20  street Beer Nuts?

21  A.   I handed the hundred dollars up to Willy and J

22  handed me the crack.

23  Q.   The hundred dollars that you handed to Willy,

24  how do you do that, you're in the back seat, he's in

25  the right front seat, how does that work?

1  A.   In between the two front seats there is an

2  armrest, handed it up to the right.

3  Q.   So with the armrest, there was an opening there,

4  a space of some sort?

5  A.   Yes, the armrest folded down.

6  Q.   It was down.  The hundred dollars that you

7  referred to was that the buy money that you talked

8  about before?

9  A.   Yes.

10  Q.   You gave that to Willy?

11  A.   Yes.

12  Q.   He took it from you?

13  A.   Yes.

14  Q.   And what happened after you gave him the buy

15  money?

16  A.   He counted and J handed the crack back in

17  between the seats.

18  Q.   So just behind his right hip, so to speak,

19  towards you?

20  A.   Yes.

21  Q.   And you were able to just place it in your hand.

22  Did he put it on the armrest, how did he hand it to

23  you?

24  A.   He just handed it to me.

25  Q.   When he handed it to you, what did he hand you?

1  A.    A corner of a baggie that was tied.

2  Q.    Did it appear to have something inside of it?

3  A.    Yes, it did.

4  Q.    What did the substance look like to you?

5  A.    Hard rock-like substance, off-white chunky

6  substance.

7  Q.    Have you seen that type of substance before?

8  A.    Yes.

9  Q.    Have you seen that type of substance before from

10  Mr. Caffie giving it to you or providing it to you?

11  A.    Yes.

12  Q.    Before this investigation?

13  A.    Yes.

14  Q.    You said that you did what with that small

15  baggie corner that was tied off?

16  A.    I put it in my pocket.

17  Q.    All right.  Then by that time the vehicle is

18  where?  Where was the vehicle going?

19  A.    Going back west toward Franzetti's.

20  Q.    In the alley way?

21  A.    Yes.

22  Q.    This all happens very quickly?

23  A.    Yes.

24  Q.    Any particular conversation in the vehicle that

25  you recall?

1  A.   No.

2  Q.   And you get to the dumpster area by the rear

3  part of Franzetti's, any conversation as you leave

4  or get out?

5  A.   Talk to you later kind of thing.

6  Q.   And you see the car drive off?

7  A.   Yes.

8  Q.   Where do you go after that?

9  A.   I head back south toward Front Street.

10  Q.   That's where Detective Gray had parked and let

11  you out?

12  A.   Yes.

13  Q.   Where did you go there at Front and Clinton?

14  A.   Front and Clinton, I got back in the car.

15  Q.   Back in Detective Gray's car.  What did you do

16  when you got back to the car?

17  A.   Handed him the crack and we took off.

18  Q.   Okay.  And where did you go?

19  A.   Back to the police station.

20  Q.   Once you got back to the police station, was

21  there a particular process or routine that you went

22  through?

23  A.   Yes.  Once we got back, we got out of the car,

24  he searched the car and we went up and he searched

25  me.

1  Q.  All right.  And by searching you what process or

2  what did he actually physically do?

3  A.   Went through the pockets.  Went through -- take

4  off the shoes, check the socks.

5  Q.   Okay.  And did he find anything?

6  A.   No.

7  Q.   Now you've indicated that this was in the

8  original conversation on the telephone from the

9  police department to J you ordered a hundred dollars

10  worth basically?

11  A.   Yes.

12  Q.   You have purchased this type of substance on the

13  street in prior occasions, as you've indicated; is

14  that correct?

15  A.   Yes.

16  Q.   What does a hundred dollars worth indicate to

17  you as far as an amount or an approximate amount of

18  crack cocaine?

19  A.   Roughly anywhere from eight-tenths to a gram.

20  Q.   And that particular amount is an amount that

21  because of the dollar amount it has a particular

22  weight or approximate weight associated with it?

23  A.   Yes.

24  Q.   Is it your experience that in ordering these

25  types of substances as you've done both in this case

1    as well as perhaps on your own, that do you usually

2    mention weight or do you just mention a dollar

3    amount?

4    A.    Just usually a dollar amount.

5    Q.    After you were at the police department with

6    Detective Gray and he searched you, where did you go

7    or what happened after that?

8    A.    After he searched me, he took me back and

9    dropped me off at home.

10   Q.    Okay.  Now, Brett, I would like to have you take

11   a look at a couple of exhibits that are up there on

12   the corner in front of you.  They are marked with

13   yellow stickers at Exhibit 2-A and 2-B.  I would

14   like to have you just take a look at those for a

15   second.  And first of all, if you can identify

16   anybody in those pictures.

17   A.    Yes, the person wearing a white hat.

18   Q.    Who is that person?

19   A.    That's J.

20   Q.    Is that the same person you've identified here

21   today as Larry Caffie the defendant?

22   A.    Yes.

23   Q.    In that particular photo, does that vehicle, at

24   least the side of the vehicle that you're able to

25   see in it, it looked familiar to you as well?

1  A.   Yes, it looks like the red Buick.

2  Q.   We have something to display and again, Judge

3  McDade, for the Court's information we are going to

4  also play this video one more time so that this

5  witness who was a part of that can describe, if

6  necessary, any of his activities or any

7  identifications, if that's --

8           THE COURT:  Before you do that, when you

9  identified the person in the white hat, what exhibit

10 were you looking at 2-A or 2-B?

11          THE WITNESS:  2-A.

12 BY MR. CAMPBELL:

13 Q.   There appears to be at least another individual

14 in that picture and it's not as sharp maybe as we

15 would like but do you know who that might be or who

16 that looks similar to?

17 A.   Looks similar to Willy but I'm not sure.

18 Q.   Okay.  If we can also play Exhibit 2, Your

19 Honor, which is the video.  And I know

20 Mr. Serritella has now seen the whole video or the

21 DVD version of it, I wonder if we can with

22 permission of Court and counsel, go through the

23 first part which really isn't relevant the first two

24 or three minutes unless you want to?

25          MR. SERRITELLA:  I have no problem with

1   speeding it up.

2          MR. CAMPBELL:  If we go, Debbie, wherever

3   that starts, maybe two or three minutes into it.  On

4   my screen I'm not seeing anything.

5          MR. SERRITELLA:  I have got it on mine.

6   BY MR. CAMPBELL:

7   Q.   First of all, before we get any further, just to

8   stop that for a moment.  Does that particular

9   building look familiar to you that you see on the

10  screen?

11  A.   Yes.

12  Q.   What is that?

13  A.   That's Franzetti's.

14  Q.   And also the person standing off to the right by

15  what looks like a small pay phone enclosure, who is

16  that?

17  A.   That's me.

18  Q.   Is that the pay phone that you had indicated

19  earlier that you had made a phone call from?

20  A.   Yes.

21  Q.   To J?

22  A.   Yes.

23  Q.   All right.  I might want to back it up just a

24  little bit here.  All right.

25          Now before you -- before the video action

1  starts, do you recognize that vehicle?  Have you

2  seen that before?

3  A.   Yes.

4  Q.   Who was driving the vehicle on that occasion,

5  the 21st of March '06?

6  A.   J was.

7  Q.   You see we have got a still version of a photo

8  of the driver, do you recognize that person?

9  A.   Yes.

10  Q.   Okay.  Keep going.  And as you testified

11  earlier, is that the vehicle that you actually

12  entered on this occasion?

13  A.   Yes.

14  Q.   And is that the vehicle in which you described

15  this drug transaction took place?

16  A.   Yes.

17  Q.   What is this video of or a picture of?

18  A.   That's me getting out of J's car.

19  Q.   Just roughly a minute later after going around

20  the block?

21  A.   Yes.

22        THE COURT:  Could you back that up please?

23  I would like to see that last shot.  Yeah, it was

24  clear.  Can you move forward a little bit?

25        MR. CAMPBELL:  Just hit play.

```
 1          THE COURT:  I saw a pretty clear shot there.
 2    It's coming up now.  Can you hold it there for a
 3    minute please?  A little bit too far.  Yeah, right
 4    there.
 5          MR. CAMPBELL:  Is that the portion that the
 6    Court wanted to see?
 7          THE COURT:  No, keep on.  It was after the
 8    witness got out of the car and there was a frame
 9    where the driver was looking at the witness
10    direction and I thought that I could see a frontal
11    view.
12          MR. CAMPBELL:  Deb, just use the advance
13    frame-by-frame in the lower left.
14          Actually, Your Honor, it seems sharper when
15    it is an actual continuance photo or sequence.
16          THE COURT:  All right.  Thank you.
17    BY MR. CAMPBELL:
18    Q.  Mr. Fowler, does that DVD version of the video
19    truly and accurately depict what you seen on that
20    occasion?
21    A.  Yes.
22    Q.  I would like to show you what has been marked
23    Exhibit 19 on this envelope with the yellow sticker.
24    First of all, for the record what is that item that
25    you're holding in your hand?
```

1  A.   It's the St. Louis baseball cap.

2  Q.   And is it a particular color?

3  A.   Yes, white.

4  Q.   It has some markings on it?

5  A.   Yes, blue markings.

6  Q.   Does there appear to be some pattern from these

7  dark markings on it?

8  A.   They are just all the hat.

9  Q.   Okay.  So it's like a check pattern of some

10 sort?

11 A.   Yes.

12 Q.   Do you believe that you've seen that hat or one

13 identical to it on a prior occasion?

14 A.   Yes.

15 Q.   When was that?

16 A.   When I met J.

17 Q.   On the 21st of March?

18 A.   21st of March.

19 Q.   You've seen the still photo 2-A and 2-B and

20 you've also seen the DVD version of the video.  Do

21 you have any opinion about whether the hat that you

22 see on the bench up there next to you is identical

23 to the one in the pictures and the video?

24 A.   Yes, it seems to be the same exact one.

25 Q.   All right.  I would like to direct your

1  attention now to March 24th of 2006, and ask if on

2  that particular occasion, in the early afternoon

3  hours, approximately 1:00 or so and thereafter that

4  you again met with Detective Gray at the Bloomington

5  Police Department?

6  A.   Yes, I did.

7  Q.   On that particular day what was the purpose of

8  meeting with Detective Gray?

9  A.   To buy some more crack from J.

10  Q.   Did you, in fact, go to the police department?

11  A.   Yes, I did.

12  Q.   And meet with Detective Gray?

13  A.   Yes.

14  Q.   Once there, what did you do?

15  A.   We made a phone call to J.

16  Q.   And you used the same phone number that you used

17  before on other occasions including the 21st?

18  A.   Yes.

19  Q.   Did you get ahold of J?

20  A.   Yes.

21  Q.   What happened?

22  A.   He said to meet him at Franzetti's, same spot.

23  Q.   Did you mention either a quantity or a dollar

24  amount of crack cocaine that you wanted?

25  A.   Yes, told him $200.

Q.   And was there some agreement or did that seem to
be something that J would be able to do?

A.   Yes.

Q.   And did he tell you that?

A.   Yes.

Q.   Before leaving the police department was there
some process or routine that you went through with
Detective Gray?

A.   Yes, I got searched.

Q.   Just as you described on the first occasion?

A.   Yes.

Q.   And were you provided also some photocopied
money currency by Detective Gray?

A.   Yes.

Q.   On this occasion how much?

A.   $200.

Q.   Besides that buy money that you had on you, did
you have any of your own money with you?

A.   No, I never took any of my own money, didn't
want to get it mixed up.

Q.   In the searching of shoes, socks, pockets and so
on, was there any contraband of any kind?

A.   No, there wasn't.

Q.   What did you and Detective Gray do after you
received this $200?

1  A.   Called J, said to meet him at Franzetti's in

2  about five or ten minutes.

3  Q.   Where did you go with Detective Gray?

4  A.   He dropped me off at Clinton and Front Street

5  again.

6  Q.   The same location as the first?

7  A.   Yes.

8  Q.   Where did you go?

9  A.   I walked to Franzetti's.

10 Q.   What did you do there?

11 A.   Used the pay phone to call J.

12 Q.   Okay.  What was the nature of the conversation

13 from the pay phone at Franzetti's with J?

14 A.   Said I was here and he said that he would be

15 here in five minutes.

16 Q.   Did you then wait outside there for a while?

17 A.   Yes, stood on the side of the building.

18 Q.   During the time that you were waiting for the

19 defendant to show up, did you notice something that

20 caught your attention in the area that might, in

21 your opinion, at least cause the defendant not to

22 stop?

23 A.   Yes.  There was a Bloomington police car at the

24 end of the alley on Robinson Street at the end of

25 alley behind Franzetti's.

1  Q.   Oh, right near you?

2  A.   The same path that we took before, yes.

3  Q.   By police car, you mean like a marked squad car?

4  A.   Black and white.

5  Q.   You thought that might be of some concern?

6  A.   Yes.

7  Q.   What did you do when you saw that marked squad

8  car?

9  A.   I went into Franzetti's to get some more change

10 and came out and called J and let him know that that

11 squad car was up there.

12 Q.   What arrangements, if any, did you make there a

13 second phone call?

14 A.   He said to walk toward the car wash.

15 Q.   Okay.  Now again we have got this overhead view

16 of that area which is marked as 15-A.  If you would

17 like to step off the stand just for a second again

18 to take a look at this.  We know where Franzetti's

19 is, so where did you go from Franzetti's after the

20 second phone call?

21 A.   Walked north up Clinton Street toward the car

22 wash.

23 Q.   All right.  And have you been informed that that

24 photograph that you're viewing there, that large

25 photograph is, there is one inaccuracy on it and

1 that is that right before the car wash there appears

2 to be a building sitting there on the parking lot

3 and that that building no longer exists and in fact

4 did not exist in 2006?

5 A.   Yes.

6 Q.   It was an old restaurant, something that had

7 been demolished?

8 A.   Yes.

9 Q.   When you walked up there, what did you see on

10 the corner before the car wash?

11 A.   It is flat.  It is just a parking lot.

12 Q.   So you walked up to the car wash, where did you

13 stand or go there?

14 A.   I just stood out at the front of the car wash on

15 the left side if it.

16 Q.   What happened next?

17 A.   J pulled in off of Clinton Street.  There is an

18 entrance right here to the car wash.  I got in the

19 car and we went into the north bay of the car cash.

20 Q.   Of the car wash?

21 A.   Of the car wash.

22 Q.   Was anybody else in the car with the defendant

23 on this occasion?

24 A.   No, there wasn't.

25 Q.   Which seat did you get into this time?

```
 1  A.   The front passenger.
 2  Q.   All right.  Once you were in the car and it
 3  pulled into the bay, this wash bay for the car wash,
 4  what happened there?
 5  A.   I gave him the $200 and he gave me the crack,
 6  and we pulled out of the east side of the car wash.
 7  Q.   Okay.  Why don't you point to the direction just
 8  so the Court will know where you went.
 9  A.   Right there.  We came out the east side.
10  Q.   Just the back side of the bay?
11  A.   Yes.
12  Q.   What happened then?
13  A.   He let me out and then he pulled onto East
14  Jefferson Street and I walked back towards Front
15  Street.
16  Q.   And when you walked back to Front Street, did
17  Detective Gray then meet with you sometime before
18  you got all the way to Front?
19  A.   Yes.  He pulled in Franzetti's parking lot and I
20  got in the car right there on Clinton and
21  Washington.
22  Q.   So that basically was the end of that
23  transaction?
24  A.   Yes.
25  Q.   Did you go back to the police department with
```

1  Detective Gray?

2  A.    Yes.

3  Q.    Before doing that, did you hand anything to

4  Detective Gray?

5  A.    Once I got in the car, I gave him the crack.

6  Q.    Now when you received this package, this crack

7  cocaine as you were referring to it from the

8  defendant on this occasion from the car wash, what

9  did it appear to be?  What was the -- was it

10  contained in something?

11  A.    Yes, three baggies.

12  Q.    Three baggies.  Were they each individual or

13  were they within a third bag or fourth bag?

14  A.    No, they were each individual.

15  Q.    What did they look like, what type of baggie?

16  A.    Just like a sandwich bag.

17  Q.    Just a portion --

18  A.    Just a corner of the sandwich bag tied off into

19  a knot.

20  Q.    You can take a seat again, if you'd like.  When

21  you received that from the defendant and as you took

22  it back, gave it to Detective Gray, and you had a

23  chance to look at it, right?

24  A.    Yes.

25  Q.    Based on your experience with these types of

1  drugs and the substance of crack cocaine, did you

2  have an opinion as to what this substance was that

3  you had just purchased?

4  A.    Yes.  It was similar to the first time we had

5  bought it, hard, off-white substance, crack.

6  Q.    Was there anything about it that would tell you

7  that it wasn't crack cocaine?

8  A.    No.

9  Q.    And Detective Gray took the baggies from you and

10  kept them for the police purposes?

11  A.    Yes.

12  Q.    Took you back down to the police station?

13  A.    Yes.

14  Q.    What happened there?

15  A.    Searched me just like before, before we did the

16  buy.

17  Q.    And was anything recovered or discovered by

18  Detective Gray when he searched you?

19  A.    No.

20  Q.    I'd like to direct your attention now to

21  March 28th of 2006, again, as part of this period of

22  time when you were working with Detective Gray in

23  this investigation, and ask if on that occasion just

24  shortly after noon time on the 28th of March, you

25  again met with Detective Gray at Bloomington Police

 1  Department?

 2  A.   Yes, I did.

 3  Q.   When you met with him, was there some particular

 4  purpose for you meeting with him that day?

 5  A.   Yes, we were going to buy more crack from J.

 6  Q.   All right.  Did you make a phone call?

 7  A.   Yes, I did.

 8  Q.   Who did you call?

 9  A.   J.

10  Q.   And did you use the same cell phone number that

11  you had called before?

12  A.   Yes, 242-0003.

13  Q.   The nature of that conversation on that day with

14  the defendant was what?  What did you ask for or

15  what did you talk about?

16  A.   I told him I needed to get some more crack and I

17  had a hundred dollars and he said to call me when

18  you get to Franzetti's.

19  Q.   Okay.  Did you go through the same search

20  routine with Detective Gray as you had before?

21  A.   Yes, I did.

22  Q.   Any contraband or money that you had that he

23  found on you that he took from you?

24  A.   No.

25  Q.   Did he provide with you some buy money?

1  A.   Yes, a hundred dollars.

2  Q.   As you understood it, that would have been

3  photographed or photocopied before?

4  A.   Yes.

5  Q.   Where did you go after you received the buy

6  money from Detective Gray?

7  A.   We called from the police station.  We said to

8  meet at Franzetti's.  So we went to -- Detective

9  Gray let me off on East Front Street and Clinton and

10  I walked to Franzetti's and called J.

11  Q.   Pretty much the same routine as the other two

12  times?

13  A.   Yes.

14  Q.   You went to the pay phone at Franzetti's?

15  A.   Yes.

16  Q.   What happened there?

17  A.   Called J and he said to walk towards the car

18  wash again, and I hung up the phone and walked

19  towards the car wash.

20  Q.   Okay.  And once you got to the car wash, what

21  did you do?

22  A.   I just stood right there on the west side of the

23  base, and he pulled on -- he pulled off of Clinton

24  Street on to East Jefferson and I got in the car on

25  the corner of East Jefferson and Clinton.

Q.   Sort of the edge of the property, the north edge
of the property at Clinton?

A.   Exactly.

Q.   Okay.  And once you got in the car, what
happened?

A.   We went east on Jefferson to Robinson, we took a
right on Robinson and right up the alley.

Q.   All right.  And, again, if you would step off
the stand just for a minute so the Court will know
exactly, I think this is something that would be
nice for the Court to see the exact route.  You
started out on the north side of the car wash on
Jefferson, right around there and went where?

A.   Went up East Jefferson to Robinson.  On Robinson
there is an alley and took the alley again all the
way down and he let me off right there.

Q.   So then the south end of the car wash?

A.   Yes.

Q.   While you were in the car with the defendant on
that route that you took, what happened?

A.   I gave him the hundred dollars and got the
hundred dollars worth of crack.

Q.   And when you received that, what you refer to as
a hundred dollars worth of crack from the defendant,
what did it appear to be, how was it packaged?

1  A.   It was packaged in one bag, a quarter of a

2  baggie tied with the knot.

3  Q.   Okay.  Very similar or identical to the other

4  times?

5  A.   Yes.

6  Q.   What did you do with that particular item?

7  A.   Pardon me?

8  Q.   What did you do with that once you received it?

9  A.   Once I got out of the car -- let me -- while I

10  was with J?

11  Q.   Yes.

12  A.   I took it and put it in my pocket.

13  Q.   Then he let you off there at the south end of

14  the car wash and you went where?

15  A.   I walked back toward Franzetti's.

16  Q.   What happened there?

17  A.   Got in the car with Detective Gray, handed him

18  the crack that I just bought, a hundred dollars

19  worth of crack.

20  Q.   Now when you saw this being handed to you by the

21  defendant and as you put it in your pocket and later

22  took it out seconds later and gave to Detective

23  Gray, what was the appearance of the substance

24  inside the plastic corner that was tied off?

25  A.   It was hard, white, off-white but a real rock

1  hard substance.

2  Q.   And what in your opinion was that substance?

3  A.   Crack.

4  Q.   Obviously as you've testified you've seen that

5  on numerous occasions before?

6  A.   Yes.

7  Q.   Go ahead and take a seat if you will.

8       Was there anything about the baggie that

9  had, as you described, the crack cocaine on this

10 third occasion, anything that would suggest to you

11 that it was not crack cocaine?

12 A.   No, huh-huh.

13 Q.   Are you familiar with the difference between

14 crack cocaine and powder cocaine?

15 A.   Yeah.  Powder is a little more chalky looking.

16 It looks like a dull white.

17 Q.   And this is not what you got?

18 A.   No.

19 Q.   Now I would like to ask you also during this

20 time that you were working with Detective Gray and

21 you went back to the police station after this third

22 transaction.

23 A.   Yes.

24 Q.   Describe for the Court briefly what happened

25 there.

1  A.   I was searched, pockets, socks, shoes.

2  Q.   Anything that was removed from you by Detective

3  Gray?

4  A.   No.

5  Q.   You had nothing else on you?

6  A.   No.

7  Q.   As part of this, these series of transactions

8  and working with Detective Gray on these three

9  occasions, you received some benefit, did you not,

10  from the police department?

11  A.   Yes.

12  Q.   And what were you receiving from the police

13  department?

14  A.   Money.

15  Q.   And you received it on at least a couple

16  occasions during the course of these transactions,

17  that is after they were concluded, is that correct,

18  after the first one at least?

19  A.   Yes, $60 the first time.

20  Q.   All right.  Then after the second or third time,

21  did you also receive some amount of money?

22  A.   Yes, I did.

23  Q.   What was that?

24  A.   60 the second and then 400 the last.

25  Q.   Now the large bulk of this, this $400 would have

1  been some time after the third transaction?

2  A.   Yes.

3  Q.   That was as a basis for you being paid

4  essentially for your assistance in this

5  investigation?

6  A.   Yes, I was.

7  Q.   You, for lack of a better term, are a paid

8  informant?

9  A.   Yes.

10  Q.   Was there any other benefit that you received in

11  this regard?  Did you have any pending charges that

12  Detective Gray said I will put a good word in for

13  you, that sort of thing?

14  A.   No, I didn't.

15  Q.   So it was basically the money?

16  A.   Yes.

17  Q.   Also during the transactions between March 21st

18  and March 24th, not in conjunction with Detective

19  Gray but on your own, did you have occasion and

20  during that three day period to call the defendant

21  on your own and ask him for something?

22  A.   Yes.  I believe I called him a day or two after

23  the 21st.

24  Q.   And did you use the same number to call him on?

25  A.   Yes.

1  Q.   And this is done from either your home or some

2  other location?

3  A.   Yes.

4  Q.   What did you talk to him on about that

5  particular occasion?

6  A.   I called him and I think I got $50 worth of

7  crack.

8  Q.   So you ordered that up for yourself?

9  A.   Yes.

10  Q.   Were you supposed to be doing that during this

11  time while you were helping the detective on this

12  case?

13  A.   No.

14  Q.   Is there some reason that you did it?

15  A.   No.

16  Q.   Did you use the crack cocaine?

17  A.   Yes, I did.

18  Q.   Did you consider yourself to be addicted to

19  crack cocaine?

20  A.   Yes.

21  Q.   So on this occasion between the 21st of March

22  and the 24th, did you meet with the defendant on

23  your own?

24  A.   Yes.

25  Q.   And where was that at?

A.   I believe it was on West Walnut, right there

East Chestnut and Walnut there is like two.

Q.   Is this in the general vicinity of Franzetti's

part of town?

A.   Yes, it is probably four or five blocks away

maybe six.

Q.   Any particular reason why you met there on the

occasion with the defendant to do this?  Why that

location?

A.   He lived close to there, and that was the

general location.  He only lived a few blocks away.

Q.   At one time he did.

A.   Yes.

Q.   Did you know during the course of the

investigation exactly where he was living?

A.   I helped him move him in a house off of Clinton

Street, but I'm not sure if he was living there or

somewhere else.

Q.   All right.  So, whose $50 or where did you get

the $50 to buy this small amount of crack cocaine

for yourself?

A.   Some of it was my money and some of it I think I

had from Detective Gray.

Q.   And when you received this $50 worth as you

described it, was it crack cocaine?

1  A.   Yes, it was.

2  Q.   When you received it, how was it packaged?

3  A.   In a corner of a baggie tied off in a knot.

4  Q.   What did it look like?

5  A.   It was hard, rock like substance kind of

6  off-white.

7  Q.   Did it look like the other substances that you

8  bought on the three occasions where you were working

9  with Detective Gray when you bought from the

10  defendant?

11  A.   No, it looked exactly the same.

12  Q.   Did you actually use that $50 rock of crack

13  cocaine?

14  A.   Yes, I did.

15  Q.   Did it have any affect on you?

16  A.   Yes.

17  Q.   What affect did it have?

18  A.   It got me high.

19  Q.   Based on your experience, and all of these

20  things that you've talked about and your experience

21  as a drug user, as a crack cocaine user and addict,

22  would you have an opinion and do you have an opinion

23  of what you purchased on that occasion from the

24  defendant?

25  A.   Yes, it was crack.

1  Q.   After that occasion you went back with Detective

2  Gray on the 24th.  Did you attempt to contact the

3  defendant again at some time during this

4  investigation to acquire something for yourself?

5  A.   No, I didn't.

6  Q.   Why was that?

7  A.   He was -- he had just -- he was about ready to

8  run out on the 24th.  He said that he had to make a

9  trip to get more.

10  Q.   Do you know whether or not that was true or not

11  or whether he made a trip?

12  A.   No, I don't know whether that is true or not.

13  Q.   Now, Brett, we have disclosed to defense counsel

14  some information about you and something the Court

15  needs to hear about as well.

16       I would like to talk briefly about your

17  criminal history so that's part of the record and

18  the Court is informed of that.  I would like to go

19  back to 1992.  And you realize, obviously, that you

20  had been convicted of crimes before?

21  A.   Yes.

22  Q.   Going back to 1992, around that time period, did

23  you get into some trouble in the Bloomington area

24  for a credit card problems?

25  A.   Yes, I did.

1  Q.   What was that?

2  A.   I think that was my aunt's credit card or my

3  mom's.

4  Q.   So you used a credit card without permission?

5  A.   Yes.

6  Q.   And did that get you arrested?

7  A.   Yes, it did.

8  Q.   And charged with an offense?

9  A.   Yes.

10  Q.   And did that result in some kind of conviction?

11  A.   Probation.

12  Q.   A felony conviction?

13  A.   Yes.

14  Q.   1992.  And you got probation?

15  A.   Yes.

16  Q.   At that time when you were using this credit

17  card without authority or permission, did you use

18  the credit card for some purpose or what purpose did

19  you use it for?

20  A.   I can't remember exactly.

21  Q.   Going to 1994, again, another credit card

22  problem, this time both in McLean and Tazewell

23  County.  So you were in two different places

24  apparently.  What was the problem with the credit

25  card in 1994?

1  A.   That was my aunt's credit card.

2  Q.   Did you use that without permission?

3  A.   Yes.

4  Q.   And did you get in trouble?

5  A.   Yes.

6  Q.   What happened as a result of that?

7  A.   I think more probation, felony conviction.

8  Q.   Felony conviction for using this and having a

9  certain dollar amount worth of value that you used

10  improperly?

11  A.   Yes.

12  Q.   And about 1997, you got involved with a scenario

13  where you ended up getting charged and convicted of

14  burglary; is that correct?

15  A.   Yes.

16  Q.   What type of situation was that?

17  A.   It was burglary of an auto.

18  Q.   A car?

19  A.   A truck.

20  Q.   And what was it that you took or helped take out

21  of the truck?

22  A.   Tools.

23  Q.   Did you take the tools and sell them?

24  A.   Actually the guy that -- we both got convicted

25  but he took the tools.

1  Q.   He took the tools but you both got convicted?

2  A.   Yes.

3  Q.   That was a felony for a car burglary -- for a

4  truck burglary?

5  A.   Yes.

6  Q.   Going on to 1998 and something else happened and

7  that involved some bad checks?

8  A.   Yes.

9  Q.   Whose checks?

10  A.   They were mine.

11  Q.   Did you write some bad checks on your account?

12  A.   Yes, I did.

13  Q.   Did you get in trouble for that?

14  A.   Yes.

15  Q.   As a result of that, did you get convicted for

16  deceptive practice?

17  A.   Yes, I did.

18  Q.   That was also McLean County?

19  A.   Yes.

20  Q.   Once you got that conviction in 1998, what

21  happened to the prior conviction, the burglary from

22  the truck of 1997?

23  A.   That violated probation.

24  Q.   Where did you go?

25  A.   DOC.

1  Q.   You went to the Department of Corrections in

2  Illinois for what period of time?

3  A.   Four years.

4  Q.   You served at least a portion of that?

5  A.   Yes.

6  Q.   Now during that time that we've talked about

7  1992 to 1998, were you using any controlled

8  substances or drugs?

9  A.   Coke, crack on and off.

10 Q.   So this scenario of 2006 when you ingested at

11 least on the one occasion the $50 rock of crack

12 cocaine that was not something new for you?

13 A.   No, it wasn't.

14 Q.   Have you been treated for drug addiction of any

15 kind over this period of time?

16 A.   Yes, twice I believe.

17 Q.   So you've attempted to do something about this?

18 A.   Yes.

19 Q.   Do you consider yourself a crack cocaine addict?

20 A.   Yes, recovering, trying to.

21 Q.   And you're working now, you're doing that?

22 A.   Yes.

23 Q.   And then finally the amount of money that was

24 paid to you by Detective Gray for your work in this

25 case involving the defendant, a total of $520; is

1  that correct?

2  A.    Yes.

3  Q.    And you think at least a small portion of that

4  you may have used on your own to buy some crack?

5  A.    Yeah, that one time.

6  Q.    From the defendant.

7          MR. CAMPBELL:  Your Honor, I'm not sure what

8  the Court wants to do as proceeding, but what we

9  have next, what I would ask the Court to do is allow

10  the jail telephone calls to be played and there is a

11  total of about ten minutes worth of calls, but there

12  is five different calls and we have transcripts of

13  those but it will take some time to go through those

14  and I don't know if the Court wants to keep going at

15  this juncture or take a short break.

16          THE COURT:  Why don't we break for lunch.

17  It is 12:20.

18          MR. CAMPBELL:  We can get that set up so

19  when we come back, we will have that ready to go.

20          THE COURT:  And come back at 1:15.  How is

21  that?

22          MR. CAMPBELL:  That's fine.  Thank you.

23          (The Court recessed for lunch.)

24          MR. CAMPBELL:  Your Honor, may the witness

25  take the stand again?  Thank you.

1   THE COURT:  You may continue.

2 BY MR. CAMPBELL:

3 Q.   Mr. Fowler, you realize you're still under oath?

4 A.   Yes.

5 Q.   We'll play these portions of recorded phone

6 calls the clerk has placed it on the bench, Exhibit

7 16 A, B, C, D, E, and these are transcripts of those

8 portions of phone calls and we provided a copy to

9 defense and there is one for the witness to look at.

10 If we look at -- if these are acceptable for the

11 Court, we won't be moving to admit the transcripts

12 at this moment, but they are just for purposes of

13 our following the recording at this time.

14   THE COURT:  Yes.  And the Court realize that

15 the evidence is the recording and not the

16 transcript, but the transcript is an aid in the

17 Court understanding the recording.  If there is a

18 conflict, the recording controls.

19   You may proceed.

20 BY MR. CAMPBELL:

21 Q.   Mr. Fowler, as the Judge indicated you're still

22 under oath; you understand that?

23 A.   Yes.

24 Q.   You have had a chance to listen to a portion of

25 some recorded phone calls; is that correct?

1  A.   Yes, yes, I have.

2  Q.   And, in fact, you heard them today at some

3  point?

4  A.   Yes.

5  Q.   As you listened to those portions of the

6  recorded phone calls, are these transcripts of the

7  words that were said on the recordings?

8  A.   Yes.

9  Q.   Were you able to follow the recorded words along

10  with the printed word on the transcript?

11  A.   Yes.

12       MR. CAMPBELL:  I would ask now, Margo, if

13  you would play the first portion of the recorded

14  conversation, telephone conversation that

15  corresponds with exhibit 16-A.

16       (Listening to recording.)

17       MR. CAMPBELL:  Could I ask that that be

18  paused just for a moment, Your Honor?

19  BY MR. CAMPBELL:

20  Q.   Mr. Fowler, you have you had a chance to listen

21  to the very first portion of this recording and

22  follow along with the transcript that it relates to;

23  is that correct?

24  A.   Yes.

25  Q.   Just based on what you hear from the recording

1  itself, do you recognize any of the voices that

2  correspond with the printed version of the

3  transcript?

4  A.   Yes, the defendant's voice.

5  Q.   When you look at the transcript, there are

6  different labels along the left-hand side at the

7  page at the very top of 16-A.  It starts out

8  "recording defendant," etcetera.  When you see the

9  word "defendant," the third line down on the very

10 first page and it says, "Larry," you heard someone

11 say Larry; is that correct?

12 A.   Yes.

13 Q.   And whose voice was that?

14 A.   That was J's.

15 Q.   For purposes of court today, that is the

16 defendant?

17 A.   Yes.

18 Q.   And you heard him say a couple other things

19 along the way and each time he says something does

20 that correspond with the label or the term defendant

21 on the sheet of paper?

22 A.   Yes, it does.

23 Q.   Do you know who the other voices belong to

24 there, do you recognize them at all?

25 A.   No, I don't.

1  Q.   But you recognize the defendant's?

2  A.   Right.

3       MR. CAMPBELL:  Margo, if we can go to the

4  next call and refer the Court and witness to

5  Exhibit 16-B which is the next piece of -- there is

6  three pieces of paper I think stapled together.

7       (Listening to recording.)

8       MR. CAMPBELL:  Your Honor, I have asked

9  Margo to stop the recording at this time.

10 BY MR. CAMPBELL:

11 Q.   Mr. Fowler, you've heard voices on this

12 recording; is that correct, here in court?

13 A.   Yes.

14 Q.   Did you recognize anybody's voice?

15 A.   The defendant's voice.

16 Q.   Have you been able to follow along on the

17 Government's Exhibit 16-B on the printed transcript?

18 A.   Yes.

19 Q.   Where it says "defendant" on the page there were

20 you able to hear a voice that you recognized?

21 A.   Yes.

22 Q.   And that was J's?

23 A.   Yes.

24       MR. CAMPBELL:  We will do the next one if we

25 could.

1          Your Honor, I would refer the Court and

2   witness to 16-C which is a one-page transcript.

3          (Listening to recording.)

4          MR. CAMPBELL:  Your Honor, that is the

5   conclusion of that particular portion.

6   BY MR. CAMPBELL:

7   Q.   Mr. Fowler, you have had a chance to listen to

8   the record here in court; is that correct?

9   A.   Yes.

10  Q.   And have you recognized anybody's voice on that

11  recording?

12  A.   Yes, J's, the defendant.

13  Q.   And again does the voice that you recognize as

14  the defendant's correspond on the page where it says

15  defendant?

16  A.   Yes, it does.

17  Q.   There is reference in there to somebody named

18  Brett.  Do you know who it is that he might be

19  talking about there?

20  A.   Yeah, he is probably talking about me.

21          MR. CAMPBELL:  16-D is the next one.

22          (Listening to recording.)

23          MR. CAMPBELL:  That concludes that portion,

24  Your Honor.

25  BY MR. CAMPBELL:

1  Q.   Again, Mr. Fowler, you have had a chance to

2  listen to the recording here in court?

3  A.   Yes.

4  Q.   Do you recognize anybody's voice in that

5  recording?

6  A.   Yes, that was J's, the defendant.

7  Q.   And you were able to follow along in the

8  transcript as the words were being spoken?

9  A.   Yes.

10       MR. CAMPBELL:  And then the final one, Your

11  Honor, is 16-E if we can have that played as well.

12       (Listening to recording.)

13  BY MR. CAMPBELL:

14  Q.   Mr. Fowler, you have had a chance to listen to

15  the record in court; is that correct?

16  A.   Yes.

17  Q.   And do you recognize anybody's voice on that

18  recording?

19  A.   Yes, J's, the defendant.

20  Q.   Brett, you've testified here in court today

21  about several matters including the fact that you

22  have used substances from time to time and you know

23  the effect of crack cocaine on your body when you

24  use it obviously.  Have you ever used powder

25  cocaine?

1   A.   Yes.

2   Q.   Do you experience a difference as the way it

3   effects you between powder and crack cocaine?

4   A.   Yes, it's more intense smoking it.

5   Q.   Which is more -- crack is more intense?

6   A.   Yes.

7   Q.   And when you say that you use crack cocaine, you

8   say that you smoke it?

9   A.   Yes.

10  Q.   That's how you use it?

11  A.   Yes.

12  Q.   Is that typical what other people do as well as

13  your experience tells you?

14  A.   Yes, it is.

15  Q.   You've seen others do that?

16  A.   Yes.

17  Q.   With you sharing and that sort of thing?

18  A.   Right.

19  Q.   Is that how you also ingest powder cocaine,

20  smoking it?

21  A.   No, you snort it.

22  Q.   Different process all together?

23  A.   There are other ways that you can do it, too.

24  Q.   In this particular instance, you've indicated

25  that on the one occasion during the investigation

1  that you acquired $50 worth of crack from the

2  defendant and used it?

3  A.   Yes.

4  Q.   Before this investigation started, before this

5  March 12th, 2006 you had been a customer, for lack

6  of a better word, of the defendant?

7  A.   Yes.

8  Q.   Did he ever sell you powder cocaine?

9  A.   No, he never did.

10  Q.   What did he sell?

11  A.   It was always crack cooked up.

12  Q.   Do you know how many times that happened before

13  March 21st of '06 approximately?

14  A.   No, maybe 30 times.

15  Q.   And did you ingest that either with others or by

16  yourself on those 30 times?

17  A.   Yes.

18  Q.   So you know the effect on you?

19  A.   Yes.

20       MR. CAMPBELL:  Your Honor, I have no other

21  questions for this witness.  Thank you.

22       THE COURT:  You may cross, Mr. Serritella.

23                   CROSS-EXAMINATION

24  BY MR. SERRITELLA:

25  Q.   Mr. Fowler, you've testified that on at least

1  four occasions you bought some substances from the

2  defendant, isn't that correct?

3  A.   Yes.

4  Q.   And you further testified I believe that you

5  have had some other conversations with him; is that

6  correct?

7  A.   Yes, I believe that's right.

8  Q.   Regarding -- you called them on the telephone?

9  A.   Yes.

10 Q.   Besides the conversations that you had with them

11 in the vehicle?

12 A.   Yes.

13 Q.   So, is it accurate to say that maybe you've,

14 from your testimony here, talked to him at least

15 four times in the vehicle when the alleged transfers

16 took place; is that correct?

17 A.   The three transactions, yes.

18 Q.   I thought you bought another?

19 A.   Yes, there was a four where I met him, four

20 total.

21 Q.   Then there were telephone conversations you had

22 with him also?

23 A.   Yes.

24 Q.   Now let me ask you this question and it's just a

25 yes or no answer.  Do you realize that in all of

1 your testimony regarding your conversations that you

2 say that you had with the defendant, not once have

3 you testified in this court that he told you that

4 this alleged substance he was giving you was crack

5 cocaine.  Do you realize that?

6 A.   Yes, I do.

7 Q.   Now you had been using drugs since you were

8 about 15 or 16 years of age; is that correct?

9 A.   I think I first started smoking pot when I was

10 15 or 16.

11 Q.   And your drug uses included LSD?

12 A.   Yes.

13 Q.   Marijuana?

14 A.   Yes.

15 Q.   Heroin?

16 A.   No.

17 Q.   Hasn't included heroin?

18 A.   No, I don't believe, maybe once.

19 Q.   But it's included heroin?

20 A.   Yes, I guess.

21 Q.   Any other drugs you've used?

22 A.   That's it.

23 Q.   How old are you now?

24 A.   40.

25 Q.   And so for approximately 25 years, you have been

1  using illegal drugs?

2  A.    Yes.

3  Q.    And has there ever been a break in that 25 years

4  when you stopped using illegal drugs for more than a

5  month?

6  A.    Yes.

7  Q.    How long is the longest you have not used

8  illegal drugs in that 25 year period?

9  A.    Roughly a little under two years.

10  Q.    How long ago was that?

11  A.    That's when I went to the Department of

12  Corrections.

13  Q.    As you sit here today, when was the last time

14  you used any substances before you testified here

15  today?

16  A.    It's been about almost two months.

17  Q.    And you say that you are employed now?

18  A.    Yes.

19  Q.    Where are you employed?

20  A.    A restaurant.

21  Q.    What restaurant?

22  A.    It's in Bloomington, Illinois.

23  Q.    What's the name of it?

24  A.    Kips.

25  Q.    What do you do there?

1   A.   Cook.

2   Q.   How long have you been employed there?

3   A.   I just started about a week ago.  Prior to that

4   I worked at a hotel for a year.

5   Q.   What did you do at the hotel?

6   A.   Cleaned rooms.

7   Q.   What hotel was that?

8   A.   That was Super8.

9   Q.   Where was that at?

10   A.   That's in Bloomington, Illinois.

11   Q.   And you cleaned rooms for a year?

12   A.   Yes.

13   Q.   Were you using drugs during that year?

14   A.   I had my rup maybe a couple times.

15   Q.   A few moments ago, if I'm not mistaken, you said

16   that you hadn't used drugs in two years.

17   A.   That's when I was in DOC.  You said how long was

18   the longest time.

19   Q.   When was the last time that you used drugs

20   before today, illegal drugs before today?

21   A.   Maybe two months ago.

22   Q.   What did you use?

23   A.   Crack.

24   Q.   Where was that at?

25   A.   In Bloomington.

1  Q.   And you hadn't used any illegal substances in

2  two months?

3  A.   No.

4  Q.   Now, while you have been using drugs for all of

5  these years have you also been selling drugs too?

6  A.   No, just got them for my own use.

7  Q.   So you're telling me that you never, during all

8  of this 25 years, you've never said, well, now, I

9  can earn enough money to get my drugs if I sell a

10  few drugs on the side, too?  You've never -- that

11  never crossed your mind?

12  A.   Yeah, it has before, but generally friends and

13  I've always had a job and we pooled money in and sat

14  down and bought drugs together, crack usually.

15  Q.   So you never sold drugs?

16  A.   I've sold -- as far as like going out on the

17  street you mean or just to friends?

18  Q.   I mean selling it to friends; did you ever sell

19  drugs to your friends?

20  A.   Yeah, but we'd sit down and do them together.

21  Q.   Now you say that you got money from the

22  Government to do this?

23  A.   Yes.

24  Q.   Did you get anything else from the Government

25  for doing this?

1  A.   No.

2  Q.   How about the fact that you've already been in

3  the penitentiary once and now you're using crack?

4  Is using crack a crime?

5  A.   I think it is.

6  Q.   You think maybe possession of the crack could be

7  a crime?

8  A.   Yes.

9  Q.   So -- and at the time when you were involved

10  with the defendant in this case, you were using

11  crack, weren't you?

12  A.   I used -- after the 21st, yes, during that time

13  I was using crack.

14  Q.   Did it cross your mind that, well, if I get

15  arrested for possessing crack because I'm using

16  crack, but I'm working for the Government, maybe the

17  Government wouldn't prosecute me for possessing the

18  crack, did that ever occur to you?

19  A.   No, it didn't.

20  Q.   How about the fact that you told them that you

21  were using crack when you made the fourth purchase

22  from the defendant that you say you made and you

23  used crack, did they prosecute you for that?

24  A.   No.

25  Q.   And they never said to you, hey, you possess

1   crack cocaine, you are going to be indicted?

2   A.   No.

3   Q.   Did it ever occur to you that maybe you were

4   going to build some good will with the police in

5   addition to the money you were being paid to make

6   these purchases?  Did that ever occur to you?

7   A.   No, it was strictly for money.

8   Q.   What did you do with the money?

9   A.   I moved to St. Louis shortly after the 28th

10  after the last buy.

11  Q.   What did you do down there?

12  A.   Just lived.  Got out of the neighborhood I was

13  in.

14  Q.   But -- strike that.

15       Did you go back to using any kind of illegal

16  drugs after that?

17  A.   After I moved to St. Louis?

18  Q.   Yeah.

19  A.   I returned to Bloomington, and I have been in

20  Bloomington now after I moved out probably close

21  to -- I moved out for two or three months, about two

22  months, I moved back to Bloomington, so I have been

23  in Bloomington again for almost two years.

24  Q.   Have you used any illegal drugs since that time?

25  A.   Yes, I have a couple times, two times.  I don't

1  know how many.

2  Q.   On one occasion, at least, you took some of the

3  money you got from the Government and allegedly

4  bought more crack, didn't you?

5  A.   Yes.

6  Q.   Did you ever have any conversations with the

7  defendant over the telephone while he was in jail?

8  A.   No.

9  Q.   When was the last felony conviction?

10  A.   I believe it was 1998.

11  Q.   And was that the one they revoked your probation

12  on?

13  A.   Yes.

14  Q.   Now, you made an agreement with the police, did

15  you not, when you became a confidential informant?

16  A.   I believe I did.

17  Q.   And that was reduced to writing, wasn't it?

18  A.   Yes.

19  Q.   Now I believe you signed it, did you not?

20  A.   I believe I did.

21       MR. SERRITELLA:  May I approach the witness,

22  Judge?

23       THE COURT:  Uh-huh.

24  BY MR. SERRITELLA:

25  Q.   Mr. Fowler, is that your signature?

1   A.   Yes, it is.

2   Q.   Did you fill this document out or did somebody

3   else fill this out and you just signed it?

4   A.   I don't remember.  I would have to see the

5   document, the whole document.  I just signed it

6   somebody else filled it out.

7   Q.   Okay.

8   A.   Yeah, I initialed that stuff there.

9   Q.   Now you did initial some parts of it, did you

10  not?

11  A.   Yes.

12  Q.   And it says here confidential source advisement,

13  "I understand that while I am a confidential source

14  for the Bloomington Police Department, I am

15  forbidden to doing any of the following:"

16          Do you remember initialing those items?

17  A.   Yes.

18  Q.   One of them says, "become involved in any

19  activity or improper conduct so long as I'm working

20  as a confidential source including carrying a weapon

21  or an officer of the law."  Do you remember that

22  one?

23  A.   Yes.

24  Q.   Did you initial that one?

25  A.   Yes.

1  Q.   Would possession of a controlled substance, a
2  felony, would that also be considered an improper
3  conduct?
4  A.   As far as I know, yes.
5  Q.   But you did that, did you not?
6  A.   Yes.
7  Q.   So you broke this agreement, didn't you?
8  A.   Yes, I guess.
9  Q.   Well do you guess or?
10  A.   Yes, yes.
11  Q.   Was there any other way you broke this agreement
12  besides possessing a controlled substance?
13  A.   No.
14  Q.   How did it come to the attention of the
15  authorities that you broke the agreement?
16  A.   I don't understand.
17  Q.   Well, did you voluntarily come forward and tell
18  the officers or the prosecutors that you had broken
19  the agreement or did they come to you and say, we
20  have evidence that you broke this agreement?  How
21  did that happen?
22  A.   I came to them.
23  Q.   And you voluntarily told them?
24  A.   Yes.
25  Q.   Why was that?

1  A.   It was a bad time in my life, and I was trying

2  to get out of that neighborhood and I let them know

3  that I used.

4  Q.   Now you said that the substance that you

5  allegedly bought from the defendant on March 27,

6  2006 was it an off-white substance and it was hard

7  rock?

8  A.   Yes.

9  Q.   And those were the other two occasions you

10 described the substance the same way; is that

11 correct?

12 A.   Yes.

13 Q.   And you said that the drugs were packaged in a

14 clear plastic baggie?

15 A.   Yes.

16 Q.   You've purchased a lot of drugs in your life,

17 haven't you?

18 A.   Yes, I have.

19 Q.   Have you ever seen any other drugs packaged in a

20 plastic baggie?

21 A.   Yes.

22 Q.   So, the way they were packaged doesn't tell you

23 that it was crack cocaine, does it?

24 A.   No.

25 Q.   Then you said it was an off-white substance; is

1  that correct?

2  A.   Yes.

3  Q.   Have you ever seen regular cocaine?

4  A.   Yes.

5  Q.   What color is that?

6  A.   It's white, dull white, more of a chalky

7  appearance.

8  Q.   Could it be described as off-white?

9  A.   Sure.

10  Q.   So the color doesn't tell you that it was crack

11  cocaine, does it?

12  A.   No.

13  Q.   So now we know that the packaging and the color

14  don't tell you it was crack cocaine?

15  A.   Correct.

16  Q.   The -- have you ever seen regular cocaine in

17  little rock forms?

18  A.   Generally it's more of a powdery fine substance,

19  but I have seen it.

20  Q.   In a rock form?

21  A.   In a chunk form, yes.

22  Q.   Now the three occasions, March the 21st, the

23  24th and the 28th, you never sampled any of those

24  substances, did you?

25  A.   No, I didn't.

1  Q.   So you can't give us an opinion from your

2  experience that those substances that you were

3  supplied with by the defendant on those days,

4  allegedly, that from their use you could tell that

5  they were crack cocaine, isn't that true?

6  A.   Yes.

7  Q.   When you were using this crack cocaine, in March

8  of 2006, were you using any other drugs, or do you

9  just strictly use one thing at a time?

10  A.    One thing at a time.

11  Q.   Say one of your buddies say, hey, I'm smoking a

12  joint of marijuana.  Would you say, oh, no, I'm only

13  doing crack right now or would you take some of the

14  marijuana?

15  A.   No, I quit smoking pot.

16  Q.   How about if the guy had some mescaline?

17  A.   No.

18  Q.   Amphetamines?

19  A.   No.

20  Q.   Heroin?

21  A.   No.

22  Q.   Okay.  So you're saying that you're just a pure

23  guy that just uses crack and that's it?

24  A.   Yes.

25  Q.   And you can tell crack from regular cocaine

1 because it is a different high?

2 A.   Yes.

3 Q.   Now, when you say it's a high, what do you mean

4 by that?

5 A.   It's like an adrenaline rush.

6 Q.   Like speed gives you?

7 A.   Yes.

8 Q.   So, it makes you feel like speed?

9 A.   Yes.

10 Q.   How -- does this stuff that you get come with a

11 label that says this is crack cocaine, this isn't

12 speed?

13 A.   No, it doesn't.

14 Q.   It's a street product, isn't that right?

15 A.   Yes.

16 Q.   So for all you know, it could be speed, couldn't

17 it?

18 A.   Yes.

19 Q.   Another point I'd like to make is that when

20 you're judging what you're taking, you're high when

21 you're judging what you're taking, aren't you?  Do

22 you understand the question?

23 A.   No.

24 Q.   Well when you're saying to yourself I'm smoking

25 this substance or I'm ingesting this substance or

1  whatever, you know it gets you high, don't you?

2  A.   Yes.

3  Q.   And your mind is in an altered state, isn't it?

4  A.   Yes, it is.

5  Q.   And that's the kind of state of mind that you're

6  bringing to judging this substance that you bought

7  off the street with, you're bringing an altered mind

8  when you're judging what it is, isn't that true?

9  A.   I have been doing it long enough.  I can judge

10  and tell pretty much crack from powder.

11  Q.   Let me ask you this.  Isn't it also arguable,

12  sir, that because you have been doing it so long

13  that maybe you've lost some of your mind and your

14  mind wasn't as good as it was 25 years ago, isn't

15  that a possibility also?

16  A.   No.

17  Q.   Okay.  Other drugs get you high, don't they?

18  A.   Like what?

19  Q.   Like other drugs, other illegal drugs, don't

20  they get you high?

21  A.   Yes.

22  Q.   So just to conclude here, we've substantiated

23  that the off-white substance appearance does not

24  mean it is crack, correct?

25  A.   Yes.

123

```
1   Q.   The hard rock substance doesn't mean it is
2   crack, correct?
3   A.   Hard white -- you can tell, I mean --
4   Q.   I said hard rock.
5   A.   Hard rock, well there is, no.
6   Q.   And the packaging doesn't mean it's crack,
7   right?
8   A.   Right.
9   Q.   And you didn't smoke it so you don't have an
10  opinion whether from using it it's crack, correct?
11  A.   Correct.
12          MR. SERRITELLA:  If I can just have a
13  minute, Judge?
14          THE COURT:  Uh-huh.
15  BY MR. SERRITELLA:
16  Q.   And the felonies that you were convicted of:
17  deceptive practice, misuse of a credit card,
18  burglary, these all involved moral turpitude, don't
19  they?
20  A.   I don't understand the question.
21  Q.   They involve lying, deceit?
22  A.   Deception maybe.
23  Q.   Yeah.
24          MR. SERRITELLA:  I have no further
25  questions, Your Honor.
```

1          THE COURT:  Redirect?

2                    REDIRECT EXAMINATION

3  BY MR. CAMPBELL:

4  Q.   Brett, you've indicated in your testimony that

5  you have purchased crack cocaine on numerous

6  occasions?

7  A.   Yes.

8  Q.   And at least at some point in your life you

9  purchased powder cocaine?

10  A.   Yes.

11  Q.   Powder cocaine is it always powder or is it some

12  times compressed?

13  A.   It can sometimes be compressed.

14  Q.   When you were asked the question just moments

15  ago about a hard substance, is there a difference

16  between hard powder substance that's compressed and

17  crack cocaine that's a rock-like substance?

18  A.   The crack is a lot more harder than the powder.

19  Generally you can take the powder and press with

20  your thumb and it will break up, but crack you

21  really have to snap it or break it up.

22  Q.   So the crack doesn't powderize, doesn't get

23  chalky?

24  A.   No, it doesn't.

25  Q.   Is there a different look to a bag that contains

1  the powder or the powder that is compressed into a

2  little ball and crack cocaine in a clear plastic

3  bag, is there a difference in the appearance of the

4  bags?

5  A.   Generally they use the corner of the bags.

6  Q.   Does the crack cocaine leave residue on the

7  inside of the bag like powder?

8  A.   No, it doesn't.  It all comes out.  The powder

9  leaves like a film that's on the bag.

10  Q.   Let me ask you this, on the March 21st, 24th,

11  28th of last year when you purchased these

12  substances from the defendant, what would the bags

13  look like to you?  What did they look like when you

14  bought them and you took them to the detective?

15  A.   It was crack.

16  Q.   Did you see any powder on the inside of the

17  bags?

18  A.   There was no powder, it was all one chunk for

19  the most part.

20  Q.   You indicated that ingesting speed would be

21  something that could give you a certain type of a

22  rush or adrenaline rush or however you said it, and

23  that crack cocaine when you smoked it could give you

24  a quote "adrenaline rush".

25  A.   Right.

1  Q.   But does speed look like crack cocaine?

2  A.   No, it doesn't.

3  Q.   What does speed look like?

4  A.   I guess you can get them in pill forms. I don't

5  know.

6  Q.   It didn't look like anything that you purchased

7  from the defendant, did it?

8  A.   No.

9  Q.   The purchases that you made with Detective Gray

10 on the 21st, 24th and 28th of March, did those

11 purchases, those substances that you purchased have

12 the same appearance as what you bought on your own

13 that one occasion for $50 from the defendant?

14 A.   Yes, it did.

15 Q.   You were asked about this agreement that you had

16 with the Bloomington Police Department in which you

17 indicated that you weren't going to violate the

18 rules of the agreement of the confidential source

19 and you freely admitted today that there was a

20 violation, you went and did something that you

21 weren't supposed to.

22 A.   Yes.

23 Q.   Later told the police about that?

24 A.   Yes.

25 Q.   You were not prosecuted for any of that because

1  what happened to the drug evidence in that case

2  where you bought the 50 rock from the defendant?

3  A.   I smoked it.

4  Q.   No evidence left?

5  A.   Right.

6  Q.   You told the police long after that?

7  A.   Yes.

8  Q.   Has your drug use over the past 25 years caused

9  you not to have a memory anymore?

10  A.   No, it hasn't.

11  Q.   You still remember details from March of 2006,

12  don't you?

13  A.   Yes, I do.

14  Q.   And you've indicated that you had contact with

15  the defendant approximately 30 times over the course

16  of the period that you knew him from, I guess --

17  does that go back into late 2005?

18  A.   Yes, or yeah, late 2005.

19  Q.   Did you have contact in those 30 times over the

20  telephone with the defendant?

21  A.   Yes, it was always over the phone to arrange to

22  meet.

23  Q.   Then did you meet him after the phone calls?

24  A.   90 percent of the time, yes.

25  Q.   What about the ten percent that you didn't?

1  A.   He was either busy or out of town.

2  Q.   Would somebody else deliver then?

3  A.   No, he would usually sit -- say go to Monroe

4  Street when he rented that house.

5  Q.   So someone from Monroe Street would deliver the

6  drugs?

7  A.   Or they had the drugs there.

8  Q.   There they had the drugs there.

9  A.   The crack.

10 Q.   Were there any other times besides when you

11 purchased these drugs by first placing a telephone

12 order with the defendant and talking to him and then

13 almost all of the time, 90 percent of the time

14 meeting him with the purchase to purchase the drugs,

15 did you ever see him on any other occasions when you

16 weren't buying drugs from him?

17 A.   No.

18 Q.   You mentioned at one time you helped him move.

19 A.   Yeah, I did help him move a couch from K's

20 Merchandise which he bought into his apartment.

21 Q.   You talked to him during that occasion?

22 A.   Yes.

23 Q.   Is there any doubt that you can recognize his

24 voice when you hear it?

25 A.   No.

1  Q.   Are you aware or do you know if there are any

2  street terms or street names for crack cocaine if

3  it's called something other than crack cocaine.  Is

4  it called rock or anything like that?

5  A.   Yes, it can be called rock.

6  Q.   Is it called hard sometimes?

7  A.    Hard, rock, that's about it.

8         MR. SERRITELLA:  Okay.  Object to the

9  leading nature, Your Honor.  He's leading them.

10  BY MR. CAMPBELL:

11  Q.   Let me ask that, do you know what the street

12  terms are for crack cocaine besides that term?

13  A.   There is hard and soft.  When people say soft

14  it's powder; when they said hard it's crack.

15  Q.   Okay.  Are you familiar with the term rock?

16  A.   Yes.

17  Q.   And what does that refer to?

18  A.   Crack.

19  Q.   You indicated that at least on some occasions

20  you sold drugs to friends, but then used it with

21  your friends, can you describe what you mean by that

22  so the Court understands?

23  A.   We'd all go in together and pool money or I

24  would get the crack and we sit down and smoke it

25  together.

1  Q.   How did the sale to your friend, how did that

2  occur in that situation?  Were you selling to them?

3  A.   No, we were just using together.

4  Q.   Okay.  So you pooled your money and bought

5  together?

6  A.   Yes.

7  Q.   So when you say you sold to friends, you meant

8  that you helped them acquire the drugs; is that what

9  you mean?

10  A.   Yes.  If they couldn't find it, I'd get it for

11  them and we'd sit down and do it, smoke it.

12  Q.   You indicated that in that period of time

13  between March 21st and 24th while this investigation

14  was going on, you admit that you violated this

15  agreement with the police department, your

16  confidential source agreement?

17  A.   Yes.

18  Q.   And you bought something for yourself and used

19  it?

20  A.   Yes.

21  Q.   Why?

22  A.   Because I'm an addict.

23  Q.   Did you have a problem at that time?

24  A.   Yes.

25  Q.   What was that?

1  A.   Smoking crack.

2  Q.   Did something occur in your life that you

3  decided that it was time to start again?

4  A.   No.

5  Q.   Just couldn't control it at that one particular

6  time?

7  A.   Yes.

8       MR. CAMPBELL:  Just a minute, Your Honor, if

9  I could.

10      Thank you, Your Honor.  No other questions.

11      MR. SERRITELLA:  Nothing further, Your

12  Honor.

13      THE COURT:  I just want clarification,

14  Mr. Fowler.  You have been using crack for at least

15  25 years; is that correct?

16      THE WITNESS:  No, I have been using crack

17  since 1998, '99.

18      THE COURT:  But you have been taking drugs?

19      THE WITNESS:  No, I meant, 1989, '88, '89.

20      THE COURT:  And how many times over that

21  period have you purchased crack?

22      THE WITNESS:  Over the last 15 years.

23      THE COURT:  Okay.

24      THE WITNESS:  Probably several hundred.

25      THE COURT:  And is this in addition to the

1  30 times with the defendant or --

2      THE WITNESS:  Yes.

3      THE COURT: -- or is that part of it?

4      THE WITNESS:  That's in addition.

5      THE COURT:  That's total?

6      THE WITNESS:  Total.

7      THE COURT:  Okay.  So you bought crack from

8  persons other than the defendant?

9      THE WITNESS:  Yes, over the past 15 years,

10 yes.

11     THE COURT:  And have you ever -- and I take

12 it you used the crack?

13     THE WITNESS:  Yes.

14     THE COURT:  In all of those 200 times have

15 you ever been given something that wasn't crack?

16     THE WITNESS:  Yeah, usually -- if I go out

17 and look for somebody that I didn't know, they'd

18 give you a dummy bag and take the money.

19     THE COURT:  And so you have had occasions

20 where you have purchased crack and given something

21 that wasn't crack?

22     THE WITNESS:  A couple of times.

23     THE COURT:  And how were you able to tell

24 that you didn't have crack?

25     THE WITNESS:  You got back and put it on the

1  pipe and it didn't melt or it tasted funny.

2       THE COURT:  And did that substance look just

3  like crack?

4       THE WITNESS:  Yeah, it appeared to be, yes.

5       THE COURT:  When you touched it, did it look

6  just like crack?  Was it like crack?

7       THE WITNESS:  Yes.

8       THE COURT:  So you're telling me that you

9  really can't tell crack when you get it unless you

10  smoke it?

11       THE WITNESS:  Well you can tell by the

12  appearance.  I mean, a couple times I bought it at

13  night when it was dark and something was hard, so

14  you just took it for granted it was a straight bag.

15  But, yeah, generally unless you sit down and smoke

16  it, you really can't tell the difference between, I

17  mean, you can as far as the rock form, but it's

18  just -- to give it a hundred percent you have to

19  smoke it.

20       THE COURT:  Well, you mean if you right now

21  in the lighted room, if someone gave you crack in

22  one hand and powder cocaine that had been compressed

23  in the other and you had that in your hand and you

24  can feel it and touch it, you're telling me that you

25  wouldn't be able to know the difference?

1          THE WITNESS:  Sure I could.

2          THE COURT:  How would you know the

3 difference?

4          THE WITNESS:  The crack is hard, I mean rock

5 hard and the powder it is a little more puffy.  It

6 leaves, you know, a film to the bag.

7          THE COURT:  So you say that you can feel it

8 and know the difference?

9          THE WITNESS:  Yeah.

10          THE COURT:  So you don't have to smoke it

11 in?

12          THE WITNESS:  No.

13          THE COURT:  And were you able to touch and

14 feel the substance that the defendant gave you on

15 March 21st, 24th and 28th?

16          THE WITNESS:  Yes.

17          THE COURT:  And how did it feel to you?

18          THE WITNESS:  Hard, hard as a rock.

19          THE COURT:  So, in your judgment, what was

20 it, crack or was it something other than crack

21 cocaine?

22          THE WITNESS:  I am sure that it was crack.

23          THE COURT:  Either counsel want to ask this

24 witness anymore questions?

25          MR. CAMPBELL:  Just real quick, Your Honor.

REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q.   In response to judge's questions you said a
couple times you thought that you were buying crack
and it felt like crack and then you decided it
wasn't after you got it home.  You said you bought
it in the dark.  What does that mean?

A.   I mean, sometimes you go out at night and the
person, the person that I usually got crack from
wouldn't answer the phone.  People on the street
sometimes make up dummy bags and try to rip you off.
So a couple times in the 15 years I have gotten a
couple of dummy bags.

Q.   Did that ever happen between you and the
defendant?

A.   No, it never did.

        MR. CAMPBELL:  No other questions.

        MR. SERRITELLA:  I have a couple.

        THE COURT:  Sure.

                    RECROSS-EXAMINATION

BY MR. SERRITELLA:

Q.   Mr. Fowler, when you purchased these phoney bags
of crack, you paid money for them, didn't you?

A.   Yes.

Q.   And when you gave the person your money, you

1  were paying full price, weren't you?

2  A.    Yes.

3  Q.    And I assume that you would not given your money

4  to somebody full price for something that you did

5  not believe was crack?

6  A.    Correct.

7  Q.    So, is it reasonable to say that you believed

8  the substance that you purchased was in fact crack

9  because it appeared to you to be crack?

10  A.    Yes, it was hard, corner of a bag, dark out.

11  Q.    Kind of looked like the same stuff that you

12  claim the defendant gave you, didn't it?

13  A.    Could be.

14  Q.    Okay.  But it turned out not to be crack, didn't

15  it?

16  A.    Yes.

17  Q.    Turned out to be maybe amphetamine, maybe

18  something else that would get you high?

19  A.    Generally it was a dummy bag it, it wasn't

20  anything.

21  Q.    It was just nothing at all.

22  A.    It could be actual rock off the sidewalk,

23  crushed up pills, something.

24  Q.    But certainly you thought it was crack, didn't

25  you?

1  A.   Yes.

2         MR. SERRITELLA:  I have no further

3  questions.

4         MR. CAMPBELL:  Can I have one question, Your

5  Honor?

6         THE COURT:  Yes.

7                  FURTHER REDIRECT EXAMINATION

8  BY MR. CAMPBELL:

9  Q.   On March 21st, 24th and 28th you weren't in the

10 dark then when you bought from the defendant, were

11 you?

12 A.   No, it was during the day.

13        MR. SERRITELLA:  If I could just follow-up

14 with that, Your Honor?

15        THE COURT:  Go ahead.

16                  FURTHER RECROSS-EXAMINATION

17 BY MR. SERRITELLA:

18 Q.   Are you saying that you bought this stuff that

19 wasn't crack, the phoney crack because it was dark

20 out and you couldn't see the bag?

21 A.    Generally it was at night, the couple times that

22 I bought dummy bags and it was on the west side and

23 it was dark, yes.

24 Q.   How about when it was light, did you ever buy a

25 bag of crack that when it was light out that --

1  A.   No.

2  Q.   -- turned out not to be crack?

3  A.   No, because you can see the -- you can see it

4  more and little better, no.

5  Q.   Let's go back to what I just asked you a few

6  moments ago, and that is you paid full price for

7  this product, didn't you?

8  A.   As far as like 50 for a half, I don't understand

9  what you're saying.

10  Q.   The guy didn't say to you, I'm going to give you

11  this crack at a cut rate, did he?

12  A.   No.

13       MR. CAMPBELL:  Your Honor, if I can impose a

14  objection.  I think it was just asked and answered.

15  I think it was just asked and answered.

16       THE COURT:  Let him finish.

17  BY MR. SERRITELLA:

18  Q.   You gave him full price, didn't you?

19  A.   Yes.

20  Q.   And I assume when you gave the man full price

21  for the crack, you examined it before you bought it,

22  didn't you?

23  A.   Generally, yes.

24  Q.   I mean when you're out buying drugs on the

25  street, this isn't like a department store where you

1  walk in and there is a brand on it, you got to look

2  to see what the guy is giving you and sometimes you

3  have to smell it and sometimes you have to feel it,

4  isn't that true?

5  A.   Yes.

6  Q.   So in reality, sir, you just didn't go out in

7  the middle of the night when it was dark out and

8  someone says here is a bag of crack, give me 50 or a

9  hundred dollars and grab it and run, you looked at

10  it and you satisfied yourself that it was crack

11  before you gave him the money?

12  A.   Sure.

13  Q.   So this theory that counsel is giving you, oh,

14  you were sold counterfeit crack because it was dark

15  out and you couldn't see, that's not true, is it?

16  A.   Well, I had a lot to do with it during the day.

17  You can usually see -- especially if you're going

18  out looking for somebody that you don't know.  You

19  kind of get it and go instead of standing around and

20  talking on the corner, so yeah, I didn't examine it

21  well.

22  Q.   So your testimony is that you were duped because

23  it was dark out and you didn't bother to look

24  closely at what this person represented to be crack?

25  A.   Yes.

1  Q.   Is that your testimony?

2  A.   Yes.

3  Q.   But you still paid them full price for it?

4  A.   Yes.

5      MR. SERRITELLA:  I have no further

6  questions.

7      THE COURT:  Thank you.  You may step down.

8      Next witness.

9      MR. CAMPBELL:  The Government calls

10  Detective Gray, Your Honor.

11                  MICHAEL GRAY,

12  after having been duly sworn, testified as follows:

13              DIRECT EXAMINATION

14  BY MR. CAMPBELL:

15  Q.   Could you please state your name and spell your

16  last name for the court reporter.

17  A.   Yes, Mike Gray, G-r-a-y.

18  Q.   What is your occupation?

19  A.   I am a detective with the Bloomington Police

20  Department vice unit.

21  Q.   Approximately how long have you been with the

22  vice unit?

23  A.   Right about three years.

24  Q.   How long as a police officer?

25  A.   Coming up on 19.

1  Q.   During that course of time, did you ever work as

2  a patrol officer on the street?

3  A.   Yes.

4  Q.   And during that course of time, did you cause to

5  be arrested individuals as patrol officers for

6  various drug offenses including possession of crack

7  cocaine?

8  A.   Yes, sir.

9  Q.   Between the time that you're a patrol officer

10  and in the vice unit for the three years, did you

11  have any other duties?

12  A.   I spent a couple of years with the proactive

13  unit.

14  Q.   What does the proactive unit do?

15  A.   Focus on gang related crimes and drug activity.

16  Q.   Did that bring you into contact with any cases

17  with which crack cocaine was seized or taken as

18  evidence?

19  A.   Yes, numerous.

20  Q.   Since being in the vice narcotics division of

21  the Bloomington Police Department now for three

22  years, have you been able to conduct investigations

23  that involve crack cocaine?

24  A.   Yes.

25  Q.   All together the number of times that you've

1   observed crack cocaine either as patrol officer,

2   proactive unit or a member of the vice unit,

3   approximately how many times have you seen crack

4   cocaine?

5   A.   Several hundred probably.

6   Q.   As a member of the vice narcotics unit, have you

7   personally acted in an undercover capacity as a

8   purchaser of drugs?

9   A.   Yes, I have.

10   Q.   Have you done that for the substance crack

11   cocaine?

12   A.   Yes.

13   Q.   Do you know approximately how many times you've

14   purchased crack cocaine in undercover capacity?

15   A.   Probably between ten and twenty times.

16   Q.   Also in your job with the vice narcotics

17   division, have you received confidential sources or

18   informants to purchase crack cocaine?

19   A.   Yes, sir.

20   Q.   Approximately how many investigations have you

21   been involved with where that has occurred in the

22   last three years?

23   A.   I'd say 50 or more times I have used different

24   informants.

25   Q.   Okay.  I'd like to ask if you became involved in

1  an investigation of a person named Larry J. Caffie

2  back around March 26th of 2006?

3  A.   Yes, I did.

4  Q.   How did you become involved in that

5  investigation, how did that start?

6  A.   A subject that was a documented informant with

7  me advised me that Mr. Caffie was selling crack

8  cocaine.

9  Q.   Who was that person that informed you that?

10  A.   Brett Fowler.

11  Q.   You had to work with Mr. Fowler on previous

12  occasions; is that correct?

13  A.   Yes, sir.

14  Q.   And he had, for lack of a better term, signed up

15  as a paid informant for the Bloomington Police

16  Department?

17  A.   Yes.

18  Q.   Had you gone through controlled buys with

19  Mr. Fowler on prior occasions with different cases?

20  A.   Yes.

21  Q.   Is that what happened in this case on three

22  occasions?

23  A.   Yes, sir.

24  Q.   Back around March 21st of last year, then

25  directing your attention to the beginning of this

1  investigation, did you have occasion to meet with

2  Brett Fowler at the Bloomington Police Department to

3  initiate this investigation?

4  A.   Yes, I did.

5  Q.   When this happened, how did this begin?  That

6  is, what started the contact with Mr. Caffie, the

7  defendant that's named in this case?

8  A.   Past the initial interview where he told me

9  about him?

10 Q.   Start with that.  That's fine?

11 A.   During the afternoon of that date, 21st of

12 March, Mr. Fowler advised me that there was a

13 subject that he had known for several months.  He

14 knew him as J.  Described him as a black male in his

15 20s.  Told him that he lived at one point on

16 Mulberry Street just east of Clinton in Bloomington.

17 Described a couple vehicles that he had seen him in

18 one being a black SUV type vehicle, possibly a

19 Tahoe, one being a maroon Buick.  Also told me that

20 he thought that he had recently moved to an unknown

21 address in the area of the Bloomington High School

22 and that he had a younger female white girlfriend

23 with a thick build.

24 Q.   So you got quite a bit of information, but all

25 you had was the initial J for the name?

1  A.    That's what he told me he knew him as J, yes.

2  Q.    And in your type of line of business working

3  with these type of cases, is it unusual or usual to

4  have a street name or initial or something besides a

5  given name that people use?

6  A.    It's most common probably.

7  Q.    From that information that you got from

8  Mr. Fowler, were you able to focus on a particular

9  individual?

10  A.    Yes.

11  Q.    How were you able to do that?

12  A.    He actually had a little bit more information.

13  I believe he provided a phone number for Mr. Caffie

14  also.  We were able to locate a photograph of him

15  and show it to Brett Fowler.

16  Q.    Okay.  And once you did that, you did show a

17  copy of the photo or actual photo to him?

18  A.    Yes, sir.

19  Q.    And this is something that you were able to

20  retrieve off of your computer system in the McLean

21  County area?

22  A.    Yes.

23  Q.    When you showed that to Mr. Fowler, whose

24  picture was it that you showed?

25  A.    Larry J. Caffie.

1  Q.   Obviously in this investigation, you focused on

2  that person.  Do you see that person here in court

3  today that you know as Larry J. Caffie?

4  A.   Yes.  He is seated at the second table back in

5  the green jump suit with the glasses.

6         MR. CAMPBELL:  Your Honor, for the purpose

7  of the record, the witness has identified where the

8  defendant is seated and what he is wearing.

9         THE COURT:  The record will reflect the

10 identification of the defendant.

11 BY MR. CAMPBELL:

12 Q.   After this initial interview with Mr. Fowler,

13 did you do other things on March 21st to further the

14 investigation?

15 A.   Yes, sir.

16 Q.   What was that?

17 A.   We had Mr. Fowler call Mr. Caffie and arrange a

18 cocaine purchase.

19 Q.   How was that done at the police station?

20 A.   We have a separate room where we meet with the

21 informants.  There is a land line phone there that

22 we have registered to the police department.  We

23 made a call from there.

24 Q.   Okay.  And were you able to hear at least the

25 side of the conversation that Mr. Fowler was engaged

1  in?

2  A.   Yes.

3  Q.   Could you hear the other end of the

4  conversations?

5  A.   Not clearly, no.

6  Q.   You could hear some words but not work them out?

7  A.   Correct.

8  Q.   What was then arranged at that time with the

9  phone call?

10  A.   There was a meeting arranged at Franzetti's

11  Pantry approximately ten minutes from the time of

12  the call with the intent of completing a hundred

13  dollar cocaine transaction.

14  Q.   Do you recall what the phone number was that

15  Mr. Fowler was using to access the line or the phone

16  of Mr. Caffie?

17  A.   Yes.  242-0003.

18  Q.   You watched Brett Fowler dial that or punch that

19  number into the phone?

20  A.   Yes, I did.

21  Q.   After that arrangement was made, what did you do

22  to make sure that the procedures that you were asked

23  to follow and to follow in your investigations were

24  done, what did you do with Mr. Fowler?

25  A.   I completed a search of his person including his

1  pockets and shoes.  Then we went to the undercover

2  vehicle that we drive.  I searched the vehicle in

3  the area that he was in to make sure that there was

4  no drugs or money or anything else.  I prerecorded

5  one hundred dollars U.S. currency, retained the copy

6  and gave the currency to Mr. Fowler, and then drove

7  him to the area of the anticipated meeting location.

8  Q.   The photo copying of the hundred dollars, does

9  that photocopy then become part of your case file?

10  A.   Yes, sir.

11  Q.   As opposed to something that is submitted into

12  evidence?

13  A.   Yes.

14  Q.   Show you what has been marked as Government's

15  Exhibit 1-A.  Do you recognize what that is and

16  would you describe it for the record?

17  A.   I do recognize that, that is a copy of the $100

18  money, the buy money used to purchase the exhibit on

19  March 21st.

20  Q.   And you made that photocopy?

21  A.   Yes.

22  Q.   Or at least a version of that, this maybe a copy

23  of the photocopy, but nevertheless the same thing?

24  A.   Yes.

25  Q.   You said you then proceeded to the area of the

1  buy -- where was this to take place, this

2  transaction with Mr. Fowler and the defendant?

3  A.   At Franzetti's Pantry, at the corner of Clinton

4  Street and Washington Street in Bloomington.

5  Q.   You have had a chance on prior occasion to view

6  what is marked as Exhibit 15-A this large overhead

7  picture of Washington and Clinton Street in

8  Bloomington and the surrounding area.  Are you

9  familiar with that?

10  A.   Yes.

11  Q.   There is a pointer up there on the bench, looks

12  like a pen.  It is actually a laser pointer.  If you

13  push the button you can make the red dot appear on

14  the photo.  Could you just let the Court know where

15  it is you went with Mr. Fowler when you went to this

16  vicinity?

17  A.   Where I parked?

18  Q.   Yes.

19  A.   Roughly behind that red car there.

20  Q.   And that is near the corners of what streets?

21  A.   Front Street and the Clinton Street.

22  Q.   Okay.  And were you from that vantage point were

23  you able to see Franzetti's Pantry, the convenience

24  store?

25  A.   I could see part of it, the part that I was

1  interested in seeing was where the pay phone was

2  situated outside.

3  Q.   Okay.  And what was your interest in making sure

4  you could see the pay phone?

5  A.   Part of the agreement during the negotiated

6  meeting location was that we call when we get there

7  or that Mr. Fowler call to tell Mr. Caffie he was

8  there for the purchase.

9  Q.   And did you have some police purpose in the

10 investigation to keep an eye on the confidential

11 source while he is making the phone call?

12 A.   Yes.

13 Q.   Before going out were there other officers

14 involved in this investigation on that day as well

15 as the other two occasions?

16 A.   Yes.

17 Q.   Did you have any kind of a briefing or meeting

18 before you went out with Mr. Fowler?

19 A.   Yes, we did.

20 Q.   And were other officers who were involved

21 informed of what was going to happen and what to

22 look for and that sort of thing?

23 A.   Yes, they were.

24 Q.   And surveillance was arranged for that general

25 area; is that correct?

1   A.   Correct.

2   Q.   As well as for an area that was believed to be

3   Mr. Caffie's residence; is that correct?

4   A.   Yes, sir.

5   Q.   That is located where or what street address?

6   A.   Mr. Caffie's residence at the time was 1132

7   North State Street in Bloomington.

8   Q.   How were you able to determine that that was his

9   residence?

10  A.   I think that we seen that vehicle parked there

11  before through local records in McLean County.  He

12  had an address listed there from recent contacts.

13  Q.   Was there an arrangement for surveillance to be

14  conducted in that vicinity or that location as well

15  as around Franzetti's?

16  A.   Yes, sir.

17  Q.   Also for a video to be made, if possible, at

18  Franzetti's?

19  A.   Yes.

20  Q.   Okay.  Once you get out to this location where

21  you've indicated you parked your vehicle, where does

22  Mr. Fowler go?

23  A.   He walked directly north from my location here

24  across the street and then to this area where the

25  pay phone is.

1  Q.   Okay.

2  A.   On the southwest side of Franzetti's.

3  Q.   And did you see him do anything there once he

4  got to that location?

5  A.   I could see him handling the phone, yes.

6  Q.   Okay.  What else did you observe as you waited

7  there and watched this location?

8  A.   I observed him wait by the phone until a maroon

9  Buick arrived.

10  Q.   Okay.  Were you able to -- from your distance

11  and your vantage point were you able to see the

12  passenger or the driver in the maroon Buick at all,

13  could you clearly see them from where you were at?

14  A.   Not from where I was at, no.

15  Q.   Could you tell that there were people in the

16  car?

17  A.   I couldn't tell from looking over my shoulder

18  and just focusing on Mr. Fowler, I just caught a

19  glimpse of the car in the parking lot.

20  Q.   What did you see next after the car got there,

21  what happened to Mr. Fowler?

22  A.   He walked to the general area of the car.

23  Q.   Were you able to see him get in the car?

24  A.   No.

25  Q.   What happened after that?

153

A.   I monitored the surveillance activities, the
officers conducted talking back and forth.
Basically heard them say that the vehicle had left
the parking lot and appeared to be going around the
block to the east.

Q.   When you say monitored, were all of the officers
involved in the investigation at the surveillance,
various locations able to hear what was going on
between themselves as one officer said one thing and
observed something and another officer would see
something else?

A.   Yes, it is a group channel on a Nextel phone.
It is similar to a two-way radio.

Q.   Okay.  What is the next thing that you saw occur
during this course of events?

A.   I saw the front of the Buick that I had seen
enter the parking lot come through the -- through
the alley westbound on the south side of Franzetti's
here towards Clinton Street and then Mr. Fowler was
out of the vehicle and walked back towards me.

Q.   And he came directly to you?

A.   Yes, sir.

Q.   And got in the vehicle you were in?

A.   Yes, sir.

Q.   What happened then?

1  A.   He handed me a bag of crack cocaine.  We drove

2  away back to the police department where I searched

3  the vehicle again to make sure that there was no

4  cocaine or money there.  Took him up to the

5  confidential source interview room.  Searched him in

6  the similar manner that is previous to the deal and

7  found no other substances or money there either.

8  Q.   The substance that he handed to you, what was --

9  what did it look like as far as what was it

10 contained in, what was the outer portion of it?

11 A.   It was a piece of a plastic baggie.

12 Q.   Could you see through the bag?

13 A.   Yes, sir.

14 Q.   What did it appear to be on the inside?

15 A.   It's a hard rock-like, off-white substance known

16 to me in my training experience as crack cocaine.

17 Q.   Sometimes after you debriefed Mr. Fowler and as

18 part of your duties on that day, did you cause to be

19 made a field test on that substance that you had

20 obtained in that manner?

21 A.   Yes, I did.

22 Q.   How did you do that?  What did you do?

23 A.   Personally what I do is I take a small paper

24 clip out of a box, unfold it, puncture the bag that

25 contains the crack cocaine and you have to break it,

1  break it apart basically.  It is hard enough you

2  have to break it apart and that allows you to get

3  enough of a sample to wipe a swab on which indicated

4  positive for cocaine.

5  Q.   When you say that it's a hard substance you

6  break apart, you're not talking about the bag,

7  you're talking about the contents of the bag?

8  A.   Correct.

9  Q.   The rock-like substance.

10  A.   Once I punctured the bag with the paper clip,

11  you have to push down hard where you're holding the

12  baggie, you have to push down onto the substance to

13  get a small piece of it to break off and try and

14  crush it to get some on the paper clip.

15  Q.   When you're pushing down on the substance while

16  it's still in the bag and you're trying to get a

17  piece off of it, does it crush in some fashion and

18  turn into powder, the whole thing that's in there?

19  A.   No, usually you get a small piece of it to chip

20  off.

21  Q.   You know the difference between crack cocaine

22  and powder cocaine?

23  A.   Yes, sir.

24  Q.   You have been involved in investigations with

25  powder cocaine?

1  A.   Yes.

2  Q.   Does it have a different appearance both inside

3  of a bag as well as when you do a field test on it?

4  A.   Yes.

5  Q.   What is the difference in the bag?  For starters

6  how does it look different?

7  A.   The bag itself isn't as transparent as it is

8  with the crack cocaine.

9  Q.   Why is that?

10  A.   The powder is just more flakey or residual

11  throughout it.  It adheres to and covers the bag on

12  the inside.

13  Q.   So it has a particular appearance inside the bag

14  itself before you even open it?

15  A.   Correct.

16  Q.   Have you ever seen powder cocaine that was

17  actually compressed to some degree or another and

18  formed a small portion that wasn't a powdery

19  substance to begin with?

20  A.   Yes.

21  Q.   How could you tell that apart from what you

22  believe to be crack cocaine?

23  A.   Well, the color is usually different.  The

24  powder cocaine is, in my experience, just a more

25  pure white color where as the crack cocaine is an

1  off-white.

2  Q.   When you have powder cocaine and it has been

3  compressed to some degree or another, could you do

4  something to field test it without having to pry a

5  piece of it as you did for the crack cocaine field

6  test?

7  A.   Typically with the powder cocaine, it's because

8  of it's residual nature, it's simple to -- a lot of

9  times you can just swipe the opening of where the

10 bag would have been tied.  It's easy to get a field

11 test that way without disturbing the contents.

12 Q.   On powder cocaine that has been compressed to

13 some degree or another, does it crush if you push on

14 it?

15 A.   Yes.

16 Q.   It goes back into powder.

17 A.   Correct.

18 Q.   After you field tested this substance and you

19 marked that as Exhibit 1 in this investigation; is

20 that correct?

21 A.   I did.

22 Q.   How did you package that up after you field

23 tested and what result did you get, by the way, from

24 the field test?

25 A.   The field test from the first exhibit was

1   positive for the presence of cocaine.

2   Q.   Are you aware of any field test that goes beyond

3   cocaine and field test positive or negative for

4   cocaine base or is it just the presence of cocaine?

5   A.   It's simply just the presence of cocaine.

6   Q.   Once you got that result, what did you do with

7   that baggie that you had opened up and taken the

8   paper clip and chipped the little piece of this off

9   the rock?

10  A.   I covered the hole that I had made with the

11  paper clip with a piece of cellophane tape, folded

12  over.  I put my initials, ID number, date and case

13  number on the edges of the tape itself.  Then placed

14  the tape into an envelope and sealed that envelope

15  with red evidence tape.  Put my initials, ID number,

16  date and case number on that also.  And then affixed

17  a property type label that we use in our police

18  department for tracking purposes on that envelope.

19  Q.   And that property label that you affixed besides

20  the writing you put on, the label itself does it

21  have some sort of a barcode on it that let's you

22  know for purposes of the police department that you

23  can scan things or you can recover things or

24  retrieve things by that device as well?

25  A.   That's exactly what it is, it's a barcode.

1  Q.   Is that information kept in a computer somewhere

2  so you can access it?  Was that part of the purpose

3  or do you know?

4  A.   I believe that each individual of property

5  whether it be drugs or recovered stolen property,

6  whatever property comes into contact with the

7  records custodians is a sign of an individual ID

8  number which is referenced by that barcode.

9  Q.   Only for that one piece of evidence is there one

10 bar code number?

11 A.   Correct.

12 Q.   Along part of this investigation on March 21st,

13 where did you next take the sealed package

14 Exhibit 1?

15 A.   To a drug cabinet that's inside a room inside

16 our crime scene laboratory at the police department.

17 Q.   Let's start at the door of the crime scene lab,

18 is that a common area that anyone can walk into?

19 A.   No, it's not.

20 Q.   Police personnel only?

21 A.   Selected police personnel.

22 Q.   Selected police personnel.  Who is allowed

23 access?

24 A.   The crime scene technicians that worked daily in

25 the lab.  Vice unit detectives are allowed inside

1  the lab and there may be a few other part-time crime

2  scene officers designated to do fingerprint samples

3  and similar techniques.

4  Q.   How do you get access to that room -- excuse

5  me -- for interrupting, but how do you get into that

6  room or how does anybody get in?

7  A.   We have a key card that we carry with us.  It's

8  a swipe card.

9  Q.   I'm sorry.  I interrupted you.  You said that

10  sometimes part-time techs were in there as well?

11  A.   And possibly some supervisors that would have

12  access.

13  Q.   Once in that secured room, what's next?

14  A.   Right into the left of the door that we go into

15  there is a marijuana leaf identification room which

16  also requires a swipe and which also has limited

17  access.

18  Q.   Who has access to that?

19  A.   Probably the same people that have access to the

20  lab itself.

21  Q.   And once you got into that room, behind the

22  second door, so to speak, that is secured, what did

23  you do then?

24  A.   I placed the exhibit in an evidence cabinet

25  inside that room.

1  Q.   Is that cabinet locked or unlocked?

2  A.   It was locked.

3  Q.   And you have a key to that?

4  A.   Yes, sir.

5  Q.   Anybody else have a key to that particular

6  locker?

7  A.   Each detective in the vice unit has a key.  We

8  all store our evidence, our chemistry evidence in

9  that same locker.  Our supervisor would have one and

10 his supervisor and on up the chain.  I believe

11 that's all.

12 Q.   When you left it there in the locker on March

13 21st of 2006, was it in a sealed condition?

14 A.   Yes.

15 Q.   Did you close and lock the locker?

16 A.   Yes, I did.

17 Q.   Take the key with you?

18 A.   Correct.

19 Q.   Left that marijuana leaf identification room,

20 back to the crime lab room, then back to the general

21 areas of the police department?

22 A.   Correct.

23 Q.   Going up to the next occasion of March 24th of

24 2006, you had contact again with Mr. Fowler on that

25 occasion; is that correct?

1  A.  Yes, sir.

2  Q.  Did he come to the police department at your

3  request?

4  A.  Yes, sir.

5  Q.  And the purpose there again was to continue this

6  investigation?

7  A.  Correct.

8  Q.  Was another phone call made in your presence by

9  Mr. Fowler?

10  A.  On that occasion I don't believe we made a phone

11  call from the police station.  If I recall

12  correctly, I think Mr. Fowler may have stated that

13  he had seen Mr. Caffie earlier in the day and he

14  knew that he was around town.

15  Q.  What was the plan then to contact Mr. Caffie,

16  the defendant, to further the investigation?

17  A.  Similar to the last purchase that we had made on

18  the 21st, we just skipped the phone call at the

19  police station and drove to Franzetti's Pantry in

20  that area.

21  Q.  Did you go the Front Street, Front and Clinton

22  area again, the same general parking space that you

23  had been at before?

24  A.  Yes, I did.

25  Q.  Before doing that, did you have occasion to go

1  through the procedure of searching Mr. Fowler,

2  searching the vehicle that you were going to travel

3  in?

4  A.   Yes.

5  Q.   Any contraband or money there that wasn't

6  authorized?

7  A.   None.

8  Q.   Money would be the only thing that was

9  authorized?

10 A.   Correct.

11 Q.   Did you have an occasion to make a photocopy of

12 buy money on that occasion?

13 A.   Yes, I did.

14 Q.   And on this occasion, did you know what the

15 purchase price for the substance, the crack cocaine

16 was going to be?

17 A.   We were going to try and attempt to purchase

18 $200 worth.

19 Q.   And is that what Mr. Fowler indicated that he

20 would be able to talk on the phone to Mr. Caffie

21 about?

22 A.   Yes, sir.

23 Q.   How much money did you give to Mr. Fowler, the

24 prerecorded or photocopied buy money?

25 A.   $200.

1  Q.   I would like to show you what has been marked as
2  Exhibit 3-A.  Ask if you can describe what that is
3  for the record and see if you recognize that.
4  A.   That's a copy of the $200 currency that I quoted
5  for the purchase of Exhibit 3 on March 24, '06.
6  Q.   And that photocopy would then be made part of
7  your case file; is that correct?
8  A.   Yes, sir.
9  Q.   And it doesn't go into evidence, it stays in a
10 file folder, correct?
11 A.   Yes.
12 Q.   And that's either a copy or that's a copy of the
13 exact copy that you made?
14 A.   Yes.
15 Q.   Accurate?
16 A.   Yes.
17 Q.   Once out there by Front and Clinton where you
18 parked your vehicle, what does Mr. Fowler do on the
19 24th of March?
20 A.   Similarly to the 21st he walked north on Clinton
21 Street and then approached the pay phone at
22 Franzetti's.
23 Q.   All right.  And you were at least able from your
24 vantage point to see that occur?
25 A.   Yes.

1  Q.   Were you also again radio contact or cell phone

2  Nextel contact with the surveillance officers in

3  this case?

4  A.   Yes, I was.

5  Q.   And what happened after you saw Mr. Fowler go to

6  the pay phone area?

7  A.   I seen him walk towards the front of Franzetti's

8  just a moment later or short time later, and then

9  return and be on the phone again.

10 Q.   Did you later learn why he had gone towards the

11 front around the corner of Franzetti's?

12 A.   Yes.

13 Q.   What was the purpose?

14 A.   He had seen a black and white police car to the

15 east of Franzetti's within a block or so on some

16 unrelated call or investigation.  Decided that it

17 would be in his best interest to make a second call

18 to Mr. Caffie and let him know that the police were

19 in the area.

20 Q.   All right.  And did you observe Mr. Fowler go to

21 the phone a second time?

22 A.   Yes, I did.

23 Q.   Then what happened after that?

24 A.   Almost immediately after that second phone call

25 Mr. Fowler walked to the north across Washington

1  Street.  If you would like to --

2  Q.   If you could point out the direction that you

3  saw him go.

4  A.   From this area where the phone is, walked to the

5  north on Clinton Street across Washington and up and

6  stood in this area momentarily.  I guess it would be

7  right here or there is a car wash here where the

8  meeting actually took place.

9  Q.   Okay.  Did you see Mr. Fowler stand there near

10  the sidewalk area of the car wash around that

11  vicinity?

12  A.   Yes, I do.

13  Q.   What happened after that?

14  A.   I repositioned myself after seeing Mr. Fowler

15  walk across Washington Street to the area of

16  Franzetti's right here, so I moved from down on

17  Front Street up to Franzetti's parking lot so I

18  could have a better visual of where he was at.

19  Q.   And you were able to see him clearly because

20  obviously this old photo shows a building that no

21  longer existed at a time this took place?

22  A.   I could see him from probably the chest up

23  although that building is not there.  I think there

24  were some used cars for sale in the parking lot.

25  Q.   What happened after you got your car moved over

1  to that location?

2  A.   Mr. Fowler met with that same maroon Buick that

3  I've seen days earlier.

4  Q.   Were you able to see clearly who the driver was

5  from your vantage point?

6  A.   No, I was not.

7  Q.   Where did the vehicle go -- what did Mr. Fowler

8  do once that vehicle showed up?

9  A.   It appeared to me from where I was at, and like

10  I said, my vision was obscured a little bit, but I

11  seen him approach the vehicle and then he

12  disappeared right by the vehicle.  I assumed he

13  entered the vehicle.

14  Q.   And were you able to see the vehicle go in any

15  particular direction at that juncture?

16  A.   No, I could see Clinton Street from where I was

17  at and I didn't see the vehicle come back out from

18  where it was at at the car wash immediately.

19  Q.   As you sat and watched it, you observed

20  something else happen a short time later?

21  A.   Yes.

22  Q.   What was that?

23  A.   I seen Mr. Fowler walking back towards me from

24  the area just at the south side of the car wash here

25  walking back through this lot where the vehicles

1   were.

2   Q.   Did you meet him then at your car?

3   A.   I did.

4   Q.   When he got in the car, did he give you

5   anything?

6   A.   Yes, he gave me three bags of crack cocaine.

7   Q.   All right.  And what did you do with them?

8   A.   I retained them.  At that point we drove back to

9   the police station again.  I searched the vehicle.

10  Found no items of contraband.  Took him upstairs to

11  our interview room.  Searched him in a similar

12  manner, again found no items of contraband.  Spoke

13  to him briefly about the transaction and then went

14  to my office and conducted a field test and a weight

15  of the crack cocaine?

16  Q.   In this particular investigation, did you then

17  assign an Exhibit Number 3 to the exhibit that was

18  generated by this transaction?

19  A.   Yes, sir.

20  Q.   And did you have a chance at that time to

21  conduct a field test of Exhibit 3?

22  A.   Yes, I did.

23  Q.   And you did that at your desk?

24  A.   Yes.

25  Q.   What did you do there at the field test?

1  A.   Similarly to the way that I described the first

2  test, punctured one of the bags with the paper clip,

3  swabbed the residue from the paper clip and received

4  a positive indication for the presence of cocaine.

5  Q.   What appearance did the substance in each of

6  these bags have to you?

7  A.   Similar to the first exhibit.  They were hard

8  rock-like substance off-white in color packaged

9  similarly with a small plastic, corner of a small

10  plastic bag tied in a knot.

11  Q.   Based on your training and experience that

12  you've described here in the police department, did

13  you have an opinion and do you have an opinion of

14  what that substance was on that occasion on those

15  three bags?

16  A.   Yes.  Yeah, my opinion would be that it was

17  crack cocaine.

18  Q.   Did you field test each of the three bags or

19  just a portion of one?

20  A.   A portion of one.

21  Q.   And in field testing that you did go through the

22  similar scenario of using a paper clip to break a

23  piece off --

24  A.   Yes.

25  Q.   -- of the substance?

1   A.   Yes, exactly.

2   Q.   Once that occurred, did you seal it up as you

3   described in the first instance the hole in the bag

4   that you made?

5   A.   Yes.

6   Q.   And placed those three bags where?

7   A.   Into a manila envelope.

8   Q.   Did you generate a red evidence sticker or tape

9   around to seal that bag up or that manila envelope?

10  A.   Yes.

11  Q.   And also place a label that has the barcode and

12  your information and the case number and all of

13  that?

14  A.   Correct.

15  Q.    Where did that then go once it was in a sealed

16  condition?  Where did you take it?

17  A.   To that same evidence cabinet in the marijuana

18  leaf identification room that is in the Bloomington

19  Police Department crime scene lab at the police

20  department.

21  Q.   When you did that, when you accessed the locker

22  on that occasion, was it locked before you were able

23  to place the item in there?

24  A.   Yes.

25  Q.   Exhibit 3.  And did you lock it after you left?

1  A.   Yes, I did.

2  Q.   When you left the item there, Exhibit 3, was it

3  left in a sealed condition?

4  A.   Yes, it was.

5  Q.   Did you have a chance then to speak with

6  Mr. Fowler along the way as to what happened on the

7  24th and basically debriefed him?

8  A.   Correct.

9  Q.   Directing your attention to March 28th of 2006,

10  did you have occasion again to meet with Mr. Fowler

11  in the early afternoon hours of the Bloomington

12  Police Department?

13  A.   I did.

14  Q.   What happened on that occasion when you and

15  Mr. Fowler got together at the PD.

16  A.   We discussed and went ahead with making another

17  purchase from Mr. Caffie.

18  Q.   Was a phone call placed from the police

19  department as you recall on this occasion?

20  A.   Yes, there was.

21  Q.   And you were present when the call was made?

22  A.   Yes.

23  Q.   Were you able to see the number that Mr. Fowler

24  was able to access or use to contact the defendant?

25  A.   It was the first number from the first instant,

1  the 242-0003.

2  Q.   You could hear Mr. Fowler's part of the

3  conversation.  Could you hear the party on the other

4  end?

5  A.   As before I could clearly hear Mr. Fowler but

6  not so much the party on the other end.  I could

7  hear he was talking to someone.

8  Q.   Okay.  And what -- was there an arrangement made

9  there in your presence for the purchase of the

10  hundred dollars worth of cocaine, crack cocaine?

11  A.   Yes, sir.

12  Q.   Do you recall if it was referred to by anything

13  other than a dollar amount?

14  A.   No, I think that he just, Mr. Fowler just stated

15  that he had a hundred dollars to spend.

16  Q.   Okay.  Did you go through the same search

17  routine with Mr. Fowler and the vehicle?

18  A.   Yes, sir.

19  Q.   Did you prerecord some U.S. currency as well?

20  A.   I did.

21  Q.   Buy money?

22  A.   Correct.

23  Q.   And in this instance it was how much?

24  A.   $100.

25  Q.   I would like to show you what has been marked as

Exhibit 4-A and see if you can take a look at that

and briefly describe what it is?

A.   That's a copy of the buy money that I recorded

for the purchase of the crack cocaine on 3/28/06.

Q.   And the photocopy whether that is the original

or a photocopy of the photocopying process is that

an accurate representation of the currency that you

gave to Mr. Fowler for buy money?

A.   It is.

Q.   And that also became part of your case file not

as a piece of evidence?

A.   Correct.

Q.   And so therefore it survived in your case file

for all of these months?

A.   Sure.

Q.   Okay.  After you did that, and after you had

done the searching as you described, did you and

Mr. Fowler then go someplace to have him meet with

Mr. Caffie?

A.   Yes, we went back to Franzetti's area again.

Q.   Did you park in the similar location as the

prior two occasions?

A.   Yes, I did.

Q.   Did you observe Mr. Fowler leave the vehicle?

A.   Yes.

1  Q.    Did you see him go where?

2  A.    To the pay phone again.

3  Q.    And you can see him at least in that part of the

4  Franzetti's?

5  A.    Yes.

6  Q.    What happened after that?

7  A.    I seen Mr. Fowler handling the phone as if he

8  was making a call or speaking to someone, watched

9  him hang up the phone and walk to the north.  Again,

10 towards that area north of Washington Street where

11 the car wash is.

12 Q.    Okay.  Did you stay in that location where you

13 started on this particular transaction, or did you

14 move again like you had done on the second one?

15 A.    Similar to the last transaction.  Once I seen

16 him cross Washington Street, I assumed, you know,

17 not hearing what was said on the phone that it was

18 going to occur the same as the previous, so I moved

19 to the parking lot at Franzetti's.

20 Q.    Okay.  Were you able to see Mr. Fowler from your

21 vantage point?

22 A.    Again, similarly to the last time I could see

23 him from the chest up probably.

24 Q.    Anything else that you could see as time went on

25 there?

1  A.   I don't believe that I did see anything else

2  from that point.  The next thing that I knew I heard

3  Mr. Fowler had entered the same maroon Buick which

4  had turned eastbound on Jefferson Street.

5  Q.   Okay.  And obviously there was, as in the first

6  occasion and the second, there was surveillance

7  vehicles, other unmarked squad cars and officers

8  around the area?

9  A.   Yes, sir.

10  Q.   And that had been arranged as part of a briefing

11  before all of this took place?

12  A.   Correct.

13  Q.   And also in the vicinity of 1132 North State

14  Street?

15  A.   Correct.

16  Q.   After you were informed on the Nextel that there

17  was this movement, what happened?

18  A.   I thought it was out of the ordinary, somewhat

19  unexpected that it had moved from Franzetti's up a

20  block and then now that the vehicle was traveling

21  eastbound on Jefferson from where I was, Franzetti's

22  Pantry, I exited and went east on Washington to

23  attempt to parallel the vehicle.  Once I got to

24  where Robinson is -- Robinson Street, although I

25  can't go north there, I looked to the north, I seen

1  that maroon Buick southbound on Robinson turn back

2  west through that alley towards the car wash.

3  Q.   And the reason you can't access Robinson Street

4  there is because it doesn't go through to

5  Washington?

6  A.   Correct.

7  Q.   Once you saw the vehicle come down the alley

8  where did you go?

9  A.   I made a turn right here, double back and went

10 back towards the Franzetti's parking lot to wait for

11 the return of my informant.

12 Q.   And what happened when you got back?

13 A.   Within a short time I heard someone say that

14 Mr. Fowler exited the maroon Buick was walking back

15 towards me.  I looked across to that used car lot

16 area just south of the car wash and I could see him

17 walking towards me.

18 Q.   Did he then get in the car with you?

19 A.   He did.

20 Q.   What happened when he got in?

21 A.   He gave me a bag of cocaine, a small bag of

22 cocaine, crack cocaine.

23 Q.   What did you do with that?

24 A.   I retained that again.  We drove back to the

25 police department.  I completed a search of the

1   vehicle and found no contraband.  Completed a search

2   of his person and again found no contraband.

3   Q.   The bag that he handed to you, what was it's

4   appearance?

5   A.   Similar to the previous purchases and exhibits

6   that were obtained, an off-white chunky rock-like

7   substance just in the one bag.

8   Q.   Did you have a chance or an opportunity to field

9   test that as well?

10  A.   Yes, I did.

11  Q.   And was this the similar type of process that

12  you've already described twice?

13  A.   Yes.

14  Q.   Once you got the bag opened with the paper clip

15  and you had the substance there to test, did you --

16  how did you take a portion of it to test?

17  A.   I just chipped off a small piece and then

18  crushed it as much as I could until there was --

19  some adhered to the paper clip.  I pulled the paper

20  clip out then swabbed the sample on the end.

21  Q.   What was the result of your field test?

22  A.   Positive for cocaine.

23  Q.   Once you had completed that, did you seal the

24  bag up as you described on the other occasions?

25  A.   Yes, I did.

1  Q.    And put that in the manila envelope?

2  A.    Correct.

3  Q.    With red evidence tape around it to seal it up?

4  A.    Correct.

5  Q.    Again, you have a barcoded label plus your open

6  handwritten case number, name and all of the other

7  things that you put on the outside of the envelope?

8  A.    Yes, sir.

9  Q.    And you sealed that up?

10  A.    Yes.

11  Q.    Where did you go with it?

12  A.    Back to where we store our evidence in the

13  marijuana leaf identification room inside the lab

14  inside the police department.

15  Q.    And when you got there, you had given this

16  particular item of evidence in Exhibit Number 4 for

17  purposes of your case report; is that correct?

18  A.    I did.

19  Q.    Once you got there what did you do with

20  Exhibit 4, once you were in the marijuana leaf

21  identification room and the locker was there?

22  A.    I secured the exhibits into that locked evidence

23  cabinet.

24  Q.    Did you lock it when you left?

25  A.    Yes.

1  Q.   Was the envelope that you placed there,

2  Exhibit 4, in a sealed condition?

3  A.   Yes, it was.

4  Q.   You had at some point then had a chance to speak

5  with Mr. Fowler and get a chance to talk to him a

6  little bit?

7  A.   Yes.

8  Q.   That wasn't the end of the investigation by any

9  means, was it?

10  A.   No, it was not.

11  Q.   What did you do next after you had taken those

12  steps?

13  A.   Shortly after Mr. Fowler returned to me we

14  followed through with the plan that we had --

15  discussed in our briefing where Mr. Caffie was

16  arrested during a traffic stop in the area.

17  Q.   And you were able to be aware of that by the

18  Nextel communications and what the officers were

19  saying and doing?

20  A.   Correct.

21  Q.   And a short time after that did you have an

22  occasion to actually see Mr. Caffie at the police

23  department?

24  A.   I did.

25  Q.   When you did, what did you do with Mr. Caffie?

1  Where did you go?

2  A.   He had been taken to an interview room where he

3  was secured in the criminal investigations division

4  on the second floor of the police department.

5  Q.   And you had contact with him there?

6  A.   I did.

7  Q.   When you went in the room did you identify

8  yourself or suggest that you were an officer, did

9  you do something like that?

10  A.   I did.  I explained to him who I was and that we

11  were conducting a drug investigation.

12  Q.   And obviously the person you saw there was the

13  defendant that you see here in the courtroom today;

14  is that correct?

15  A.   Yes, sir.

16  Q.   You sat there face-to-face for several minutes?

17  A.   Correct.

18  Q.   And listened to him?

19  A.   Correct.

20  Q.   Before asking any questions did you have

21  occasion to -- any questions of substance, did you

22  have occasion to read to him his Miranda rights, his

23  mandatory warning?

24  A.   I did.

25  Q.   How did you do that?

1  A.    From a card that I carry with me.

2  Q.    Do you have that card with you?

3  A.    I brought it with me.

4  Q.    Could you produce that please?

5  A.    Yes.

6  Q.    And for the record could you please read what

7  you said, what you said off the card, what you read

8  off the card to Mr. Caffie, the defendant, on this

9  occasion?

10  A.    Yes.  I advised him, "You have a right to remain

11  silent.  You do not have to talk to me unless you

12  want to do so."  I asked him if he understood that.

13  He acknowledged that he did.  I stated, "If you do

14  want to talk to me, I must advise you that whatever

15  you say can be used against you as evidence in

16  court."  He stated that he acknowledged that and

17  understood that also.  I told him, "You have a right

18  to consult with a lawyer and have a lawyer present

19  with you while you are being questioned."  He also

20  acknowledged that he understood that.  I stated

21  that, "If you want a lawyer but are unable to pay

22  for one, a lawyer can be appointed to represent you

23  free without any cost to you."  Again, he

24  acknowledged that and that he understood.

25  Q.    Was Mr. Caffie then willing to speak to you

1 after you did the reading of these words to him and

2 he indicated he understood?

3 A.   Yes.

4 Q.   When you began that interview with the

5 defendant, what is it that occurred first as best

6 you can recall?

7 A.   I asked him how long he had lived in Bloomington

8 or in the Bloomington area.  He told me he had only

9 been there for a few months or several months.

10 Mentioned having stayed with a cousin in an

11 apartment in Bloomington.  Told me that his

12 girlfriend Rachel had nothing to do with this

13 investigation.  She didn't know anything about

14 anything.  He did admit to being regularly involved

15 in the sale of narcotics in Bloomington since he had

16 been down here.

17 Q.   What words did he use in that context because

18 basically you're describing now in a summary form?

19 Did he use any specific words that you recall when

20 he began talking about what he had done in

21 Bloomington in regards to sale of drugs?

22 A.   I don't know that he mentioned anything specific

23 as far as like crack.  It was understood on my

24 end --

25          MR. SERRITELLA:  I am going to object to

what is understood -- I am going to object to him
characterizing what was said and talking about what
was understood.  I think the appropriate way to ask
this is what did the defendant say, and what did you
say to the best of your knowledge, not summarizing
it and saying, well, he understood and I understood.
I think that's an improper way of examining the
officer.

MR. CAMPBELL:  I'm sorry.

THE COURT:  Will you -- I will sustain the
objection.  You can ask the question again.

BY MR. CAMPBELL:

Q.   Without characterizing what the defendant may or
may not have understood when you talked to him, the
words that you recall him saying about his
involvement in so-called business or drug sales in
Bloomington, to the best of your recollection what
was said or how did he say it?

A.   That he had been selling drugs in Bloomington
since he moved here.  That he had not had a job
since he lived here.  The last job he had was in the
Rockford area where he worked part-time for a
relative I believe.

Q.   Okay.  You also mentioned that he brought up the
topic of his girlfriend.  At that stage did you know

1  who she was particularly from any investigation that
2  you had done?
3  A.   I believe just from her name being a registered
4  owner of the vehicle that we had seen arrive at the
5  transactions, that maroon vehicle was registered to
6  a Rachel Rolo (phonetically).
7  Q.   Let me show you what has been marked as
8  Exhibit 10.  Can you describe what that Exhibit is?
9  A.   Yes, that is a printout of an Illinois Secretary
10  of State inquiry for a temporary registration
11  vehicle registration or permit for the registration
12  number 936F025.
13  Q.   How is it that you obtained that information, is
14  that something that you did or one of the officers
15  did?
16  A.   Yes.  It's common to make inquiries on a regular
17  basis through a website that is available to us
18  through the Secretary of State.
19  Q.   Okay.  And that gives information also as to the
20  street address of the registered owner at least to
21  the tag, the temporary tag on the vehicle?
22  A.   Yes.  It indicates that Rachel Rolo is the name
23  as the registered owner.  It shows a street address
24  as 1132 North State Street in Bloomington, Illinois.
25  Q.   Going back to the interview room when you're

1  talking to the defendant.  After he made reference

2  to Rachel Rolo, what was the next thing that you

3  recall being talked about?

4  A.   I asked him if we searched his residence, I

5  asked what we would find there.

6  Q.   What response?

7  A.   He asked me in the form of a question, he said,

8  "1105 Gettysburg number six?"

9  Q.   What does that mean?

10 A.   It's an apartment complex in Bloomington.  It's

11 a street address.  I told him, no, your other house.

12 He said, "Oh, you mean 1132 North State Street?"

13 Q.   You knew during the course of investigation that

14 that was the place that surveillance had seen this

15 vehicle coming and going from at various times?

16 A.   Yes.

17 Q.   On the days in question right before or shortly

18 before the deliveries took place?

19 A.   Yes.

20 Q.   Had you also caused to apply for a search

21 warrant in McLean County for that particular

22 residence?

23 A.   Yes, I had.

24 Q.   That happened on or about March 28th in the

25 afternoon hours?

1  A.   Yes.

2  Q.   You were the affiant for that particular search

3  warrant?

4  A.   I was.

5  Q.   Did you, in fact, get a search warrant

6  authorization from a McLean County Circuit judge?

7  A.   I did.

8  Q.   For 1132 North State?

9  A.   Yes.

10  Q.   Let me show you what's been marked as Exhibit 18

11  and ask if you can identify that.

12  A.   That's a copy of the search warrant issued on

13  March 28, 2006 for 1132 North State Street.

14  Q.   That's something that you would make part of

15  your case file; is that correct?

16  A.   Yes, sir.

17  Q.   Going back to the interview room after you

18  indicated that we are not talking about the

19  Gettysburg address, we are talking about 1132 North

20  State, you said his place, what happened after that,

21  what was next said?

22  A.   After he mentioned the State Street address,

23  confirmed that that's what I was talking about when

24  I asked what we would find, he asked me why are you

25  asking me questions when you already know the

1    answers.  And I did know some of the answers.  I
2    told him that I didn't know all of the answers.  I
3    said, "What would be there?"  I said, "Is it about
4    two ounces of dope that's there?"  And he
5    interrupted me and he said, "No four."  I said,
6    "Okay, that's what I'm talking about.  That's just a
7    question that I'm asking what would we find there."
8    At that point he again told me that his girlfriend
9    had nothing to do with this.  And asked me what it
10   would take to make all of this go away.
11   Q.   Did you have some discussion with him then as to
12   what possible good, I guess for lack of a better
13   word, he would do for himself with working with the
14   police or cooperating in some manner?
15   A.   I did as I would with almost any drug
16   investigation.  There is always someone that is able
17   to, you know, do more or provide more narcotics.  I
18   began to talk to him about the possibility that if
19   he was interested in cooperating with us, we would
20   give him that opportunity, more than likely to take
21   us to his supplier.  From that point he said, "Well,
22   I can get you another four ounces," he said, "I got
23   four ounces from a guy named G, a male black subject
24   from Schaumburg, Illinois."  He said, "The dope that
25   was at my house is what was left from that four

1  ounces."  He said, "I can get you four more."  He

2  said, "I can get you nine and a half if you want,

3  it's up to you."  From there I said that's something

4  that we can sit down and talk about.  I said we need

5  to talk about this investigation now.  It's time to

6  talk about that.  He told me that was fine, but he

7  wanted a guarantee in writing that he wasn't going

8  to be charged and his girlfriend wasn't going to be

9  charged.  And I tried to explain to him that that

10  wasn't my decision to make.  I didn't have the

11  authority to do that and tried to explain to him how

12  any cooperation given on his part would be passed on

13  to the state's attorney possibly for consideration

14  against any charges he may or may not have.  He

15  didn't want to continue the interview any further.

16  He was upset not having something in writing saying

17  he was granted immunity basically from what was in

18  front of me that day.

19  Q.   At the time that you were talking to him had you

20  already obtained the search warrant authorization?

21  A.   Yes.

22  Q.   But had the search warrant actually taken place

23  yet?

24  A.   I believe they had secured the residence and had

25  begun the search.

1  Q.   So you didn't really know exactly what he said

2  was matching up with what was being found by the

3  officers at the house?

4  A.   One of the officers had told me that they found

5  what they believed to be a couple ounces of crack

6  cocaine at the house there.  That's how I knew to

7  ask him about the amount.  I asked him how much it

8  may or may not have been.

9  Q.   Sometime later that day -- did that pretty much

10 conclude your conversation with Mr. Caffie?

11 A.   Yes, it did.

12 Q.   Sometime later that day you were made aware of

13 items of evidence being taken from his residence at

14 1132 North State; is that correct?

15 A.   Yes.

16 Q.   Those items were placed into evidence including

17 some drug evidence?

18 A.   Yes.

19 Q.   That drug evidence which was given the case

20 Exhibit Number 20 was what was the evidence seized

21 in the house, that was the drug evidence, the crack

22 cocaine?

23 A.   That was the quantity of crack cocaine that was

24 found in the residence, yes.

25 Q.   And at some occasion that ended up in the

1  possession of Bloomington police in the evidence

2  area in the control situation that you described?

3  A.   Correct.

4  Q.   Did you have any hand in doing that on that

5  occasion, Exhibit 20?

6  A.   In placing that into that evidence cabinet, no.

7  Q.   Did you have any hand in field testing any of

8  that substance that was in Exhibit 20?

9  A.   No, I did not.

10  Q.   I'd like to know -- I'd like to ask you this

11  question, at some point and in particular on

12  June 19th of 2006, as part of your duties with the

13  police department, could you go to the Morton

14  Illinois Crime Lab?

15  A.   I did.

16  Q.   And on that occasion did you retrieve some items

17  of evidence that had been previously taken there by

18  a different officer?

19  A.   Yes.

20  Q.   Those were in relation to this case?

21  A.   Yes.

22  Q.   Those would be the three controlled buys, the

23  substances from them that you had been responsible

24  for bagging up and securing?

25  A.   Correct.

1  Q.   And this last bit of evidence, Exhibit

2  Number 20, based on your information from the

3  search?

4  A.   Correct.

5  Q.   I'd like to show you what's been marked as

6  Exhibit 1, 3, 4 and 20.  Can you identify those

7  please?

8  A.   Those are the lab receipts that I signed while I

9  was at the Morton Crime Lab.

10  Q.   Those exhibits have your original signature on

11  it?

12  A.   Yes, they do.

13  Q.   On the occasion on June 19th when you retrieved

14  those items of evidence, did you see a person from

15  the crime lab?

16  A.   Yes.

17  Q.   Who was that?

18  A.   Denise Hanley.

19  Q.   Who did you receive these items that you signed

20  off on the evidence received from?

21  A.   From Denise Hanley.

22  Q.   So she basically provided and handed them to

23  you?

24  A.   Yes, she did.

25  Q.   And did she sign in your presence?

A.   Yes.

Q.   Were the items 1, 3, 4 and 20 in a sealed

condition when you received them from her?

A.   Yes, they were.

Q.   Did you then take those in a sealed condition

back to the Bloomington Police Department?

A.   Yes.

Q.   What did you do with them there?

A.   I turned them over to the records custodian at

the police department for long term storage.

Q.   Who is that person?

A.   I believe Stephanie Bachman.

Q.   And her duties there at the police department as

evidence custodian are what?

A.   She's responsible for the maintenance of any

evidence at the police department, track in logging,

the check in, check out, so on and so forth.

Q.   The evidence such as this 1, 3, 4 and 20 is that

kept in a secured area of the police department by

Stephanie Bachman?

A.   Yes.

Q.   And if an item of evidence is removed, any of

these items, there would be a sign out sheet or some

sort of process to show who took possession of it?

A.   Yes.

1   Q.   Or who brought it back?

2   A.   Correct.

3   Q.   As part of your working with Brett Fowler, you

4   had occasion to pay him for his work with you; is

5   that correct.

6   A.   Yes, sir.

7   Q.   Paid informant, that what his title would be I

8   suppose?

9   A.   Correct.

10   Q.   And the total amount of money that you paid,

11   that you paid on more than one occasion because

12   there is more than one transaction; is that correct?

13   A.   Correct.

14   Q.   Did you recall what it is that you paid and when

15   you paid it?

16   A.   Overall I think Mr. Fowler has paid

17   approximately $520 for the entire investigation.  It

18   wasn't necessarily one payment.  It was payments as

19   he worked with this on a daily basis.

20   Q.   And once the case is concluded, that is once

21   there was an arrest and once all of the

22   investigation is over, was there a payment to

23   Mr. Fowler as a sort of a -- the end of the process

24   that's where he gets the bulk of the money so to

25   speak.

1  A.   Yes.

2  Q.   One other document I would like to show you

3  that's been marked as Exhibit 7.  Can you please for

4  the record describe what that is a copy of?

5  A.   It's an appearance bond from McLean County in

6  the 11th Judicial Circuit, State of Illinois.  It

7  lists at the very top Caffie, Larry J. as a

8  defendant for driving on a suspended charge.  It

9  shows that he was given an individual bond or a

10 recognizance type bond on -- it looks like on the

11 bottom, the 24th of February, 2006, Mr. Caffie

12 signed the form, and indicated his address at 1132

13 North State Street in Bloomington, Illinois.

14 Q.   You are familiar with those type of bond forms

15 having worked as a police officer for 19 years?

16 A.   Yes, sir.

17 Q.   And the portion of the bond form that is signed

18 by the individual who is being placed on bond, is it

19 a place where they sign their own name, their

20 signature is placed there by them?

21 A.   Correct.

22 Q.   And it gives the terms and conditions of an

23 appearance bond?

24 A.   Correct.

25 Q.   And an address for the clerk's office and the

1  court to know where that person is to be located?

2  A.   Exactly.

3  Q.   And that's what this particular document shows?

4  A.   Yes.

5  Q.   In fact, isn't this a certified copy of that

6  bond form from the circuit clerk's office in McLean

7  County?

8  A.   It is.

9        MR. CAMPBELL:  Your Honor, we have some

10  recordings --

11        THE COURT:  I would like to take a break

12  right now please.  Let's take a ten minute break

13  please.

14        (The court took a recess.)

15        MR. CAMPBELL:  Thank you, Your Honor.

16  BY MR. CAMPBELL:

17  Q.   Going back to Exhibit Number 7.  Detective Gray,

18  you've already testified that the search warrant

19  that you obtained is -- a copy of that is

20  Exhibit 18, you looked at that and identified that?

21  A.   Correct.

22  Q.   There was an application for search warrant as

23  well, a rather lengthy application that had very

24  many attachments including police reports and

25  pictures and so on that were submitted to the judge

1  before he signed off on the search warrant; is that

2  correct?

3  A.   Yes.

4  Q.   Exhibit 7 which you have there in front of you

5  is a certified copy of the traffic bond form that

6  you just testified about recently.

7       Was there an attachment to the search

8  warrant complaint that was presented to the judge

9  not in a certified form but the exact same thing

10 that you see there in front of you, that is the bond

11 form for the defendant for the traffic case?

12 A.   I believe there was, yes.

13 Q.   And that was not something that you generated,

14 who generated that for the search warrant complaint?

15 A.   The assistant state's attorney who helped us

16 with the application process had someone retrieve

17 that from the court file.

18 Q.   So the judge who made the decision on the search

19 warrant saw that as well, although it wasn't a

20 police document, it was something that the assistant

21 state's attorney said that let's include this that

22 with the name and address on it?

23 A.   Yes.

24 Q.   We have some telephone calls, we have a

25 transcript in front of you, a pile of papers that

1  start with Government Exhibit 16-A at the upper

2  right hand corner.

3  A.   Yes.

4  Q.   And before we start that, you have had a chance

5  as part of this investigation to listen to a large

6  number of phone calls from the McLean County jail

7  phone recording system for inmates?

8  A.   Yes, I have.

9  Q.   Those are done in a digital format; is that

10  correct?

11  A.   They are.

12  Q.   You are able to access those through a computer

13  and link up to the McLean County, I guess, the law

14  and justice center?

15  A.   Yes.

16  Q.   In particular that you've listened to hours and

17  hours of phone calls that are attributed to Larry

18  Caffie; is that correct?

19  A.   I have.

20  Q.   And from those you have condensed down or helped

21  caused to be condensed down these calls into a very

22  short format, just parts of those phone calls?

23  A.   Correct.

24  Q.   And those also had been made into transcripts.

25  So you have had a chance to review the condensed

1  version of the phone calls that you listened to in

2  entirety; is that correct?

3  A.   I have.

4  Q.   And you've already looked at the transcripts for

5  those condensed calls as you were listening to the

6  calls?

7  A.   Yes.

8  Q.   First of all, is the condensed version of those

9  phone calls true and accurate, a copy true and

10  accurate copy of the longer phone calls that just

11  happen to be portions of those longer calls?

12  A.   Yes.

13  Q.   Secondly, the transcripts that you had a chance

14  to examine Exhibit 16-A, B, C, D and E, do those

15  reflect to the best of your ability the words that

16  were spoken in these condensed versions that you

17  have listened to?

18  A.   Yes, they are.

19       MR. CAMPBELL:  If we could then I would like

20  to start the recordings, Your Honor.  I think

21  because the first witness only identified a portion

22  of them, we didn't hear the whole recordings.  At

23  this time I think that we will listen to them all

24  the way through if the court will permit.

25       THE COURT:  All right.

1     MR. CAMPBELL:  Starting with 16-A.

2     (Listening to recording.)

3  Q.  Detective Gray, you have had a chance to listen

4  to the recording here in court, is that a true and

5  accurate representation and recording of what you

6  had heard from the phone calls that you took from

7  the McLean County jail recording system?

8  A.  Yes.

9  Q.  And you also read along with the 16-A for that

10  phone call?

11  A.  Yes.

12  Q.  Does that to the best of your knowledge reflect

13  the words that were spoken?

14  A.  Yes.

15  Q.  On this particular transcript 16-A there are

16  different labels of individuals speaking along the

17  left side of the page and from time to time you will

18  see one that says defendant as well some others.  Do

19  you recognize any of the voices on that recording,

20  any voice you've ever heard before?

21  A.  Just the defendant's voice.

22  Q.  All right.  And where it says defendant and you

23  listened to the recording and read along, is the

24  defendant Larry Caffie in this case who you referred

25  to the defendant on this recording?

1  A.   Yes, Larry Caffie.

2       MR. CAMPBELL:  I would like to play the

3  second portion, that's number two, Margo, 16-B for

4  the transcript.

5       (Listening to recording.)

6  BY MR. CAMPBELL:

7  Q.   Detective Gray, you have had a chance to listen

8  to the recording in court, is that a true and

9  accurate copy of the original phone call that you

10 helped take the condensation or condensed version

11 of?

12 A.   Yes, it is.

13 Q.   It says defendant along the side, do you

14 recognize the voice of that person?

15 A.   Larry Caffie is whose voice it is.

16 Q.   Do you know anybody else's voice on that

17 recording besides the defendant?

18 A.   No.

19       MR. CAMPBELL:  If we could do call 16-C,

20 Margo.

21       (Listening to recording.)

22 BY MR. CAMPBELL:

23 Q.   Detective Gray, you again listened to a portion

24 of that phone call that you -- first of all, is that

25 a true and accurate recording of the original phone

1  call that you researched and listened to?

2  A.   Yes, sir.

3  Q.   At least a portion of that and you read along

4  with the transcript as well; is that correct?

5  A.   Yes, I did.

6  Q.   Whose voice do you recognize on that particular

7  phone call?

8  A.   Labeled as the defendant, I recognized the voice

9  as Larry Caffie.

10  Q.   Anybody else's voice on that that you recognize?

11  A.   No.

12       MR. CAMPBELL:  Ready for number four, I

13  think, 16-D.

14       (Listening to recording.)

15  BY MR. CAMPBELL:

16  Q.   Detective Gray, you have heard a recorded

17  portion of a McLean County Jail, is this a true and

18  exact recording of the calls that you sorted through

19  and listened to in their entirety?

20  A.   Yes.

21  Q.   And it is accurate; is that correct?

22  A.   Yes.

23  Q.   As to the identification of the voices, do you

24  recognize anybody's voice?

25  A.   The -- where it's labeled defendant, that was

1 Larry Caffie.

2 Q.   All right.   Brett Fowler, you're obviously

3 familiar with that person, is that a person who is

4 white or Caucasian?

5 A.   Yes.

6 Q.   Do you happen to know who Troy is that is

7 referred to in a previous phone call?

8 A.   No, I do not.

9        MR. CAMPBELL:   Final phone call number five,

10 16-E.

11        (Listening to recording.)

12 BY MR. CAMPBELL:

13 Q.   And finally, Detective Gray, you've listened to

14 that portion of a phone call, is that a true and

15 accurate recording or the representation of the

16 original phone call that you took this from?

17 A.   Yes, it is.

18 Q.   And the transcript reflects your best

19 recollection of your best ability to put that in

20 writing?

21 A.   Yes.

22 Q.   Whose voice, if any, do you recognize of the

23 people talking?

24 A.   The voice of the defendant is Larry Caffie.

25        MR. CAMPBELL:   Your Honor, the recording

1  that we have been listening to and that the witness

2  has testified to is marked as Defendant's

3  Exhibit 16.  The transcripts as I've referred to

4  them and as the witness referred to as 16-A through

5  E, I would move for the admission of 16 and the

6  transcript 16-A through E, noting as the Court has

7  said earlier that the recordings and the spoken

8  words are the best evidence of what actually was

9  said but that the transcript I do believe might

10  assist the Court.

11         In addition to that, I would move for the

12  admission of Exhibits 1, 3, 4 and 20 which are the

13  evidence receipts that this witness, Detective Gray,

14  has testified about when he picked up evidence from

15  the crime lab.

16         I move for the -- also for the admission of

17  Exhibit 7 which is a certified copy of a bond form

18  of the defendant's name and address on it.  A

19  version of that was given as part of the documents

20  for the complaint for search warrant to the issuing

21  judge in McLean County, but we thought it would be

22  better just to present the certified copy so the

23  Court would have a self-proving document but that is

24  basically what it is.

25         And then finally, Exhibit 18 which is the

1  actual search warrant itself signed by Circuit Judge

2  Ron Dozier on the 28th of March 2006, which

3  Detective Gray was the affiant for and will come

4  into play at a later part of the case when we

5  introduce or seek to introduce evidence from the

6  search of the house at 1132 North State Street.

7        MR. SERRITELLA:  I have no objection, Your

8  Honor.

9        THE COURT:  All right.  All of those

10  Government's Exhibits were admitted.

11        Were you able to get them down, Rhonda?

12        THE CLERK:  Yes, Judge, I got them.

13        MR. CAMPBELL:  Judge, I think there might

14  have been one more exhibit.  Let me double check.

15        Judge, Exhibit 10 was the printout from the

16  leads inquiry as to the registered owner on a

17  temporary license plate for the maroon Buick.  And

18  this witness testified about Exhibit 10.  We would

19  move for the admission of that just for the purpose

20  of showing that's what the police relied upon as

21  part of the investigation, that was part of the

22  documents they looked at.

23        MR. SERRITELLA:  No objection, Your Honor.

24        THE COURT:  Be admitted.

25        MR. CAMPBELL:  Can I have just a moment,

1  Your Honor?

2          No further questions for this witness.

3          THE COURT:  All right.  You may cross.

4          MR. SERRITELLA:  Thank you, Your Honor.

5                  CROSS-EXAMINATION

6   BY MR. SERRITELLA:

7  Q.    Detective Gray, you made out a police report in

8  this case regarding the interview you had with the

9  defendant, didn't you, detective?

10 A.    Yes, sir.

11 Q.    Have you seen that police report?

12 A.    Yes.

13 Q.    Do you have a copy with you?

14 A.    Not with me, no.

15          MR. SERRITELLA:  Judge, may I approach the

16 witness?

17          THE COURT:  You may.

18 BY MR. SERRITELLA:

19 Q.    I'm going to show you, detective, what the

20 Government's given me and it purports to be your

21 police report?

22 A.    Okay.  The third of the three pages is something

23 different but the first two are the interview.

24 Q.    Okay.  The first two pages then would be your

25 police report?

1  A.    Regarding the interview, yes, sir.

2  Q.    This was held on March the 28th of 2006.  You

3  met with Mr. Caffie at the police department in

4  Bloomington?

5  A.    Yes, sir.

6  Q.    It was for purposes of questioning him regarding

7  these incidents of deliveries of the alleged crack

8  cocaine?

9  A.    Correct.

10  Q.    And at the time you personally had taken the

11  items that he had allegedly delivered and you had

12  put them in the cabinet so you knew what we were

13  talking about.

14  A.    Correct.

15  Q.    In your police report, I count that on a

16  approximately nine occasions, you refer to drugs in

17  the police report, and all nine times you refer to

18  cocaine.  You never use the word crack anywhere in

19  the two-page police report, and when you are

20  referring to the drugs involved in this case, you

21  always refer to it as cocaine with the exception of

22  one time when you refer to powder cocaine.  Would

23  that be accurate?

24  A.    Yes, sir.

25  Q.    You never used the word crack in your police

1  report, did you?

2  A.   I don't believe so.

3  Q.   And on page two, when you were talking with him

4  about him obtaining drugs and being able to get you

5  more drugs, etcetera, he specifically tells you that

6  he can get you any amount of powder cocaine.  Does

7  he not?

8  A.   Yes.

9  Q.   He never says that I can get crack cocaine, does

10 he?

11 A.   Maybe not specifically.

12 Q.   Well, but specifically the other way, he never

13 said during this entire interview I can get you

14 crack cocaine, did he?

15 A.   In those words, no.

16 Q.   You never used the word crack, did he?

17 A.   Correct.

18 Q.   And when you were questioning him, and you were

19 talking to him in your police report, you never

20 indicate that you ever used the term crack during

21 this entire interview?

22 A.   Correct.

23 Q.   The only thing that you refer to is cocaine in

24 this interview, isn't that true?

25 A.   Correct.

1  Q.   Now let's go to the complaint for search

2  warrant, did you prepare the complaint for search

3  warrant, detective?

4  A.   No, sir.

5  Q.   Who did?

6  A.   Assistant State's Attorney Horve.

7  Q.   You were the complainant though, weren't you?

8  A.   The affiant.

9  Q.   You signed it as the police officer, didn't you?

10  A.   Yes, sir.

11  Q.   You read it thoroughly?

12  A.   I did.

13  Q.   You were the only police officer in fact to sign

14  this document, weren't you?

15  A.   Correct.

16  Q.   And in that complaint for search warrant, once

17  again, the word crack is never used, is it?

18  A.   That's correct.

19  Q.   Cocaine is used, isn't it?

20  A.   I believe so.

21  Q.   And heroin?

22  A.   Possibly.

23  Q.   Cannabis?

24  A.   Yes.

25  Q.   But crack cocaine is never mentioned in that

209

1  complaint for search warrant, isn't that true?

2  A.   You're probably correct.

3       MR. SERRITELLA:  May I approach, Judge?

4       THE COURT:  Yes, you may.

5  BY MR. SERRITELLA:

6  Q.   I'm going to show you what the Government's

7  given me and said this is the complaint for search

8  warrant.  Take a look at that.

9  A.   You're correct.

10  Q.   Do you know who prepared the search warrant in

11  this case?

12  A.   Again, Assistant State's Attorney Horve.

13  Q.   Did you look that over also?

14  A.   Yes, sir.

15  Q.   Once again, nowhere in the search warrant does

16  it use the word crack cocaine?

17  A.   Probably not.

18  Q.   Well, let me show you it again.

19  A.   Just to make sure.

20  Q.   I want you to be sure.

21  A.   You're correct.

22  Q.   So your police report which evidences the

23  interview that you had with the defendant on March

24  the 28th of 2006, the search warrant that was

25  composed or the complaint for search warrant that

1  was composed shortly thereafter if not

2  contemporaneously and the search warrant itself all

3  three of those documents failed to mention crack

4  cocaine.

5  A.   Correct.

6  Q.   They only mention cocaine.

7  A.   Correct.

8  Q.   Now you're aware that the alleged crack cocaine

9  was destroyed by the Bloomington authorities?

10  A.   Yes, sir.

11  Q.   And that's because the evidence was destroyed

12  because the case was dismissed in the normal course

13  of situation they just destroy the evidence; is that

14  true?

15  A.   Yes.

16  Q.   Let me ask you a question then, can you tell me

17  why the cell phone and why the hat are here and they

18  weren't destroyed along with the drugs?

19  A.   Cell phones are commonly items that we seize

20  then turn around for resell.  I believe the hats

21  were intended to be returned to Mr. Caffie at some

22  point if he so desired.

23  Q.   Weren't these things all kept in the same --

24  together in the same place?

25  A.   I would assume so in the same general area.

1  Q.   Okay.  I can understand maybe the cell phone,

2  but you're saying that they intended to return the

3  cap to him and that's why it wasn't destroyed?

4  A.   It sounded odd to me too, but that's what I was

5  told.

6  Q.   That's what you were told and it sounds odd to

7  you also.

8  A.   That they would keep the hats to return them,

9  yes.

10  Q.   Now, you indicated I believe that your opinion

11  was that the substances that Mr. Fowler allegedly

12  got from my client, that those substances were crack

13  cocaine?

14  A.   Yes, sir.

15  Q.   Did you smoke any of them?

16  A.   No, sir.

17  Q.   Have you ever smoked crack cocaine?

18  A.   No, sir.

19  Q.   So you can't tell us it's crack because you

20  smoked and you knew it was crack, correct?

21  A.   For that reason, no.

22  Q.   So there has to be another reason why you're

23  giving, why you're giving us your opinion that it's

24  crack; is that correct?

25  A.   Correct.

1  Q.   Okay.  If you could tell me the reasons specific

2  reasons why you say that it was crack cocaine in

3  your opinion, I would appreciate it.

4  A.   Based on my training and experience, the

5  appearance of it being a hard rock-like substance.

6  Q.   Rock-like substance that's one thing.  What

7  else?

8  A.   The color of it was not like that of powder

9  cocaine.

10  Q.   What was the color of it?

11  A.   Like an off-white color.

12  Q.   Off-white color.  Anything else that led you to

13  believe it was crack?

14  A.   Just the hardness of it and the actual field

15  test that indicated that there was cocaine present

16  in the material.

17  Q.   But the field test only indicated that there was

18  cocaine present.  It doesn't say whether it's crack

19  or cocaine, it just says cocaine.

20  A.   Exactly.

21  Q.   So the field test does not do anything but

22  establish that it's cocaine.  That doesn't tell you

23  that it was crack?

24  A.   Not specifically, no.

25  Q.   So then let's get this down then.  We have the

1  fact that it was a rock-like substance and that it

2  was an off-white color.  Those are the two remaining

3  things that I figure that you're basing your opinion

4  on?

5  A.  The way that they were packaged, I could add

6  that also.

7  Q.  Could you tell me what was distinctive about the

8  way it was packaged?

9  A.  Like a portion of a sandwich baggie tied into a

10  knot.

11  Q.  Haven't you ever seen any other drugs packaged

12  in a sandwich baggie?

13  A.  Sure.

14  Q.  So the packaging doesn't make it crack cocaine

15  either, does it?

16  A.  It is one thing to consider along with the

17  appearance of the packaging.

18  Q.  Well, okay, it's something that a lot of other

19  drugs are packaged that way, too, though, aren't

20  they?

21  A.  Sure.

22  Q.  Have you ever seen any other cocaine that was an

23  off-white color?

24          THE COURT:  You mean other than crack?

25          MR. SERRITELLA:  Other than crack, yes.

1  BY THE WITNESS:

2  A.   I think most of the powder cocaine that I have

3  seen has been almost a -- more of a pure white

4  color.

5  BY MR. SERRITELLA:

6  Q.   Have you ever seen any off-white cocaine, just

7  cocaine powder?

8  A.   Not that I can remember.

9  Q.   Have you ever seen any cocaine base off-white

10  color?

11  A.   Cocaine base off-white color?

12  Q.   Yes.

13  A.   Meaning crack?

14  Q.   No.  Not all cocaine base is crack.  All crack

15  is cocaine base, but not all cocaine base is crack.

16          MR. CAMPBELL:  Your Honor, I object this

17  isn't a question.  It is a statement by counsel and

18  if there is a question he should ask a question.

19          MR. SERRITELLA:  Okay.

20  BY MR. SERRITELLA:

21  Q.   Have you ever seen any other cocaine, any other

22  kind of cocaine whether it be cocaine base, cocaine

23  powder, any other thing besides crack that was an

24  off-white color?

25  A.   No.

1  Q.   Have you ever seen any other drugs that were an

2  off-white color?

3  A.   Not that I can recall right now, no.

4  Q.   Have you ever seen any drugs that appeared to be

5  in a rock-like substance besides crack cocaine?

6  A.   Not to that consistency, no.

7  Q.   What do you mean not to that consistency?

8  A.   As I testified to earlier, the powder cocaine

9  can appear chunky and hard as an appearance.  Once

10  it's compressed or pressure is applied to it, it

11  crumbles and powders leaving a lot of residue.

12  Heroin is similar.  The crack cocaine it breaks off

13  in pieces.  It is more like brittle.  It is a hard

14  substance.

15  Q.   How about things like this mescaline and

16  amphetamines and all of these other things, can they

17  have an off-white color to them?

18  A.   I suppose pills or tablets could have any kind

19  of a color.

20  Q.   Can they have a rock-like substance to them?

21  A.   Not similar to the crack cocaine.

22  Q.   Have you ever seen crack cocaine that wasn't an

23  off-white color, say a yellow color?

24  A.   Yeah, probably seen it somewhat yellow before,

25  but could also be described as an off-white.

1  Q.   So now you're saying that -- let me get this
2  straight -- that the crack cocaine you saw could be
3  described as off-white or a yellow?
4  A.   I think probably on just a couple of occasions
5  I've seen crack cocaine that was -- probably could
6  be described as off-white or yellow based on
7  probably the way that it was prepared but not in
8  this instance.
9  Q.   But is it accurate to say, detective, that your
10 entire opinion is based on what this substance
11 appeared to you when you looked at it?
12 A.   Based on my training and experience, yes.
13 Q.   Have you ever seen any counterfeit crack
14 cocaine?
15 A.   I have seen bagged up pieces of look alike
16 substance that were sold to us as cocaine that
17 actually turned out not to be, but it didn't look
18 like crack cocaine when you examined it.
19 Q.   Mr. Fowler earlier testified that on occasion he
20 has purchased counterfeit crack cocaine.  Have you
21 ever heard of anything like that happening before?
22 A.   People sell dummy bags.  They will mix baking
23 soda up with water and try to harden it and pass it
24 off as cocaine, corn meal or whatever they think
25 that they can pass off.

1  Q.   Have you ever seen anything like that yourself

2  that you did find out?

3  A.   Like a look alike substance or whatever?

4  Q.   Yeah.

5  A.   Sure.

6  Q.   Have you personally ever seized a substance that

7  you thought was crack cocaine and then when it was

8  analyzed it turned out not to be crack cocaine?

9  A.   Several times I've acquired pieces of substances

10  that were put off as being crack cocaine.  I don't

11  think that I've ever sent anything to the lab and

12  checked for crack cocaine or cocaine base and not

13  had that result.

14       MR. SERRITELLA:  Okay.  I have no further

15  questions, Judge.

16       THE COURT:  Redirect.

17            REDIRECT EXAMINATION

18  BY MR. CAMPBELL:

19  Q.   Detective Gray, when you investigate your drug

20  cases, is it the rule or the exception that they end

21  up going to federal court?

22  A.   The exception.

23  Q.   And you've indicated that you have several

24  different cases in which you were a buying agent,

25  undercover agent, or additional many cases in which

1 a controlled substance was purchased by a

2 confidential source?

3 A.   Correct.

4 Q.   In those instances when that was crack cocaine,

5 did they all become federal cases?

6 A.   No, sir.

7 Q.   In fact in your experience as a police officer

8 in Bloomington and going through the state court

9 system, is there any distinction made in the state

10 court between crack cocaine and powder cocaine?

11 A.   At the state level there is not.

12 Q.   Do you in your ordinary course of business when

13 you're prosecuting or gathering evidence for state

14 prosecutions refer to cocaine as crack cocaine even

15 if you believe it to be crack cocaine?

16 A.   No, not ordinarily.

17 Q.   In this particular case you were asked questions

18 about color of substances and so on, and you

19 indicated that the off-white color is typical for

20 you to see when you believe it's crack cocaine and

21 it goes to the lab and it gets tested.  What is the

22 color in this particular instance?

23 A.   An off-white color.

24 Q.   So this isn't a case where there was some

25 yellowish color to it?

1  A.   Correct.

2  Q.   And when these substances get -- let me refresh

3  your memory here with Exhibits 1, 3, 4 and 20.

4       Here's a handwritten notation at the bottom

5  of that form for each of those exhibits, 1, 3, 4 and

6  20.  And there is three letters there F-E-D, what

7  did that signify to you?

8  A.   That's an indication that the forensic scientist

9  or somebody at the laboratory has marked them FED,

10 short for federal or federal prosecution which would

11 indicate they need to conduct a different type of

12 test than they normally would.

13 Q.   That different type of test, although you are

14 not a scientist, you don't conduct a test, you know

15 there are different tests for powder and different

16 tests for crack cocaine?

17 A.   I know that it's different because we have to

18 make specific requests to have it done that way.

19 Q.   When you get results back, do you know what the

20 term cocaine base refers to from the results of

21 tests, those words?

22 A.   Basically that that's confirming our suspicion

23 that it is crack cocaine.

24 Q.   Okay.  So one of the things Mr. Serritella was

25 asking one of the indicators of crack cocaine and

1  you've described it as a hard rock-like substance,

2  off-white is another indicator that it is cocaine

3  base, the lab says that it is cocaine base.

4  A.   Yes.

5  Q.   So cocaine base plus your observations plus your

6  conclusions is that the basis for your opinion in

7  this particular instance about what these substances

8  are?

9  A.   Yes, with everything combined.

10  Q.   If the lab reports in this instance didn't come

11  back as cocaine base, would you still be calling

12  this crack cocaine?

13  A.   No, and we wouldn't be here probably.

14  Q.   All right.  Do you know from your training and

15  experience what crack cocaine is made from, where

16  does it start out as?

17  A.   From a coca plant.

18  Q.   Does the coca plant get processed to become some

19  substance before it becomes crack cocaine?

20  A.   I believe in its early stages of processing it

21  is more of a paste like subject or substance.

22  Q.   And once it's a paste like substance, does it

23  get turned into another substance before it becomes

24  crack cocaine?

25  A.   Probably back into like the powder cocaine.

Q.   Powder cocaine.  Is that a typical sort of a
stage of the drug that's often sold?

A.   Yes.

Q.   But that stage is different than crack cocaine?

A.   Yes, it is.

Q.   Are you able to say whether there is some change
made to make powder cocaine, alter it some way to
make it what you believe to be crack cocaine?

A.   There is a change that has to be made.

Q.   Do you know what that change is, what happens to
the powder to make it crack?

A.   It has to be mixed with something such as baking
soda or water or similar substances and then heated.

Q.   In the course of your investigations, have you
ever been involved in search warrants or seizures of
evidence in which there is evidence of some of this
preparation of powder into this other substance that
is crack cocaine?

A.   Yes.

Q.   What have you observed in your experience in
that regard?

A.   You know, a variety of items including the
presence of baking soda, pots and pans with residue
that you can obtain field tests from for cocaine,
mixing bowls, whatever would be used to package the

1  material, razor blades to cut the material once it's

2  hardened.

3  Q.   Are you describing some type of a cooking

4  process to transform powder into something else

5  called crack cocaine?

6  A.   Yes.

7  Q.   When you were writing your report of the

8  interview with Mr. Caffie, you were asked about why

9  the word crack cocaine does not appear in there, nor

10  does it appear in the search warrant application or

11  the search warrant itself.  What explanation do you

12  have for that at that stage of your investigation

13  that you would refer to this simply as cocaine?

14  A.   For me it's a general term.  It's just what's

15  more commonly used.

16  Q.   Until you got results back from the crime lab to

17  know what tests resulted from what the forensic

18  scientist had done resulting in a conclusion of

19  cocaine base, were you -- would that be one other

20  indicator to you that this is something else other

21  than powder cocaine?

22  A.   Yes.

23  Q.   You have had a chance as part of being the case

24  agent to know that that was the conclusion the

25  report made by the crime lab.

```
 1  A.    Correct.
 2          MR. CAMPBELL:  Can I have just a moment,
 3  Your Honor?
 4          No other questions, Your Honor.
 5          MR. SERRITELLA:  Judge, I have a few more.
 6          THE COURT:  Yes.
 7                      RECROSS-EXAMINATION
 8  BY MR. SERRITELLA:
 9  Q.    Detective Gray, I believe you said that the
10  reason you know this is cocaine, crack, because it
11  has a rock hard substance, it is an off-white color?
12  A.    In my experience looking at what I had there,
13  yes.
14  Q.    That is how you determined it was crack?
15  A.    In my opinion, yes.
16  Q.    In your opinion, I understand.  Now just a
17  moment ago, did I understand you to say when counsel
18  was questioning you that you referred in the police
19  report and in the complaint for search warrant to
20  the substance as cocaine because you hadn't gotten
21  the lab report back on it; am I correct?  Is that --
22  did I understand that right?
23  A.    No, I don't know that we've ever listed as an
24  application or within that application --
25  Q.    No, no, no, I'm sorry.  Listen to my question.
```

224

1  My question is this --

2          MR. CAMPBELL:  Your Honor, if the witness

3  would be allowed to answer the question as asked and

4  another one could be followed up, it might be a

5  little less confusing.

6          THE COURT:  Well --

7          MR. SERRITELLA:  He wasn't answering my

8  question.

9          THE COURT:  I don't think the witness -- at

10 least it didn't appear that he answered the question

11 that was asked of him.  Why don't we start over

12 again.  Ask your question again.

13 BY MR. SERRITELLA:

14 Q.   Listen carefully if you would please.

15 A.   Go ahead.

16 Q.   When counsel was questioning you a few moments

17 ago, did I understand you to say that you did not

18 refer to the substance as crack cocaine in the

19 police report and in the complaint for search

20 warrant because you hadn't gotten the lab report

21 back yet telling you what it was; is that what you

22 said a few moments ago?

23 A.   Possibly, yes.

24 Q.   Okay.  Well, if you identify this as crack

25 cocaine because of its rock-like substance and its

1 off-white color, then what do you need a lab report

2 for?  If you're identifying it as a crack because of

3 its off-white color and because of its rock hard

4 substance then what do you need the lab report back

5 to tell you it's crack for?

6 A.   To proceed in a federal prosecution case.

7 Q.   I mean, you're saying as soon as you saw this

8 stuff, when Fowler gave it to you, you knew it was

9 crack.

10 A.   I'm saying that's what it was, yes.

11 Q.   That's before you wrote up the police report,

12 isn't it?

13 A.   Correct.

14 Q.   And it's before you wrote out the complaint for

15 search warrant, isn't it?

16 A.   Correct.

17 Q.   So you would've made your determination that it

18 was crack cocaine well before you talked to the

19 defendant and made out the police report, well

20 before you signed the complaint for search warrant,

21 correct?

22 A.   Certainly.

23 Q.   Well then why didn't you refer to it as crack

24 cocaine in your police report and in the complaint

25 for search warrant if you already identified it as

1  crack cocaine?

2  A.   It's not a common practice for us to list

3  something specifically as crack cocaine.  In my

4  experience, I've always listed cocaine whether it be

5  powder or crack as simply cocaine.  It's not

6  relevant whether a search warrant is granted or not

7  whether it's specified as cocaine or crack cocaine.

8  Q.   Okay.  That's your answer.  But a few moments

9  ago when counsel was questioning you, didn't you

10  just say that you didn't refer to it as crack

11  because you hadn't gotten the lab report back yet,

12  didn't you say that?

13  A.   Well that's a perfect reason not to refer to it

14  as crack, but you don't have that confirmation from

15  the lab, so, yeah, I probably did say that.

16        MR. SERRITELLA:  I have no further

17  questions.

18        MR. CAMPBELL:  No other questions.  Thank

19  you.

20        THE COURT:  Well, I just want to make sure

21  because this is a critical point to what I

22  understand is the defendant's defense in this case.

23  And the question here is, if you recognize the drugs

24  that Mr. Fowler purchased for you as crack cocaine,

25  based on your experience and training, why didn't

1 you use crack cocaine in the police report and in

2 the affidavit for search warrant?  I mean that's

3 really the issue that supports the defendant's

4 defense.  I understand that you were saying that you

5 didn't use crack to distinguish the drug that was

6 bought by Fowler because it made no --  it had no

7 significance in state court prosecution because

8 whether it's crack or powder it's all treated the

9 same under state law; is that what you're saying?

10          THE WITNESS:  That's what I'm simply saying,

11 yes, sir.

12          THE COURT:  And when you became aware that

13 this case may go to federal court, apparently you

14 then understood that there was some significance to

15 whether or not the drug was powder cocaine or crack

16 cocaine; is that correct?

17          THE WITNESS:  Correct.

18          THE COURT:  And when did you first become

19 aware that this case was going to come to federal

20 court, do you recall?

21          THE WITNESS:  Probably within the next --

22 within a month of Mr. Caffie's arrest, I'm sure.

23          THE COURT:  You mention something about some

24 notation on the lab report, FDR or?

25          THE WITNESS:  F-E-D on the bottom of the lab

1 report for FED.

2         THE COURT:  Do you know who wrote that on

3 there?

4         THE WITNESS:  No, I do not.

5         THE COURT:  But when you got the receipt

6 back, that was on there.

7         THE WITNESS:  I believe it would have been,

8 yes.

9         THE COURT:  And it has a significance to

10 you?

11         THE WITNESS:  Certainly.

12         THE COURT:  And what is that significance?

13         THE WITNESS:  The significance is once the

14 cocaine is tested at the lab and confirmed to be

15 cocaine base, there is a different level of charges

16 available for us at the federal level that are not

17 available at the state level.

18         THE COURT:  Then in your mind, I take it

19 cocaine base is synonymous with crack cocaine in

20 your mind?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Do you have any reservations

23 about whether or not the drugs that Fowler purchased

24 from this defendant were crack cocaine?  Do you have

25 any reservations at all?

1        THE WITNESS:  No, that's the only thing I

2  believe it was, was crack cocaine and nothing else.

3        THE COURT:  And would your opinion have

4  changed if the lab report did not show cocaine base,

5  would that effect your opinion?

6        THE WITNESS:  I suppose it would because

7  that's never happened before, but the number of

8  times that I've sent what I believed was crack

9  cocaine to the lab, my indication was confirmed by

10  the results being cocaine base.

11        THE COURT:  Now you've had, I take it,

12  numerous investigations of drug cases that have been

13  prosecuted, have you not?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  And they involved in many

16  instances crack cocaine?

17        THE WITNESS:  Correct.

18        THE COURT:  That was prosecuted in state

19  court as simply cocaine.

20        THE WITNESS:  Correct.

21        THE COURT:  And there would be lab reports

22  that show cocaine base.

23        THE WITNESS:  No, sir.  We have to make a

24  specific request for the lab to test for cocaine

25  base.  If we don't, they just simply test for

1    cocaine.

2         THE COURT:  Okay.  So in those cases that

3    you have been involved with prosecution in state

4    court involving crack, the lab report just simply

5    says that they were cocaine?

6         THE WITNESS:  Yeah, unless we request them

7    otherwise to test for it and I think that's what's

8    indicated by FED here.  It's not the rule for them

9    to simply test for the cocaine base, it's the

10   exception, as I indicated, and that's probably just

11   a notation for them on that rare instance they do

12   test for cocaine base.

13        THE COURT:  So the lab reports you usually

14   see associated with crack that you've prosecuted in

15   state court, have simply said cocaine.

16        THE WITNESS:  That's absolutely correct,

17   yes.

18        THE COURT:  In your mind, is it difficult to

19   distinguish crack cocaine from powder cocaine on the

20   street?

21        THE WITNESS:  No, it is not.

22        THE COURT:  In your dealings with users and

23   sellers of crack cocaine, how do they refer to it on

24   the street?

25        THE WITNESS:  As the crack you're saying?

```
 1          THE COURT:  Yes.
 2          THE WITNESS:  It's got a variety of
 3  different names.  I guess rock is the most common.
 4  They will refer to crack as being hard and powder as
 5  being soft, and it's commonly referred to as dope.
 6          THE COURT:  Okay.  Let's go back to when
 7  Fowler came to you and told you -- what did he tell
 8  you exactly?
 9          THE WITNESS:  That he was selling hard
10  cocaine.
11          THE COURT:  Is that what he said?
12          THE WITNESS:  Yes.
13          THE COURT:  That he had bought -- tell me
14  again he said to you that he had bought some -- when
15  he first came to you.
16          THE WITNESS:  When he first came to me that
17  he knew Mr. Caffie subsequently identified.
18          THE COURT:  He called him J.
19          THE WITNESS:  Yes.
20          THE COURT:  What did he tell you that J was
21  doing?
22          THE WITNESS:  That he was selling hard
23  cocaine.
24          THE COURT:  He used the word hard cocaine?
25          THE WITNESS:  Yes.
```

232

1    THE COURT:  That's the word that Fowler

2  used?

3    THE WITNESS:  Yes.

4    THE COURT:  You took that to mean what?

5    THE WITNESS:  Crack.

6    THE COURT:  And during your interview with

7  the defendant, how did you -- what words did you use

8  to refer to the drugs that he was selling to Fowler?

9    THE WITNESS:  I believe I used the term

10  dope.

11    THE COURT:  So neither one of you used the

12  word crack or hard cocaine?

13    THE WITNESS:  Not that I remember, no, sir.

14    THE COURT:  Thank you.

15    Anyone else have any questions for this

16  witness?

17    MR. CAMPBELL:  Just briefly, Your Honor.

18          FURTHER REDIRECT EXAMINATION

19  BY MR. MURPHY:

20  Q.  Detective Gray, you have Exhibits 1, 3, 4 and 20

21  in front of you; is that correct?

22  A.  Yes, sir.

23  Q.  And you've referred to those in responding to

24  the judge's questions with the word F-E-D or FED

25  written at the bottom of those?

1  A.   Of each page, yes.

2  Q.   Those receipts were generated on what date by

3  Detective Walcott and Denise Hanley and the receipts

4  that you can see right there?

5  A.   April 19, 2006.

6  Q.   So until April 19th, which was roughly two to

7  three weeks after this investigation, there wasn't

8  an attempt to test for cocaine base; is that

9  correct?

10  A.   I don't believe there was.

11  Q.   Do you know of any reason why the lab would put

12  that word on the bottom or would this be something

13  that someone at the police department put it on the

14  bottom when they take the evidence to be assigned to

15  some scientist at the Morton Crime Lab?

16  A.   No, what I believe happened is at some point our

17  police report had communication with your office

18  about this case.  You agreed to review the case and

19  consider it for federal prosecution, contingent upon

20  the lab work being tested the federal way for

21  cocaine base.

22  Q.   Now according to those documents that you have

23  in front of you, that could not have happened any

24  time before April 19th?

25  A.   Correct.

1  Q.   And it could have been very well sometime after

2  that depending on who wrote the word FED on the

3  bottom of the receipts?

4  A.   Exactly.

5  Q.   The conclusion of the lab of cocaine base along

6  with your opinion of what you saw and what you were

7  purchasing through the CS from the defendant, is

8  that just another confirmation of your opinion of

9  what happened?

10  A.   Yes, exactly.

11  Q.   Of what this drug was?

12  A.   Correct.

13          MR. CAMPBELL:  No other questions.

14          MR. SERRITELLA:  I have no further

15  questions.

16          THE COURT:  Thank you, officer.

17          THE WITNESS:  Thank you.

18          MR. MURPHY:  I'm going to need Kenneth Bays.

19                   KENNETH BAYS,

20  after having been duly sworn, testified as follows:

21                   DIRECT EXAMINATION

22  BY MR. MURPHY:

23  Q.   Sir, will you please state your name and spell

24  your last name for us.

25  A.   My name is Kenneth Bays, B-a-y-s.

1  Q.   And your business or occupation is what?

2  A.   I am a police officer for the city of

3  Bloomington, Illinois.

4  Q.   How long have you been so employed?

5  A.   Over nine years.

6  Q.   Your current assignment is what?

7  A.   I am a patrol sergeant on second shift.

8  Q.   And going back to March of 2006, did you have a

9  different assignment at that time?

10 A.   I did.  I was a detective assigned to the Vice &

11 Narcotics Unit at Bloomington.

12 Q.   And during the latter days of March on a couple

13 of different occasions did you assist in an

14 investigation that had come to center upon Larry

15 Caffie?

16 A.   Yes, I did.

17 Q.   Let me ask you, first of all, if you had any

18 participation in a purchase for Mr. Caffie on

19 May 21st?

20 A.   Yes, I did.

21 Q.   And what was your participation on that first

22 buy on March 21st?

23 A.   I participated in a surveillance.

24 Q.   How many different surveillances did you take

25 part in?

1  A.    Three.

2  Q.    Okay.  And on the first purchase of March 21,

3  would you tell us what -- first of all, did you

4  attend a briefing held on -- about 4:30 in the

5  afternoon on March 21st?

6  A.    Yes.

7  Q.    What was your assignment that day?

8  A.    My assignment was to be in the area of

9  Franzetti's Pantry where the purchase was supposed

10  to take place.

11  Q.    Excuse me, just a minute.  Let me direct your

12  attention, Sergeant Bays, to -- we have got the

13  wrong one up there.  I'm sorry.  What number?  15-A.

14        Let me direct your attention to 15-A. Do you

15  recognize that overhead?

16  A.    Yes, I do.

17  Q.    What is the general area there?

18  A.    That is Washington and Clinton in Bloomington,

19  Illinois.

20  Q.    Does that prominently show the Franzetti's

21  establishment?

22  A.    It does in the southeast corner.

23  Q.    That would be the corner of Washington and

24  Clinton?

25  A.    Yes.

1  Q.    Okay.  On that particular day of March 21st,

2  what was your surveillance position?

3  A.    My recollection, I have one recollection, at the

4  completion of the deal I was mobile eastbound on

5  Washington.

6  Q.    Okay.  And what, if anything, did you observe on

7  that day?

8  A.    I briefly followed a maroon vehicle with two

9  occupants in it.

10  Q.    And for what period of time -- tell us where

11  they went, what they did?

12  A.    My recollection is eastbound on Washington to

13  approximately Davis where there was a hand off to

14  the next surveillance officer.

15  Q.    So this was after the transaction?

16  A.    Correct.

17  Q.    Let's move on then to Friday, March 24th.  And

18  did you attend a briefing that happened at about

19  1:30 p.m. that afternoon?

20  A.    Yes, I did.

21  Q.    At that briefing, what was your assignment?

22  A.    My assignment was to be static surveillance

23  initially in the area of the 1100 block of North

24  State Street in Bloomington.

25  Q.    What did you understand the 1100 block of North

1  State Street to be as it related to this

2  investigation?

3  A.  Specifically, 1132 North State.

4  Q.  What did you understand that to be?

5  A.  The location and residence of Larry Caffie the

6  defendant.

7  Q.  And sometime shortly before 2:00 did you take up

8  your surveillance position near that residence?

9  A.  I did.

10  Q.  Whereabouts more specifically -- I think there

11  is a pointer or laser pointer up there if you want

12  to use that or if you would rather step down and

13  point it out, it might be better.

14  A.  Specifically on the 24th?

15  Q.  Yes.

16  A.  I posted in the position of approximately here

17  providing me a view through my windows of my

18  undercover vehicle of the residence.

19  Q.  You'd be heading southbound at that point?

20  A.  I was facing northbound.

21  Q.  But you were looking back through your vehicle.

22  Did that allow you a view of the residence and a

23  garage and a driveway?

24  A.  Yes, and there was actually a vehicle parked in

25  the driveway, the same one from the 21st.

Q.   You observed this maroon Buick on the 21st?

A.   It had a temporary license plate on it of 936F025.

Q.   Did you see that same vehicle that date of March 24th?

A.   Yes, I did.

Q.   Where was it again?

A.   It was parked in the driveway of the residence.

Q.   And did you maintain your surveillance at that point in time?

A.   I did to a point.

Q.   Until about almost 2:30 or so?

A.   Approximately, yes.

Q.   And what did you observe occur there at or about the residence shortly before 2:30?

A.   A black male exited wearing a hat and a blue coat with orange sleeves, got into that maroon vehicle that I previously spoke of, went northbound on state and westbound on Marion where I lost visual contract.

Q.   Did you stay where you were at or did you move?

A.   I did not stay where I was at.

Q.   Where did you go or what did you see?

A.   I moved to the area of Franzetti's Pantry again.

Q.   We will go back to that one.  Okay.  And I think

1  that's 15-A, correct?

2  A.   Yes, sir.

3  Q.   And you moved, can you point out to us where you

4  moved to?

5  A.   I was able to get to the area prior to the

6  defendant.  I was able to park in this area here

7  directly across from a car wash.

8  Q.   So you were across Clinton Street to the west

9  from the car wash?

10  A.   Yes.

11  Q.   And you were there shortly after 2:30, correct?

12  A.   Yes.

13  Q.   And tell us what observations you were able to

14  make from your vantage point shortly after 2:30?

15  A.   I watched the maroon Buick with the temporary

16  tag arrive on the north on Clinton.  I pulled into

17  the parking lot at the car wash, pulled into the

18  parking lot of the car wash, the CS that was

19  assisting us in this transaction got in the vehicle

20  with the defendant and pulled into the northern most

21  bay of the car wash, continued on through to the

22  east side, as I said over here, and saw the CS exit

23  the vehicle.  The vehicle then turned onto Jefferson

24  here, briefly traveling west and north on Clinton.

25  Q.   Now did you actually see the CS get out of the

1  vehicle?

2  A.    Yes.

3  Q.    Where did that occur roughly?

4  A.    Just on the east side of the wash bay, the

5  northern most wash bay.

6  Q.    When the doors to the bay open, you could see

7  through it?

8  A.    Yes.

9  Q.    Then did you have any further observation that

10 particular day?

11 A.    No.

12 Q.    I would like to move onto the next day, that

13 would be Tuesday, March 28th, did you attend a

14 briefing at about 12:30 p.m. that day?

15 A.    Yes.

16 Q.    What was your assignment that day, sir?

17 A.    Again surveillance, this time to remain with

18 eyes on 1132 North State.

19 Q.    Do you want to go ahead and take that one down?

20        Again, shortly before 1:00 did you take up

21 your surveillance position?

22 A.    I did.  Actually this was a different location

23 this time.

24 Q.    You were on Prairie Street I believe at that

25 point?

1  A.   I was on Prairie Street facing west looking

2  through the windshield of my vehicle.

3  Q.   And tell us what your observations at about 1:00

4  were of that location?

5  A.   The same Buick with the same temporary license

6  plate was again parked in the driveway of 1132 North

7  State.

8  Q.   And did that pretty much stay the situation that

9  you observed until about 1:30 or so?

10  A.   Yes, that's correct.

11  Q.   And tell us shortly before 1:30 what you saw?

12  A.   Black male exit 1132 North State this time

13  wearing a dark colored coat with either lighter or

14  different colored sleeves than the main torso, got

15  in the vehicle, north again on State, west on

16  Marion.

17  Q.   And were you aware that there were other

18  surveillance officers in the area?

19  A.   I was.

20  Q.   Who else if you recall?

21  A.   Detective Sergeant Hoeniges, Detective Wolters,

22  Detective Walcott, Detective Stanfield and Detective

23  Sergeant Edmiaston from Normal PD.

24  Q.   Specifically Detective Wolters was up in your

25  area?

1  A.   Yes, he took the hand off.

2  Q.   And when you say "took the hand off," what do

3  you mean?

4  A.   When I lost visual, he picked it up.

5  Q.   You stayed where you were that day.

6  A.   I did not move.

7  Q.   In fact you stayed there for a good long time,

8  did you not?

9  A.   Yes.

10  Q.   Until almost 2:30 in the afternoon or so?

11  A.   Yes.

12  Q.   What did you see about 2:30 in the afternoon?

13  A.   At approximately 2:30 a female exited the

14  residence.  I believe her name was Rachel Rolo

15  identified as, she came out and checked her mail,

16  she looked all around.  I believe at one point she

17  crossed her arms and looked to the north.  She

18  returned to the residence, stood in the doorway

19  continuing to look up and down the street outside

20  and then closed the door.  At some point a little

21  later she came back outside again, looked around,

22  returned back in the house and the blinds were up

23  and down and opened and closed on that house a few

24  times.

25  Q.   Okay.  Could you tell who was opening and

1  closing blinds?

2  A.    I could not tell.

3  Q.    But this female came out twice, as I understand,

4  sometime around 2:30?

5  A.    Yes.

6  Q.    Now, you stayed in your position, same place all

7  the time?

8  A.    Yes, sir.

9  Q.    Directing your attention to about 3:30 that

10  afternoon something happened about that time.

11  A.    Our emergency response unit arrived and served a

12  search warrant on the residence.

13  Q.    So you stayed with the residence continuously

14  that afternoon?

15  A.    Yes.

16  Q.    And specifically you stayed there after the

17  maroon Buick left to make sure that nobody was

18  coming or going from the residence?

19  A.    Yes.

20  Q.    And that search warrant was served at about

21  shortly before 3:30 that afternoon?

22  A.    2:25, yes.

23  Q.    At any time during the course of your

24  observations of the driver on, I think, three

25  different occasions that you referred to the driver

1  of this maroon Buick, were you ever in a position to
2  be close enough to identify who that driver was on
3  these three dates?
4  A.   I was not.
5          MR. MURPHY:  Thank you, Judge.  That
6  concludes my questioning of Sergeant Bays.
7          MR. SERRITELLA:  I have no questions, Your
8  Honor.
9          THE COURT:  All right.  Witness is excused.
10         MR. MURPHY:  Judge, both of our next two
11 witnesses are going to be somewhat lengthy.  We are
12 happy to go head and start them if you want to if
13 you have an ending time you want to get to, but I
14 want to let you know that unless you're planning on
15 going past 6:00, I don't think we are going to get
16 done with the next witness.
17         THE COURT:  All right.  We will start back
18 Tuesday morning then.
19         (Which were all of the proceedings had in
20         this case on this date.)
21
22
23
24
25